**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| MARRIOTT INTERNATIONAL, INC.,<br>10400 Fernwood Road<br>Bethesda, Maryland 20817,<br><br>     Plaintiff,<br><br>v.<br><br>Dynasty Marketing Group LLC,<br>773 South Kirkman Rd<br>Orlando, Florida 32811,<br><br>  SERVE:<br>  Bruno Borra<br>  6100 Lake Ellenor Drive 258<br>  Orlando, FL 32805<br><br>Rapid Eagle Inc., d/b/a VoIP Essential,<br>355 W Olive Ave, Ste 212,<br>Sunnyvale CA 94086,<br><br>  SERVE:<br>  Tushar Ram Kothalkar<br>  1093 E Homestead Rd<br>  Sunnyvale, CA 94087<br><br>Whisl Telecom, LLC,<br>5435 N. Garland Ave.<br>Suite #140-507<br>Garland, TX 75040,<br><br>  SERVE:<br>  Lindy Cairns, Chief Financial Officer<br>  1105 VZ County Road 3104<br>  Edgewood, Texas 75117<br><br>PrestigeDRVoIP.Com Inc.<br>1028 Spring Garden St<br>Allentown, PA 18102, | Civil Action No. 1:21-cv-00610-AJT/JFA |

SERVE:
New York Department of State
One Commerce Plaza
99 Washington Ave.,
Albany, New York 12231-0001

Vacancy Rewards, LLC
2692 SW 137th Ave,
Miami, Florida 33175,

SERVE:
Avel A Gonzalez PA
Registered Agent
2688 S.W. 137th Ave
Miami, FL 33175,

Cancun Ink Corp., S.A. de C.V.,
ROSAS NO22 MZA. 24 SM. 22, Cancun
Centro 77500 Benito Juarez, Quintana Roo,

SERVE:
Ministry of Foreign Affairs, Directorate-
General of Legal Affairs
Plaza Juárez No. 20, Planta Baja
Col. Centro, Alcaldía Cuauhtémoc
C.P. 06010 Ciudad de México
Mexico

Oficinas PARROT CARIBBEAN S.A. de
C.V. MONTECITO 38 PISO 33 OFICINA
21 Napoles Benito Juárez 3810,

SERVE:
Ministry of Foreign Affairs, Directorate-
General of Legal Affairs
Plaza Juárez No. 20, Planta Baja
Col. Centro, Alcaldía Cuauhtémoc
C.P. 06010 Ciudad de México
Mexico

Deep Blue Desarrollos S. de R.L. de C.V.,
d/b/a Vallarta Gardens Private Beach Club
& Spa Private Residence Club, Paseo Diaz
Ordaz No. 530, Centro, Puerto Vallarta,

SERVE:
Ministry of Foreign Affairs, Directorate-
General of Legal Affairs
Plaza Juárez No. 20, Planta Baja
Col. Centro, Alcaldía Cuauhtémoc
C.P. 06010 Ciudad de México
Mexico

Club Caribe Villa Del Palmar, S.A. de C.V.,
Xcaret, Manzana 2, Lote 5, Local 20,
Supermanzana 35, Benito Juárez, Quintana
Roo,

SERVE:
Ministry of Foreign Affairs, Directorate-
General of Legal Affairs
Plaza Juárez No. 20, Planta Baja
Col. Centro, Alcaldía Cuauhtémoc
C.P. 06010 Ciudad de México
Mexico

ResortCom International, LLC
6850 Bermuda Rd., Las Vegas, NV 89119,

SERVE:
Resident Agents of Nevada, Inc.
711 S. Carson St. Ste. 4
Carson City, Nevada 89701,

and John Does,

    Defendants.

## FIRST AMENDED COMPLAINT

Plaintiff Marriott International, Inc. ("Marriott" or "Plaintiff"), by counsel, alleges as follows for its First Amended Complaint against Defendants Dynasty Marketing Group LLC ("DVC"), Rapid Eagle Inc., d/b/a VoIP Essential ("Rapid Eagle"), Whisl Telecom LLC ("Whisl"), PrestigeDRVoIP.Com Inc. ("Prestige"), Vacancy Rewards, LLC ("Vacancy Rewards"), Cancun

Ink Corp., S.A. de C.V. ("Cancun Ink"), Parrot Caribbean S.A. de C.V. ("Parrot Caribbean"), Deep Blue Desarrollos S. de R.L. de C.V. ("Vallarta Gardens"), Club Caribe Villa Del Palmar, S.A. de C.V. aka Tafer Resorts ("Tafer Resorts"), ResortCom International, LLC ("ResortCom"), and additional, unidentified John Does (collectively, "Defendants"), seeking the disabling of robocall scams that violate consumers' rights and infringe upon Marriott's goodwill and valuable trademark rights.

## NATURE OF THE SUIT

1.      This is an action for damages and injunctive relief stemming from Defendants' trademark infringement, trademark counterfeiting, trademark dilution, unfair competition, false designation of origin, and false advertising under the Lanham Act, 15 U.S.C. §§ 1114(1) & 1125(a), engagement in deceptive and abusive telemarketing practices under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108, and the Telemarketing Sales Rule, 16 C.F.R. § 310, unfair competition under the Virginia Consumer Protection Act, VA. CODE ANN. § 59.1-200, false advertising under VA. CODE ANN. § 18.2-216, as well as common law tortious interference and conspiracy.

2.      Marriott files this First Amended Complaint to address the unauthorized use and abuse of its brand name "Marriott" by a network of intertwined entities located within and outside of the United States, including a tangled web of timeshare resorts, timeshare resort groups, timeshare exchange companies, timeshare marketing organizations, and their service providers, associating for the purpose of profiteering from deceptive robocall scams at the expense of Marriott, its customers, and other consumers.  Without Marriott's authorization or consent, Marriott's valuable rights in its famous and distinctive MARRIOTT trademarks have been deliberately infringed upon through Defendants' unauthorized use of the MARRIOTT name and

trademarks while telemarketing promotions via fraudulent robocalls.  Monetizing these robocalls misusing Marriott's name and marks, Defendants entice consumers, and specifically target consumers located in Virginia and within this District, to purchase promotions from Defendants, entities that are not authorized by or affiliated with Marriott.

3.     As a result of Defendants' deceptive practices (financially benefitting Defendants at the expense of Marriott), consumers are dissatisfied with Defendants' schemes and/or telemarketing practices and often with the vacation packages marketed by Defendants.  Because consumers are confused as to the origin of the robocalls and/or vacation packages, they inaccurately believe Marriott is to blame for the robocalls and/or inferior-quality vacation packages, direct their frustrations and complaints toward Marriott, and refrain from doing further business with Marriott.  The tangled web of entities involved in this scheme is reflected in the following diagram:

## Relationships Between Defendants

**Resorts**

Resorts are the principal cog in the schemes:
- 1) *Hire telemarketers* to generate consumer leads using brand name "Marriott".
- 2) *Use Payment Processors* to process payments from leads;
- 3) *Sell vacation packages to leads* that also benefit the *Exchanges*.

**Payment Processors**

Payment Processors process payments for Resorts involving consumer purchases based on use of brand name "Marriott":
- Vacation packages for short trips to the Resort, and
- Vacation packages at the Resort.

Payment Processors may sometimes process payments from the consumer to the telemarketers.

**Telemarketers**
- Paid by Resorts to generate millions of robocalls to close consumer leads to visit their resorts for a vacation pitch using brand name "Marriott".
- Even if only a small % of consumers buy a package (e.g., >1%), Resorts obtain a return on investment.

**Exchanges**

Based on use of brand name "Marriott" Exchanges sell or process excess room capacity from Resorts to consumers subscribing to their service (consumers generally pay the Exchange an annual fee and processing charges).

**VoIP Providers**

Telemarketers hire VoIP providers to originate lead generation robocalls using brand name "Marriott".
- VoIP providers can generate *tens of millions of monthly robocalls* to consumers.
- Each call costs *a fraction of a penny*, meaning millions of calls can be made for a small cost to the Telemarketer.

Press '1'

When a consumer presses '1' to speak to an operator, they are connected to a CSR in a call center that 'closes' the deal and sells a package to the Resort to the unsuspecting consumer.

4.     Defendants' unauthorized use of Marriott's name and trademarks thus harms Marriott's goodwill, tarnishes Marriott's trademarks, and interferes with Marriott's business relationships with its customers.

5.     Additionally, robocalls are not merely an annoyance to consumers but a pervasive problem that disrupts and disturbs consumers' lives on an enormous scale—American consumers received an estimated 50 billion robocalls in 2021.

6.     Marriott's exclusive rights are being violated and the consuming public is being misled and confused by Defendants' misconduct.  As a result, Marriott and the consuming public will suffer irreparable harm unless this Court acts swiftly to halt the unauthorized and fraudulent use of the Marriott trademarks.

## **PARTIES**

7.     Plaintiff Marriott is a Delaware corporation with a principal place of business at 10400 Fernwood Road, Bethesda, Maryland 20817.  Marriott owns a large family of trademarks consisting of or containing MARRIOTT.

8.     Defendants reside within and outside of the United States.  Defendants conduct business throughout the United States, including within this District, by perpetuating a years-long, abusive robocall scam utilizing tens of millions of robocalls that victimize residents located in the District, many of whom are or were Marriott customers, and harms Marriott in the District.  The Defendants purposefully avail themselves of doing business in Virginia by telemarketing or causing telemarketers to market vacation packages via deceptive robocalls to residents of this District, many of whom are or were Marriott customers.  These Defendants reference Marriott without Marriott's authorization to legitimize their fraudulent scam with the goal of deceiving consumers into purchasing vacation packages.  Other Defendants facilitate and support the

robocall scam by providing necessary services, including but not limited to marketing material, payment processing, and voice over internet protocol ("VoIP") services.

9.      DVC is a Florida timeshare resort marketing entity.

10.     Rapid Eagle is a VoIP provider incorporated in California.

11.     Whisl is Texas-based small business that provides VoIP services.

12.     Prestige is a VoIP provider located in New York.

13.     Vacancy Rewards is a timeshare a vacation exchange website located in Florida and operating in both Florida and Mexico.

14.     Cancun Ink is a telemarketer located in Mexico.

15.     Parrot Caribbean is a telemarketer located in Mexico.

16.     Vallarta Gardens is a timeshare resort located in Mexico.

17.     Tafer Resorts is a timeshare resort group located in Mexico.

18.     ResortCom provides timeshare-related services and is incorporated in Nevada.

19.     Defendants John Does are additional persons of unknown identity who initiated and/or currently operate, facilitate, or benefit from robocall scams that misuse the MARRIOTT name and trademarks.

## JURISDICTION, VENUE AND JOINDER

20.     This Court has original jurisdiction over Plaintiff's Lanham Act, 15 U.S.C. §§ 1114(1) & 1125(a), claims under 15 U.S.C. §§ 1121(a), 1125(d) and 28 U.S.C. §§ 1331 and 1338(a).  The Court has original jurisdiction over Plaintiff's Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108, and Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310, claims under 15 U.S.C. § 6104(a), as well as 28 U.S.C. § 1331.

21.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28

U.S.C. § 1367.

22.     The Court has *in personam* jurisdiction over Defendants because Plaintiff's claims against Defendants for trademark infringement, trademark counterfeiting, trademark dilution, false designation of origin, false advertising, violations of the TSR, deceptive and abusive telemarketing practices, and unfair competition are based on Defendants' unauthorized use of the Marriott name and trademarks in the direct or indirect marketing, solicitation, and sale of promotions purported to be affiliated with Marriott through the use of fraudulent robocalls to consumers located in this District.  For those Defendants not located in this District, they too are subject to specific personal jurisdiction in this District based on their conduct connected to this suit.  Defendants maintain sufficient minimum contacts that do not offend traditional notions of fair play and substantial justice and also satisfy Virginia's long-arm statute, *see* VA. CODE ANN. § 8.01-328.1.

23.     Defendants have specifically targeted Marriott customers and other consumers located in this District by directly or indirectly marketing, soliciting, and selling them vacation packages and referencing Marriott, without Marriott's permission, to lend legitimacy to and effectuate their misleading robocall scheme.  Between October 12, 2018, and the present, Defendants collectively delivered an estimated 71.2 million robocalls purporting to be from Marriott to consumers throughout the United States.  During that same timeframe, it is estimated that Defendants delivered 1.4 million robocalls purporting to be from Marriott to consumers in this District.  Defendants have targeted their activities toward Virginia by directly or indirectly marketing, soliciting, and selling promotions to consumers and harming Marriott's brand in this District.  Each indirect or direct act of deceptive marketing, soliciting, and sale of promotions to consumers located in this District that includes unauthorized references to Marriott causes harm to Marriott in this District.  Accordingly, each of the Defendants is directly or indirectly committing

tortious acts against both Marriott and its customers in Virginia, engaging in interstate commerce, and have wrongfully caused and continue to cause Marriott and Virginia-based consumers substantial injury in this District.

24.     Defendants made numerous calls into Virginia from which the Marriott claims arise, including:

- Defendant Group 1 (defined below) directly or indirectly placed approximately 1.4 million "Marriott" robocalls to Virginia residents.

- Defendant Group 2 (defined below) targeted Virginia residents with approximately 96,000 "Marriott" robocalls.

- The Mexico-based telemarketers placed an estimated 714,000 campaign-matched calls to consumers in this District between February 2, 2021 and May 16, 2021, a timeframe during which the two VoIP providers Whisl and Prestige originated or routed at least a portion of those calls.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

26.     Joinder of the Defendants is proper under Fed. R. Civ. P. 20(a)(2) in that the claims set forth herein arise out of the same series of transactions and the same questions of law are common to all of the Defendants. Specifically, Marriott has incontestable rights in the MARRIOTT mark. Domestic and international Defendants conspired to wrongfully profit off of the MARRIOTT mark without authorization through the fraudulent and deceptive marketing of vacation packages. Defendants' conduct confuses the public, harms Marriott's brand, and damages Marriott's long-established goodwill.

## MARRIOTT'S RIGHTS

27.     J. Willard Marriott, Sr. and Alice Marriott launched Marriott in 1927, and the family has been involved in the business for over 90 years. Their son, J. Willard Marriott, Jr., recently retired as Executive Chairman and Chairman of the company's Board of Directors and

has assumed the role of Chairman Emeritus, and their grandson, David Marriott, is the current Chairman of the Board of Directors. Their granddaughter, Deborah Marriott Harrison, is a member of the Board of Directors. This family-oriented business has developed from a root beer stand in Washington, D.C. into the largest hotel company in the world.[1]

28.     Marriott entered the hotel business in 1957 and became a global enterprise over the next twenty-five years under Bill Marriott's leadership.

29.     Marriott operates, franchises, and licenses hotel and residential properties on a worldwide scale.

30.     To date, Marriott owns 30 brands with more than 7,900 hotel and residential properties in 139 countries and territories.[2]

31.     Consumers around the world have come to associate the Marriott name as one of the most influential and recognized hotel brands in the world.

32.     Marriott promotes its products and services throughout the United States and the world under its Marriott formative trademarks including word marks and design marks (collectively the "MARRIOTT Marks"). This includes Marriott's use of the MARRIOTT word

---

[1]     *See Our Story of Innovation*, MARRIOTT INTERNATIONAL, https://www.marriott.com/about/culture-and-values/history.mi (last visited Apr. 27, 2022); Marriott Int'l, Inc., Annual Report (Form 10-K) (Feb. 15, 2022); *David Marriott Named Chairman of the Board at Marriott International, Inc. in Bethesda*, HOSPITALITYNET (Feb. 14, 2022),https://www.hospitalitynet.org/appointment/79023392.html; *Leadership*, MARRIOTT INTERNATIONAL, https://news.marriott.com/leadership/deborah-marriott-harrison (last visited May 1, 2022).

[2]     *See Marriott International Celebrates its 1,000th Hotel in Europe, Middle East and Africa*, MARRIOTT NEWS CENTER (Apr. 25, 2022), https://news.marriott.com/news/2022/04/25/marriott-international-celebrates-its-1-000th-hotel-in-europe-middle-east-and-africa; Marriott International, Inc., Annual Report (Form 10-K) (Feb. 18, 2022), https://marriott.gcs-web.com/static-files/621fefe9-1305-4d73-9a6d-560ff19b826f.

mark in its domain name www.marriott.com, as well as Marriott's use of the MARRIOTT Marks throughout its website.

33.     Marriott uses the MARRIOTT Marks to indicate the source of its high-quality hotel-related, lodging, residential, and hospitality services.  Consumers have come to distinguish Marriott's goods and services as a result of the use and widespread promotion of the MARRIOTT Marks.

34.     Third parties may only use MARRIOTT Marks with the express permission and authority of Marriott.

35.     The MARRIOTT Marks are entitled to common law trademark rights.

36.     The MARRIOTT Marks are famous and/or distinctive throughout the United States and the world in connection with Marriott's products and services.

37.     The MARRIOTT Marks include a number of word marks that are registered around the world, including on the Principal Trademark Register of the U.S. Patent and Trademark Office. Marriott has also registered some stylized design marks with the United States Patent and Trademark Office and elsewhere for use in connection with its MARRIOTT branded products and services.   The following is a representative sampling of Marriott's U.S. federal trademark registrations for the MARRIOTT Marks, including both word marks and stylized design marks:

| REG. NO. | MARK | REG. DATE | REGISTERED SERVICES |
|---|---|---|---|
| 6131145 | **MARRIOTT BONVOY** | August 18, 2020 | 35 - Administration of an incentive award program that allows members to redeem points for accommodations and travel-related goods, services, and experiences; administration of an incentive award program that allows members to redeem points for awards offered by other loyalty programs; promoting hotel, resort, airline, car rental, time share, travel, and vacation services through an incentive award program; business organization, operation and supervision of loyalty programs 36 - Real estate timesharing services featuring an incentive award program; real estate listing, rental and leasing services for residential housing, apartments, rooms in homes, vacation homes, and villas featuring an incentive award program; |

| REG. NO. | MARK | REG. DATE | REGISTERED SERVICES |
|---|---|---|---|
| | | | issuance of credit cards; credit card authorization, verification, payment processing, and transaction processing services<br>43 - Hotel services featuring an incentive award program; hotel reservation services for others |
| 6148202 | MARRIOTT BONVOY | September 8, 2020 | 35 - Advertising, business management, business administration; incentive award programs, namely, programs to promote hotel, resort, airline, car rental, time share, travel, and vacation services of others; business administration of consumer loyalty programs<br>36 - Real estate timesharing services featuring an incentive award program; real estate listing, rental and leasing services for residential housing, apartments, rooms in homes, vacation homes, and villas featuring an incentive award program; credit card services<br>43 - Services for providing food and drink; temporary accommodation; hotel services featuring an incentive award program; hotel reservations |
| 6165523 | EAT AROUND TOWN BY MARRIOTT BONVOY | September 29, 2020 | 35 - Business administration of a customer loyalty program; providing incentive award programs for customers whereby program points are awarded for purchases made from participating businesses<br>43 - Restaurant and bar services featuring a customer loyalty program; hotel services featuring a customer loyalty program whereby program points are awarded for purchases made from participating restaurants and bars |
| 6054331 | MARRIOTT BONVOY BOLD | May 12, 2020 | 36 - Issuance of credit cards; credit card authorization, verification, payment processing, and transaction processing services |
| 6054323 | MARRIOTT BONVOY BOUNDLESS | May 12, 2020 | 36 - Issuance of credit cards; credit card authorization, verification, payment processing, and transaction processing services |
| 6054322 | MARRIOTT BONVOY BRILLIANT | May 12, 2020 | 36 - Issuance of credit cards; credit card authorization, verification, payment processing, and transaction processing services |
| 6054321 | MARRIOTT BONVOY BUSINESS | May 12, 2020 | 36 - Issuance of credit cards; credit card authorization, verification, payment processing, and transaction processing services |
| 5449114 | MARRIOTT VACATION CLUB PULSE | April 17, 2018 | 36 - Real estate services, namely, management, financing, brokerage, and leasing of timeshare properties; arranging of time share exchanges; arranging of time share holidays; real estate services, namely, management, financing, brokerage, and leasing of residential properties<br>43 - Hotel services; restaurant, catering, bar and lounge services; resort and lodging services; provision of general-purpose facilities for meetings, conferences and exhibitions; provision of banquet and social function facilities for special occasions; and reservations services for hotel accommodations for others |
| 5395064 | MARRIOTT | February 6, 2018 | 44 - Spa services, namely, providing facial, hair, skin and body treatments, manicure and pedicure services, massage services, body waxing services and beauty salon services |

| REG. NO. | MARK | REG. DATE | REGISTERED SERVICES |
|---|---|---|---|
| 5238192 | JW MARRIOTT | July 4, 2017 | 36 - Real estate services, namely, listing, leasing, brokerage and management of condominium residential units; real estate financing |
| 4550796 | MARRIOTT GOLF ACADEMY | June 17, 2014 | 41 - Golf club services; golf courses; golf instruction; providing golf facilities |
| 4539498 | M | May 27, 2014 | 43 - Hotel services; restaurant, catering, bar and cocktail lounge services; resort lodging services; provision of general-purpose facilities for meetings, conferences and exhibitions; provision of banquet and social function facilities for special occasions; and reservations services for hotel accommodations for others |
| 4353159 | EXPERIENCES BY MARRIOTT | June 18, 2013 | 43 - Hotel services; restaurant, bar and cocktail lounge services; resort lodging services; and reservations services for hotel accommodations |
| 3715294 | MARRIOTT RESORTS | November 24, 2009 | 41 - Health club services, namely, providing consultation in the field of physical exercise; providing use of exercise equipment; providing fitness and exercise facilities; golf club, golf course and golf instruction services<br>43 - Hotel services; restaurant, catering, bar and cocktail lounge services; resort lodging services; provision of general purpose facilities for meetings, conferences and exhibitions; provision of banquet and social function facilities for special occasions; and reservation services for hotel accommodations for others<br>44 - Health spa services, namely, providing facial, hair, skin and body treatments, manicure and pedicure services, massage services, body waxing services and beauty salon services |
| 3628880 | MARRIOTT | May 26, 2009 | 09 - Computer programs, software, applications and systems, and accompanying user manuals, all for use in the hotel, lodging and hospitality industries, namely, computer software for managing the operations of hotels, lodging and hospitality facilities, computer software for financial accounting functions, computer software for financial analysis, namely, aggregating and analyzing data generated by customer transactions and preparing related reports, computer software for inventory control, delivery, scheduling and management, educational software featuring instruction in hotel, lodging and hospitality management, computer software for payroll processing and for managing human resource data, computer software for record-keeping functions in the hotel, lodging and hospitality operations; computer programs for the enabling of access or entrance control; computer carrying cases<br>38 - Providing multiple-user access to a global computer information network |
| 3639547 | MARRIOTT GRAND RESIDENCE CLUB | June 16, 2009 | 43 - Hotel, restaurant, catering, bar and lounge services; provision of general purpose facilities for meetings, conferences and exhibitions; reservation services for hotel accommodations for others |
| 3639546 | MARRIOTT GRAND RESIDENCE CLUB | June 16, 2009 | 36 - Real estate services, namely, financing, management, brokerage and leasing of timeshare properties |
| 3639551 | JW MARRIOTT | June 16, 2009 | 41 - Health club services, namely, providing instruction and consultation in the field of physical exercise; providing use of exercise equipment; providing fitness and exercise facilities; golf club, golf course and golf instruction services |

| REG. NO. | MARK | REG. DATE | REGISTERED SERVICES |
|---|---|---|---|
| | | | 43 - Hotel services; restaurant, catering, bar and lounge services; resort and lodging services; provision of general purpose facilities for meetings, conferences and exhibitions; provision of banquet and social function facilities for special occasions; and reservation services for hotel accommodations<br>44 - Health spa services, namely, providing facial, hair, skin and body treatments, manicure and pedicure services, massage services, body waxing services and beauty salon services |
| 2714665 | MARRIOTT GRAND RESIDENCE CLUB | May 6, 2003 | 43 - Hotel services; provision of facilities for meetings; reservation services for hotel accommodations |
| 2714666 | MARRIOTT GRAND RESIDENCE CLUB | May 6, 2003 | 36 - Real estate services, namely financing, management, brokerage and leasing of timeshare properties |
| 3638115 | MARRIOTT | June 16, 2009 | 41 - Golf club services; Golf courses; Golf instruction; Providing golf facilities |
| 3948765 | MARRIOTT VACATION CLUB DESTINATIONS | April 19, 2011 | 36 - Real estate services, namely, financing, brokerage, leasing and real estate agency services in the field of timeshare properties; arranging of time share exchanges; arranging of time share holidays |
| 3445053 | MARRIOTT VACATION CLUB | June 10, 2008 | 36 - Real estate time-sharing |
| 3569086 | MARRIOTT | February 3, 2009 | 35 - Online retail store and mail order catalog services featuring apparel, household goods, linens, bedding products, towels, interior furnishings, personal care products, plush toys, music recordings; Retail store services, namely, gift shop, souvenir and convenience store services |
| 3491986 | MARRIOTT | August 26, 2008 | 35 - Charitable services, namely, employment counseling and assistance in obtaining and maintaining employment provided to individuals and employers; counseling in the field of employment; coordinating volunteers for community service |
| 3491985 | MARRIOTT | August 26, 2008 | 36 - Charitable fund raising services; providing financial support to charitable, family services and health-related organizations; provision of in-kind contributions to public and private entities and individuals; providing educational scholarships and grants to educational institutions |
| 3006123 | M | October 11, 2005 | 43 – Hotel, restaurant, catering, bar and lounge services; provision of facilities for meetings, conferences and exhibitions; reservations services for hotel accommodations |
| 2509272 | MARRIOTT VILLAGE | November 20, 2001 | 43 - Hotel services, restaurant, catering, bar and lounge services; provision of facilities for conferences, meetings and exhibitions; reservation services for hotel accommodations for others |
| 2504099 | MARRIOTT | November 6, 2001 | 42 - Hotel, restaurant, catering, bar and lounge services; provision of facilities for meetings, conferences and exhibitions; reservation services for hotel accommodations |
| 2393255 | JW MARRIOTT | October 10, 2000 | 42 - Hotel, restaurant, catering, bar and lounge services; provision of facilities for meetings, conferences and exhibitions; making hotel * reservations * for others |
| 2426714 | DESTINATIONS BY MARRIOTT | February 6, 2001 | 41 - Special event planning and production services |

| REG. NO. | MARK | REG. DATE | REGISTERED SERVICES |
|---|---|---|---|
| 2384222 | **MARRIOTT EXECUTIVE APARTMENTS** | September 5, 2000 | 36 - Real estate services, namely, rental and management of serviced apartments |
| 2380065 | **MARRIOTT EXECUTIVE APARTMENTS** | August 22, 2000 | 42 - Hotel, [restaurant, catering, bar and lounge] services; [provision of facilities for meetings, conferences and exhibitions;] reservation services for hotel accommodations |
| 2343578 | **MARRIOTT SUITES** | April 18, 2000 | 43 - Hotel, restaurant, catering, bar and lounge services; provision of facilities for meetings, conferences and exhibitions; reservation services for hotel accommodations |
| 1576776 | **MARRIOTT** | January 9, 1990 | 36 – Real estate timesharing services |
| 1566496 | **M** | November 14, 1989 | 42 – Hotel, restaurant, catering services |
| 1277443 | **MARRIOTT HOTEL** | May 8, 1984 | 43 – Hotel Services |
| 1277442 | **MARRIOTT HOTELS** | May 8, 1984 | 43 – Hotel Services |
| 0904029 | **MARRIOTT** | December 8, 1970 | 43 – Hotel and restaurant services |
| 0899900 | **MARRIOTT** | September 29, 1970 | 43 – Hotel and restaurant services |

38.     A true and correct copy of a representative sample of U.S. trademark registrations owned by Marriott for the MARRIOTT word marks is attached hereto as Exhibit A.

39.     A true and correct copy of a representative sample of U.S. trademark registrations owned by Marriott for the MARRIOTT stylized design marks is attached hereto as Exhibit B.

40.     Many of Plaintiff's registered MARRIOTT Marks have obtained incontestable status pursuant to 15 U.S.C. § 1065.

41.     Plaintiff's incontestable federal registrations for the MARRIOTT Marks are *conclusive* evidence of the validity of the marks, of Marriott's ownership of the marks, and of Marriott's exclusive right to use the marks in U.S. commerce.

42.     Marriott regularly utilizes its valuable MARRIOTT Marks and conducts business in Virginia.

43.     Marriott currently operates approximately 200 properties in Virginia.

44.     Additionally, in 2019, Marriott unveiled its "travel program designed to bring to

life Marriott's extraordinary portfolio of global brands. . . , while also providing endless inspiration

for members to keep traveling and pursuing their passions"—Marriott Bonvoy.[3]  Nearly 3 million

Marriott Bonvoy members reside in Virginia.  At least three of the Virginia victims referenced in

this First Amended Complaint are Marriott Bonvoy members.

45.    Defendants' ongoing conduct harms Marriott's current and future business

operations in Virginia.

## **BACKGROUND**

46.    Generally, telemarketing calls "interfere with [consumers'] lives, tie up their phone

lines, and cause confusion and disruption on phone records."  *Krakauer v. Dish Network, LLC*,

925 F.3d 643, 649 (4th Cir. 2019).   Robocalls using brand names such as "Marriott"

simultaneously harm the owner of the brand and company goodwill as unsuspecting consumers

misdirect their outrage about fraudulent robocalls—often by posting on online forums—at Marriott

rather than the Defendants.

47.    Pertinent here is a specific type of telemarketing:  the robocall and/or the improper

use of Marriott's name or brand.

48.    The pervasive and unwelcome violation of consumers' rights is felt not only on a

national scale but also here in Virginia.  The National Consumer Law Center reported that in 2020,

1,206,317,000 robocalls were made to consumers located in Virginia.  And with respect to 2022,

about 400 million robocalls already have been made to consumers located in Virginia.

49.    In response to the mounting "public criticism of abusive telephone marketing

---

[3] *Marriott International Announces Marriott Bonvoy—The New Brand Name of Its Loyalty Program*, MARRIOTT INTERNATIONAL (Jan. 16, 2019), https://news.marriott.com/news/2019/01/16/marriott-international-announces-marriott-bonvoy-the-new-brand-name-of-its-loyalty-program.

practices" and American "outrage[] over the proliferation of intrusive, nuisance calls to their homes from telemarketers," Congress enacted the Telephone Consumer Protection Act of 1991 ("TCPA").  *Krakauer*, 925 F.3d at 649 (citing and quoting 47 U.S.C. § 227 note (Congressional Statement of Findings) (2012)).

50.      In so doing, Congress sought to "strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms.'"  *Id*. (citing 47 U.S.C. § 227 note (Congressional Statement of Findings) (alteration in original)).

51.      The TCPA authorized the Federal Trade Commission ("FTC"), a federal agency whose mission is to safeguard consumers' rights, to develop protective rules.  One such rule is the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.  The TSR imposes several restrictions on telemarketers—requiring them, *inter alia*, to make certain disclosures, obey time restrictions, and refrain from calling consumers who have asked not to be called by that particular seller.

52.      The TSR also prohibits people from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing[4] that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule."  Section 310.3(b).  Those acts may include:

> providing lists of contacts to a seller or telemarketer that identify persons over the age of 55, persons who have bad credit histories, or persons who have been victimized previously by deceptive telemarketing or direct sales; providing any certificate or coupon which may later be exchanged for travel related services; providing any script, advertising, brochure, promotional material, or direct marketing piece used in telemarketing; or providing an appraisal or valuation of a

---

[4] The FTC explained that the "conscious avoidance" standard was "intended to capture the situation where actual knowledge cannot be proven, but there are facts and evidence that support an inference of deliberate ignorance."  Statement of Basis, 68 Fed. Reg. at 4580, 4612 (Jan. 29, 2003) (codified at 16 C.F.R. § 310).  An example of such a circumstance includes when a fulfillment house ships "only inexpensive prizes on behalf of a telemarketer about whom it receives numerous complaints."  *Id*.

good or service sold through telemarketing when such an appraisal or valuation has no reasonable basis in fact or cannot be substantiated at the time it is rendered.

Statement of Basis, 60 Fed. Reg. at 43,842, 43,852 (Aug. 23, 1995).  Another act not enumerated above that violates the TSR includes "providing [] merchant accounts to [an entity] despite a slew of red flags indicating [that the entity] was engaged in a fraudulent telemarketing scheme."  *See, e.g.*, *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1239 (11th Cir. 2017).

53.     For example, Adrian Abramovich "made 96,758,223 illegally spoofed robocalls during a three-month period in 2016 in violation of the Truth in Caller ID Act of 2009 (['']Truth in Caller ID Act[']) and the [Federal Communications] Commission's rules . . . ."[5] *In re Abramovich*, 33 FCC Rcd. 4663 (2018).  The prerecorded message concerned vacation deals offered by well-known travel or hospitality companies, including Marriott.  *Id*. at 4664.  The FCC imposed a $120,000,000.00 fine against Abramovich for spearheading "one of the largest spoofed robocall campaigns that the [FCC] has ever investigated."  *Id*. at 4663.

54.     The FCC also recently assessed a forfeiture in the amount of $225,000,000.00 against John C. Spiller and Jakob A. Mears for making one billion spoofed robocalls over four months in violation of the same Act.  *In re Spiller*, 36 FCC Rcd. 6225, 6226 (2021).  The prerecorded messages concerned the sale of health-insurance plans and contained false or misleading caller ID information and falsely implied that Spiller and Mears's company was associated with well-known health-insurance companies.  *Id*. at 6627-28.

55.     The FCC announced on February 17, 2022, that it had issued more than a dozen cease-and-desist letters to companies involved in the transmission of abusive and deceptive

---

[5] "Spoofing" is defined as "falsifying caller ID Information with the intent to defraud, cause harm, or wrongfully obtain anything of value."  *Abramovich*, 33 FCC Rcd. 4663.

robocalls.[6]

56.     Despite the staggering consequences of these federal enforcement actions, Defendants remain undeterred and continue their fraudulent robocall scams.

57.     Although laws have been enacted and rules have been promulgated, "robocalls remain a significant consumer protection problem and one of consumers' top complaints to the [FTC]."[7]

58.     "Through the first nine months of Fiscal Year 2020, the FTC received more than 2.7 million complaints about unwanted calls, including 1.9 million complaints about robocalls."[8]

## **DEFENDANTS' UNLAWFUL CONDUCT**

59.     This case is about robocallers that utilize deceptive and abusive practices to secure sales of vacation packages.  These Robocallers attempt to establish legitimacy of their promotion and seek to induce consumers to remain on the line by falsely claiming to be associated with a well-known brand or claim an affiliation with a well-known brand, resulting in consumer confusion.

60.     Defendants have deployed several robocall scams targeting Marriott, Marriott customers, and consumers in this District wherein Defendants use the MARRIOTT Marks without authorization and deceive consumers by falsely purporting to be Marriott or promoting packages

---

[6] *See FCC Continues to Send Cease-and-Desist Letters to Voice Service Providers Suspected of Facilitating Illegal Robocalls*, FCC (Feb. 17, 2022), https://www.fcc.gov/document/fcc-orders-more-robocall-enabling-providers-cease-and-desist.

[7] DEP'T OF JUSTICE, TELEPHONE ROBOCALL ABUSE CRIMINAL ENFORCEMENT AND DETERRENCE ACT 2020 REPORT TO CONGRESS 5 (2020) [hereinafter "DOJ Report"], https://www.justice.gov/opa/press-release/file/1331576/download.

[8] *Id.*

sponsored by Marriott.  Various iterations of these deceptive robocall scams targeting consumers in this District include but are not limited to the following:

- ***Thank you for choosing Marriott hotels***, we would like to inform you that because you have stayed at one of our properties[,] ***your telephone number was qualified by our booking system*** to receive an all[-]inclusive complimentary [stay].  [F]or further details[,] press zero now; to be placed on the do-not-call list[,] press two now.

- ***Thank you for choosing Marriott hotels***[.] **[W]e would like to inform you that thanks to** *the friends and family rewards program*, **your** *membership was drawn* **to receive a complimentary stay; for further details, press one now; to be placed on the do-not-call list, press two now.**

- Hi[,] this is an ***exclusive announcement from*** **Marriott Hotel**.  Your ***telephone number has been pre-selected*** to receive a complimentary stay in one of our five[-]star hotels.  [F]or further details[,] press one now.

- Hi, my name is Jennifer Kelly. You are receiving this call because you and your family are **previous guests** with the Hilton **and Marriott**. You are eligible to receive our members only free upgrade for our fourth of July day special from Hilton Grand vacation club.  Travel to our all[-]inclusive award-winning resorts in Cabo, Cancún, Tulum, Puerto Vallarta, and the Dominican Republic[,] Punta Cana, Panama, Costa Rica, and many other locations such as Dubai, Italy, Spain, Peru, Asia and over a hundred locations throughout the United States such as Orlando and Las Vegas just to name a few.  Call the number on your caller ID now for this amazing deal.  We have four vacations, four years for only 488. Plus, if you call the number on your caller ID now, receive a free four day and three[-]night trip in the U.S. Call now to receive your Hilton and **Marriott honors** free upgrade.

61.     In robocall scams involving unauthorized use of Marriott's name and the MARRIOTT Marks, Defendants often state that the consumer qualified for the promotion because he or she was either a member of Marriott's loyalty program, Marriott Bonvoy, recently stayed at a MARRIOTT brand hotel or resort, or was recommended to receive the promotion, and the Defendants often refer to 1-800 numbers and/or particular websites in an apparent attempt to legitimize the calls.

62.     The infringing robocalls were made or caused to be made by Defendants.

63.     Defendants wrongfully and misleadingly represent themselves as Marriott, falsely state that they are acting on behalf of Marriott, or indicate that they are associated with Marriott and use MARRIOTT Marks.

64.     Defendants have not entered into a licensing agreement with Marriott nor have Defendants obtained authorization to act on behalf of Marriott or to use MARRIOTT Marks.

65.     The promotions sold through the robocalls made by Defendants are not marketed by, sold by, endorsed by, or otherwise associated with Marriott.  Marriott is not affiliated with Defendants in any manner and has not permitted or authorized Defendants to use Marriott's name or the MARRIOTT Marks for any purpose.

66.     Based on Marriott's prefiling investigation, Defendants made or caused to be made approximately 1.5 million robocalls to consumers in this District between October 2018 and the present that referenced the MARRIOTT Marks without authorization.

67.     Many of Marriott's customers, including the victims referenced in this First Amended Complaint, were confused by the robocall scams and ultimately purchased the advertised promotions.

68.     Defendants' deceptive robocalls have caused, and continue to cause, harm to Marriott, including irreparable harm to Marriott's goodwill and reputation.

69.     Defendants intended to obtain, and did wrongfully obtain, unsuspecting Marriott customers' business by orchestrating and implementing these robocall scams.

70.     Defendants have used Marriott's name and the MARRIOTT Marks for their own financial benefit and have usurped the goodwill Marriott developed over almost a century.

### **Defendant Group 1**

71.     A resort (Vallarta Gardens), a resort group (Tafer Resorts), service providers

(ResortCom), telemarketers (Cancun Ink Corp. and Parrot Caribbean),[9] and a timeshare vacation exchange website (Vacancy Rewards) located primarily in Mexico, California, and Nevada act in concert with one another and with VoIP service providers (Whisl and Prestige) (collectively "Defendant Group 1") to orchestrate a highly profitable and deceptive robocall scam falsely trading on Marriott's brand to induce consumers located in the United States, including Virginia, to purchase vacation packages.

72.     The resort, resort group, timeshare exchange website, service providers, and VoIP providers either directly market vacation packages to consumers in the United States, including Virginia, facilitate such marketing, or obtain the services of third parties, including telemarketers, telemarketing lead providers, and auto dialers, to market the timeshare vacation packages on their behalf.  *See Affidavit of John Charles Payne*, Motion to Dismiss, Ex. 2 ¶ 5, *Shelton v. Resortcom Int'l, LLC*, No. 1:19-cv-01378 (N.D. Ohio Nov. 1, 2019), Dkt. No. 10.

73.     If contracting with a third-party telemarketing lead provider to market the vacation packages, once the lead provider directly connects with a consumer, the lead provider then transfers the call to the telemarketer who pitches the scam on behalf of the resort or resort group. *See id*. at ¶¶ 6-7.  The lead provider then sends pre-qualified customers to the resort or resort groups.  *See id*. at ¶¶ 8-9.

74.     Specific to this robocall scam, Defendants directly or indirectly market vacation packages at resorts associated with Vallarta Gardens and Tafer Resorts.  Defendant telemarketers also utilize a series of websites apparently intended to lend legitimacy to their marketing pitch (*e.g.*,          pricetravelvip.com,          BookVipAllInclusive.com,          5startravel.com.mx,

---

[9] Parrot Caribbean is a Mexico-based telemarketer that operates under various names, including Go Discover Mexico and Bookertop.

allinclusivebeachfronts.com).

75.     Structural overlaps among the Defendant Group 1 reflects coordination and shared knowledge.

76.     Defendant Group 1 shares corporate officers and board members.  Fernando Gonzalez Corona serves as a principal of Tafer Resorts.  Several board members of a timeshare exchange company that shares a corporate address with Resortcom are affiliated with Tafer Resorts (Robert Kistner and Fernando Gonzalez Corona) and ResortCom (two individuals, including ResortCom's Chief Operations Officer Dennis Morrissey and outside counsel Mark Nelson).[10]

████████████████████

77.     Many of the Defendants are aware of each other's participation in misleading robocalling but nevertheless maintain relationships with entities that have a history of wrongdoing and publicly acknowledge those affiliations, which further reflects coordinated conduct.

78.     Indeed, Tafer Resorts publicizes its affiliation with ResortCom which it "collaborate[s] [with] on a daily basis."

79.     Additionally, Tafer Resorts also maintains a broker list, which identifies many of the same telemarketers that have been associated with websites referenced in the deceptive robocalls (*e.g.*, website BookVipAllInclusive, which lists timeshare resorts Vallarta Gardens).

### 1.      Defendant Group 1 VoIP Providers

80.     VoIP providers assist and facilitate the furtherance of the robocall scam by enabling telemarketers to conduct their calls.

---

[10] *See Minutes*, UNIVERSAL VACATION CLUB ANNUAL MEETING OF THE MEMBERS (Sept. 10, 2021), https://myuvci.com/uploads/extras/2021Annual%20Meeting%20Minutes.pdf.

page

81.     The two VoIP providers involved in the robocall scam are fully aware of the unlawful nature of the fraudulent robocalls they originate and transmit given the volume of traceback requests they received, reflecting coordination and shared knowledge.  Whisl, a VoIP provider located in Texas, is the direct downstream provider to Prestige, meaning it directly accepted and transited the robocall traffic originated by Prestige, a Brooklyn-based VoIP provider.

82.     Marriott obtained Whisl's Call Detail Records ("CDRs")[11] reflecting traffic it directly received from Prestige.  During a three-month period, Whisl received over one billion calls from Prestige, which is a hallmark of call traffic associated with deceptive and abusive robocalls.  Whisl's CDRs reflect that Prestige routed 1.2 billion calls, 99.8% of which spanned thirty seconds or fewer, more than 75% were zero seconds in duration, and all of which reflected so-called "snowshoeing"[12] characteristics— approximately 80% of Prestige's calls used individual phone numbers for no more than two calls.  The Mexico-based telemarketers placed an estimated 714,000 campaign-matched calls to consumers in this District between October 12, 2018 and May 29, 2021, a timeframe during which the two VoIP providers originated or routed a portion of those calls.

83.     Prestige also has preexisting relationships with at least one of the international defendants—Mexico-based telemarketer Cancun Ink Corp.  In March of 2021, Prestige executed

---

[11] CDRs provide detailed information about each call's point of origin, the telephone numbers of the callers themselves, as well as the date, time, and duration of each call.

[12] Snowshoeing refers to a practice whereby a single telephone number is used to originate a very small number of calls (*e.g.*, the telephone number is only used once or twice).  *See* Lavinia Kennedy & Jim Tyrrell, *TNS Identity and Protection Services, 17* (Jan. 16, 2020) https://ecfsapi.fcc.gov/file/10122556718964/TNS_FCCJanuary%2016%202020.pdf          ("Bad actor[s] will spoof a local number but will spread those calls in high volume over several numbers each day over several days.").  Robocallers "spoof several numbers in low volumes in an attempt to avoid detection."  FCC, CONSUMER AND GOVERNMENTAL AFFAIRS BUREAU, CALL BLOCKING TOOLS NOW SUBSTANTIALLY AVAILABLE TO CONSUMERS: REPORT ON CALL BLOCKING, No. 17-59 (June 2020) at 23 n.250.

a Master Services Agreement with Cancun Ink Corp.

84.     Whisl, as well, is no stranger to the business of fraudulent robocalling.  Specifically, the Chief Executive Officer of Whisl, Omar Luna, is also the Chief Executive Officer of Globex, an entity subject to a recent FTC enforcement action for assisting and facilitating deceptive robocalls.  Between February 4, 2020 and April 13, 2021, companies that Mr. Luna controls have also received at least three warning letters from the FCC and FTC related to their transmission of misleading robocalls.

85.     Prestige, too, has originated abusive and deceptive robocalls.  The FCC publicly issued Prestige a Cease-and-Desist letter for facilitating fourteen robocalls associated with marketing vacation packages.

86.     Both Whisl and Prestige are specifically implicated in this robocall scam.  The Industry Traceback Group ("ITG")[13], the FCC's registered Traceback Consortium, conducted tracebacks at Marriott's request and during a five-month period, Prestige was identified in twenty-nine tracebacks involving Marriott robocalls from telemarketers involved in the robocall scam (e.g., Prestige originated calls from multiple entities involved in the robocalls, including Defendant Cancun Inc. Corp., a Mexican entity identified on the Consultant Broker List).

87.     Whisl is aware of its upstream provider's conduct as it pertains to this robocall scam because it has actual notice of ITG's traceback requests.[14]  Whisl made *de minimus* efforts, if any,

---

[13] ITG collaborates with "companies from across the wireline, wireless, VoIP, and cable industries . . . to trace, source, and ultimately, stop illegal robocalls."  *See What is the Industry Traceback Group?*, INDUSTRY TRACEBACK GROUP, https://tracebacks.org/ (last visited Apr. 22, 2022).

[14] *See Policies and Procedures at 8, Industry Traceback Group* (Apr. 2022), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://tracebacks.org/wp-content/uploads/2022/04/ITG-Policies-and-Procedures-Updated-Apr-2022.pdf (noting that "a notification is sent to the terminating Voice Service Provider whose customer received the Suspicious Traffic").

to mitigate Prestige's traffic related to the Marriott robocalls—a single email exchange with Prestige.  Additionally, during a three-month period between March and May of 2021, Whisl received nearly thirty traceback requests from the ITG in Whisl's capacity as direct downstream provider for Prestige's robocall traffic.  Moreover, Whisl's use of the Secure Traceback Portal ("STP") utilized by the ITG for conducting Prestige tracebacks required Whisl to comply with the ITG's terms of use.  ITG's Terms of Use require users to represent and warrant that it "understand[s] and, to the extent applicable, compl[ies] with the laws governing illegal robocalls, including but not limited to the [Telephone] Consumer Protection Act (TCPA) and the Truth in Caller ID Act of 2009, see 47 U.S.C. § 227 and the FCC's implementing rules, the Telemarketing Sales Rule, see 16 CFR § 310, [and] the Wire Fraud Statute, see 18 U.S.C. § 1343."  To the extent Whisl could not make those representations and warranties, the ITG's Terms of Use stated that Whisl "must not access or use the STP."  Whisl continued accessing STP even though Whisl's only effort to mitigate Prestige's traffic occurred on a single occasion after the ITG conducted tracebacks at Marriott's request over a period of five months.

88.     Whisl also sought to expand its robocall scheme with Prestige by proposing to "sign a bilateral agreement in order to strengthen our business relationship," which terms included an intention to "develop new business together, to increase the volume of traffic, if it is to the benefit of the two parties."

### 2.     Defendant Group 1 Payment Processor

89.     Payment processors assist and facilitate the furtherance of the Marriott robocall scam by enabling consumers to purchase vacation packages.  *See, e.g.*, *WV Universal Mgmt., LLC*, 877 F.3d 1234 at 1237.

90.     ResortCom provides a variety of timeshare-related services to resorts, including "helping resorts manage their timeshare membership accounts with billing, processing,

reservation, and other related services."[15]   ResortCom boasts on its website that it "isn't a cost

center—[it's] a profit center."

91.    ResortCom provides services to many of the Defendants.

92.    ████████████████████████████████████████████

████████████████████████████████████████   ResortCom in some

instances processes payments through the unique payment code "Holiday Billing Las Vegas,

NV".[16]

93.    ResortCom knows of the Defendant timeshare resorts, timeshare groups, and

timeshare exchange groups' wrongdoing based on records ResortCom keeps in its normal course

of business.   Even so, ResortCom turns a blind eye.

94.    ResortCom maintains chargeback-related records,[17] ████████████████████

████████████████████████████████████████████████████

████████████████████████████████   *See, e.g.*, *FTC v. Loewen*, No. C12-1207, 2013

WL 5816420, at *6 (W.D. Wash. Oct. 29, 2013) (noting that high chargeback rates are indicative

of deceptive practices in the Telemarketing Sales Rule context).   It is well-known that chargeback

rates of even 1% trigger the scrutiny of, and monitoring by, credit card companies.   *See* 80 Fed.

Reg.   77,520,   77,522   (Dec.   14,   2015)   *https://www.govinfo.gov/content/pkg/FR-2015-12-

14/pdf/2015-30761.pdf#page=41* (noting that payment card networks monitor whether a

merchant's monthly ratio of chargebacks exceeds 1%). ████████████████████████

---

[15] *See* Affidavit of Dennis Hershey, ResortCom Chief Financial Officer, Motion to Dismiss, Ex. 1
¶ 7, *Shelton v. ResortCom, Int'l,* No. 1:19-cv-01378 (N.D. Ohio Nov. 1, 2019), Dkt. No. 10.

[16] *Id.*

[17] A "chargeback" occurs when an individual is dissatisfied with a good or service and successfully
disputes the charge with the individual's issuing bank.   The issuing bank pays the individual.   The
issuing bank then recovers that amount from, ultimately, the merchant.

███████████████████████████████████████████ *See also* Amended Complaint, ¶

*86, FTC v. Electronic Payment Sols. of Am.,* No. 2:17-cv-02535 (D. Az. 2017), Dkt. No. 85 (noting

that a defendant had a chargeback rate of 15.6%); Amended Complaint ¶¶ 127, 128, *FTC v. Tax*

*Club, Inc.*, No. 1:13-cv-00210 (S.D.N.Y. 2013), Dkt. No. 88 (noting that a defendant had a "return

and chargeback rate of over 20% of all sales processed through Bank of America Merchant

Services," and "a return and chargeback rate of 13% of all sales through the Discover network,

spiking to 19% in the first half of 2009").

95.     In the ordinary course, excessive chargeback rates prompt the termination of

merchant accounts.  *See, e.g.,* Amended Complaint ¶ 132, *Tax Club, Inc.*, No. 1:13-cv-00210

(S.D.N.Y. 2013), Dkt. No. 88.  ██████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████  ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

96.     ResortCom has notice of the Defendants' wrongful conduct given that ResortCom

is a named defendant in numerous suits concerning robocalling, yet it still maintains working

relationships with the Defendants.  *See, e.g.*, Complaint, *Shelton v. ResortCom Int'l, LLC*, No.

1:19-cv-01378 (N.D. Ohio June 14, 2019) Dkt. No.1; Complaint, *Harris v. Universal Vacation*

*Club*, No. 2:18-cv-03182 (C.D. Cal. Apr. 16, 2018) Dkt. No. 1; Complaint, *Pacleb v. ResortCom*

*Int'l, LLC,* No. 2:13-cv-07250 (C.D. Cal. Oct. 1, 2013) Dkt. No. 1.  These suits also reflect that

ResortCom's members may have a relationship with Defendant telemarketer Cancun Ink Corp.

**3.       Examples of Defendant Group 1 Deceptive Robocalls**

97.     In one example, Whisl CDR data reflects a "Marriott" robocall originated by Prestige on March 5, 2021.  The call began with a prerecorded message referencing Marriott, the customer service representative ("CSR") mentioned Marriott during the call, and the victim ultimately purchased a vacation package from Vallarta Gardens.  The payment was processed through ResortCom, using the unique billing code "Holiday Billing Las Vegas, NV."

98.     In another example, CDR data reflects that a victim, who we refer to as Victim 1 and resides in Richmond, Virginia, received "Marriott" robocalls from one of the Defendant Group 1 defendants during June and July of 2021.  The CSR referenced Marriott, and Victim 1 purchased a vacation package.  Victim 1 was told her vacation package was redeemable at a Marriott located in Orlando but was instead rebooked to Club Wyndham Cypress Palms.

99.     CDR data reflects that Defendant Group 1 defendants placed "Marriott" robocalls to Victim 2, a Marriott Bonvoy member who resides in Stafford, Virginia, in June, July, and August of 2021.  Victim 2 believes the initial call began with a prerecorded message because he recalls being provided a list of options and selected the option to stay on the call.  He then connected with a live CSR who referred to Marriott as an "affiliate" during the pitch.  The CSR also mentioned myriad resorts, including Defendant Villa Del Palmar.  After negotiating, Victim 2 purchased the timeshare vacation package for $600 to be paid in installments—to date, Victim 2 has paid $200.

100.    CDR data reflects that Victim 3, who possesses a telephone number with an 804-area code, received a "Marriott" robocall in March 2021. The CSR referenced Marriott and other entities connected to the deceptive robocall scam.  Victim 3 purchased a timeshare vacation package for $450 at a resort in Cabo, possibly Defendant Villa del Palmar, and endured a timeshare presentation.

101.    Victim 4 received a "Marriott" robocall and paid $1,780 in December 2020 for a vacation package redeemable in Mexico or in Orlando, Florida, with bonus trips.  Documents reflect that one of the bonus trips was redeemable at "Marriott World Wide/USA," despite the fact that Marriott has no relationship with this booking.

102.    CDRs reflect that Victim 5, who resides in this District, was robocalled by a Defendant Group 1 defendant.  The CSR referenced Marriott in making the pitch, and Victim 5 purchased a package for approximately $1,000 in October 2020.  Documentation from Victim 5 reflects references to Defendant Villa Del Palmar (a Defendant Tafer Resort).

103.     CDRs associated with Whisl reflect that Victim 6, a Virginia resident and Marriott Bonvoy member, received a "Marriott" robocall and purchased a package for approximately $830.  Documents furnished by Victim 6 reflect references to Defendant Villa del Palmar, which is a resort owned by Defendant Tafer Resorts.

104.    Whisl CDR data reflects that Victim 7 received a "Marriott" robocall to her Virginia telephone number.  She purchased a vacation package from Defendant Vallarta Gardens and visited the resort where she endured a lengthy presentation.  Her payment authorization for $5,600 was processed by ResortCom.

105.    CSRs frequently referenced Marriott, including nine calls promoting Defendant Vallarta Gardens.  During three of those calls, the victim purchased timeshare vacation packages which were processed using the unique billing code associated with Defendant ResortCom, "Holiday Billing Las Vegas, NV."  The victim memorialized the fact that the CSRs also promoted Defendant Villa Del Palmar (related to Defendant Tafer Resorts) and a Mexico-based resort that was implicated in the Abramovich Notice of Apparent Liability for its involvement in abusive and

deceptive robocalling.[18]  One of the robocalls to the victim: 1) purported to be from "Marriott hotels"; 2) is included in Defendant Whisl CDR data reflecting a call originated by Defendant Prestige; 3) resulted in the credit card charge being processed through Defendant ResortCom; and 4) resulted in the purchase of a vacation package at Defendant Vallarta Gardens.  CSRs also promoted Defendant Villa Del Palmar (related to Defendant Tafer Resorts).

106.    BookVipAllInclusive, a website regularly promoted in this scheme, placed a "Marriott" robocall to a victim who purchased a package that was booked by Vacancy Rewards through a timeshare exchange company, for a resort package in Orlando, Florida.

107.    Defendant Cancun Ink Corp. has represented that they "work with Marriott".  And websites that have regularly been promoted in the deceptive robocalls were also referenced: privcetravelvip.com and allinclusivebeachfronts.com.

108.    Parrot Caribbean placed a deceptive "Marriott" robocall, and during the pitch, the CSR referenced a website regularly promoted in the scheme (5startravel.com.mx) and maintained that Parrot Caribbean had contractual relationships with "all the Marriott[]s in Orlando, Florida."

### Defendant Group 2

109.    A timeshare resort marketing entity located in Florida (DVC) and a California VoIP provider (Rapid Eagle) coordinate a unique variation of the robocall scam trading on Marriott's brand by marketing vacation timeshare packages with a holiday theme.  DVC generated the outbound calls which VoIP Essential/Rapid Eagle routed.

110.    Variations of the illegal robocalls include but are not limited to the following:

---

[18] *See* Notice of Apparent Liability for Forfeiture, FCC 17-80 at 4 (June 22, 2017), https://www.fcc.gov/document/fcc-proposes-120m-fine-robocaller-illegal-spoofing  (noting that TripAdvisor's investigator discovered that Sunset World Group implemented robocall scams, using Adrian Abramovich as a service provider and lead generator, and trading on the names of well-known hotel brands, including Marriott).

- Fourth of July Campaign (active through 7/15/2021): Hi, my name is Jennifer Kelly. You are receiving this call because you and your family are **previous guests** with the Hilton and **Marriott**. You are eligible to receive our members only free upgrade for our fourth of July day special from Hilton Grand vacation club. Travel to our all[-]inclusive award-winning resorts in Cabo, Cancún, Tulum, Puerto Vallarta, and the Dominican Republic[,] Punta Cana, Panama, Costa Rica, and many other locations such as Dubai, Italy, Spain, Peru, Asia and over a hundred locations throughout the United States such as Orlando and Las Vegas[,] just to name a few. Call the number on your caller ID now for this amazing deal. We have four vacations, four years for only 488. Plus, if you call the number on your caller ID now, receive a free four day and three[-]night trip in the U.S. Call now to receive your Hilton and **Marriott honors** free upgrade.

- Black Friday Campaign (active through March 8, 2021): Hi this is Tiffany. You're getting this message because **you traveled in our network with** Hilton & **Marriott** within the last 24 months and we are doing an extended Black Friday holiday special sale with this promotion. You can travel to Orlando[,] Disney World[,] Las Vegas[,] beautiful Dubai[,] and all-inclusive five-star resort from the Caribbean Islands.

111. Generally, DVC advertises through its website resort vacation packages available internationally and in the United States. DVC advertises sixty international and domestic resort locations. To take advantage of these packages, consumers are required to endure a timeshare pitch.

112. When marketing resort vacation packages via telemarketing, DVC suggests an affiliation with Marriott and then promotes packages at domestic and international resorts that it advertises on its website.

113. In perpetuating the misleading robocall scam targeting Marriott, DVC placed approximately 3.9 million Marriott robocalls to consumers, 96,500 of whom are Virginia residents. ITG tracebacks identified DVC as the originating provider in fifteen tracebacks it conducted associated with these robocalls.

114. In its robocall scam, DVC has also made references to at least one other large hotel chain unaffiliated with Marriott.

### 1. Defendant Group 2 VoIP Provider

115.    ITG also identified Rapid Eagle as the VoIP provider for eight of these robocalls.

116.    Rapid Eagle understands that it is facilitating wrongful conduct and has made that its business model.  On its website, Rapid Eagle advertises that it is capable of handling "huge volumes of traffic from our customers including . . . dialer traffic," and can be utilized by "call center[s] or call shop[s]", which is how Defendant Group 2 telemarketers effectuated the scam.

117.    Rapid Eagle retained DVC as a customer even after receiving eight traceback requests during a one-month period from the ITG, all of which identified DVC as the originating customer.  Rapid Eagle is also defending a complaint filed by the Indiana Attorney General for routing 1.5 million abusive and deceptive robocalls, for which it was allegedly paid more than $100,000 to "look the other way."

### 2. Defendant Group 2 Payment Processor

118.    Defendants John Does are additional persons of unknown identity who processed payments associated with the robocall scams that misuse the MARRIOTT name and trademarks.

### 3. Examples of Defendant Group 2 Deceptive Robocalls

119.    Victim 8, a Marriott Bonvoy member who resides in Virginia, received a "Marriott" robocall from DVC.  DVC left a prerecorded message on Victim 8's mobile phone which references Marriott.  During the live pitch, the CSR referenced Marriott and mentioned that DVC obtained information in relation to Victim 8's travels, which the victim assumed were his Marriott-related travels.  Victim 8 purchased a vacation package for $500 in exchange for enduring a timeshare presentation.

### <u>MARRIOTT'S RESPONSE</u>

120.     Shortly before the filing of this action, Marriott experienced an exponential increase in the number of complaints received about these illicit robocall scams from irate Marriott customers.

121.     In addition, incensed Marriott customers have turned to public forums to voice their frustrations with robocallers impersonating Marriott.  Marriott customers have posted comments on Marriott's social media accounts, including Facebook and Twitter, wherein Marriott customers accuse Marriott of being the perpetrator of the robocall scams and threaten to discontinue, or actually do discontinue, their support of Marriott.

122.     Marriott has diligently reviewed complaints made by Marriott customers via internal and external platforms and spends considerable resources responding to as many of them as reasonably possible.

123.     In addition, on December 3, 2020, Marriott updated and re-issued a public statement disavowing any participation in these robocalls, denying affiliation with the perpetrators, advising Marriott customers on how to handle such robocalls, and directing Marriott customers located in the United States to report the infringing robocalls to the FTC.

124.     The statement specifically provides:

Marriott International is aware of pre-recorded telephone calls (often known as "robocalls") that fraudulently reference Marriott's name to entice the call recipient to listen to a sales pitch.  Marriott is not making or authorizing these calls.  Marriott is committed to protecting the privacy of the personal information that is entrusted to us and has not provided any information to the parties making these fraudulent calls.  If you receive a suspicious robocall referencing Marriott, we urge you not to provide any personal or credit card information and to end the call.

For residents in the U.S., they should report the call to the Federal Trade Commission (FTC).  For more information about phone scams, visit the FTC Consumer Information site.

For Canadian residents, more information on telephone scams can be found on the Canadian Telecommunications Commission's web site.[19]

125.    After the public statement was released, Marriott continued to receive customer complaints from customers who were deceived into believing that Marriott was associated with the robocalls.

126.    Marriott seeks to prevent further harm to Marriott customers and to itself by commencing this action, including a request for injunctive relief.

127.    Marriott also advised the FTC of this action to protect its customers and the consuming public from Defendants' conduct.

128.    In April 2022, a currently unknown actor under investigation sent emails to numerous individuals affiliated with the ITG and spoofed the sending email address to suggest that an undersigned attorney for Marriott sent the email.  One of the emails contained a Microsoft Excel spreadsheet that an initial analysis suggests was infected with trojan malware, and one of the spoofed email addresses using the Marriott attorney's name falsely appears to be associated with a resort in Mexico.  This attempted hack is presumably designed to hinder Marriott's investigation and has caused Marriott to devote additional resources to reveal the wrongdoer(s).

129.    Of chief concern to Marriott is that Marriott, its customers, including Virginia victims, and the consuming public have suffered, and continue to suffer, substantial harm at the receiving end of Defendants' fraudulent robocalls.  The robocalls were and are: (a) harassing to Marriott customers, (b) disturbing Marriott customers' daily lives, (c) disseminating false statements about purported employment with or an affiliation with Marriott to induce Marriott

---

[19] *Marriott International's Statement on Fraudulent Phone Calls,* MARRIOTT INTERNATIONAL NEWS CENTER (Dec. 3, 2020), https://news.marriott.com/news/2020/12/03/marriott-internationals-statement-on-fraudulent-phone-calls.

customers to remain on the line and purchase the promotion, (d) persuading Marriott customers to purchase a promotion of unknown quality from an unknown entity, and (e) confusing Marriott customers and misleading them into falsely believing there is a relationship between Marriott and Defendants.

130.    For almost 100 years, Marriott has invested significant assets in developing its brand and goodwill.  Defendants wrongfully traded and currently trade on Marriott's name and the MARRIOTT Marks, damaging Marriott's brand and goodwill for Defendants' own commercial gain.   Further, Defendants caused and cause Marriott's customers to believe that Marriott spearheaded the robocall scams and violated its own customers' rights.  As a result, the robocalls subjected and continue to subject Marriott to the following harms: (a) Marriott customers directed their frustration about the robocalls to Marriott, thereby (b) burdening Marriott's complaint process, (c) causing Marriott to expend resources to resolve such complaints, and (d) potentially exposing Marriott to litigation.

### COUNT ONE:
### (Trademark Counterfeiting)
### (Against Defendants DVC, Cancun Ink Corp., Parrot Caribbean, Vallarta Gardens, and John Does)

131.    Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

132.    Defendants are intentionally and knowingly using counterfeit versions of the MARRIOTT Marks in connection with the sale of and/or offering for sale of travel-related goods and services including time shares.

133.    Defendants used spurious designations that are identical with, or substantially indistinguishable from, the MARRIOTT Marks on goods and/or services covered by the federal registrations for such marks.

134.    Defendants used these spurious designations knowing they are counterfeit in connection with the advertisement, promotion, sale, and offering for sale of goods and/or services.

135.    Defendants' unauthorized use of the MARRIOTT Marks as set forth above is likely to: (a) cause confusion, mistake, and deception; (b) cause the public to believe that the products and/or services sold by Defendants are authorized, sponsored or approved by Marriott or that Defendants are affiliated, connected, or associated with or in some way related to Marriott; and (c) result in Defendants unfairly benefiting from Marriott's advertising and promotion and profiting from the reputation of MARRIOTT and the MARRIOTT Marks all to the substantial and irreparable injury of the public and Marriott for which monetary relief will not suffice.

136.    Each Defendant is independently liable for its own misconduct, and Defendant Vallarta Gardens is liable for the misconduct of Defendants Cancun Ink Corp. and/or Parrot Caribbean.

137.    The aforesaid acts by Defendants constitute willful trademark counterfeiting in violation of Sections 32 and 34 of the Lanham Act, 15 U.S.C. §§ 1114 and 1116(d)(1). Accordingly, Marriott is entitled to a statutory damages award of up to $2,000,000 per counterfeit mark per type of goods or service sold, offered for sale, or distributed, pursuant to 15 U.S.C. § 1117(c).

138.    In the alternative to statutory damages, as a direct and proximate result of Defendants' trademark counterfeiting, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including, without limitation, lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion.  Marriott is entitled to disgorgement of Defendants' profits, to any damages, including

treble damages, pursuant to 15 U.S.C. § 1117(b), and to costs of this action.

139.    The aforesaid acts have caused, and are causing, great and irreparable harm to Marriott and the public.   The harm to Marriott includes misuse and counterfeiting of the MARRIOTT Marks for which monetary relief will not suffice.   Unless permanently restrained and enjoined by this Court, said irreparable harm will continue.   Therefore, Marriott is entitled to a permanent injunction under Section 34 of the Lanham Act, 15 U.S.C. § 1116.

## COUNT TWO:
### (Trademark Infringement)
### (Against Defendants DVC, Cancun Ink Corp., Parrot Caribbean, and Vallarta Gardens, and John Does)

140.    Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

141.    Defendants are using the MARRIOTT Marks in commerce and have no valid rights in the MARRIOTT Marks.

142.    Defendants have actual and/or constructive notice, pursuant to Section 22 of the Lanham Act, 15 U.S.C. § 1072, of the existence of MARRIOTT's superior rights in its MARRIOTT Marks by reason of the existence of Marriott's aforementioned federal trademark rights.

143.    Use of the MARRIOTT Marks by Defendants is without the permission or authorization of Marriott.

144.    The aforesaid acts by Defendants have caused and/or are likely to cause confusion, mistake and/or deception among consumers and the public, leading the public falsely to believe that the products advertised and sold by Defendants are those of, are sponsored or approved by, or

are in some way connected with Marriott.  And because Marriott customers filed complaints with Marriott about these robocalls, it is clear that actual confusion occurred.

145.   The aforesaid acts by Defendants constitute direct infringement of Marriott's trademark rights in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114.

146.   Each Defendant is independently liable for its own misconduct, and Defendant Vallarta Gardens is liable for the misconduct of Defendants Cancun Ink Corp. and/or Parrot Caribbean.

147.   As a direct and proximate result of Defendants' trademark infringement, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including without limitation, lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion.  Marriott is entitled to disgorgement of Defendants' profits, to any damages, including treble damages, and to costs of this action.

148.   The aforesaid acts have caused, and are causing, great and irreparable harm to Marriott and the public.  The harm to Marriott includes harm to the value and goodwill associated with the MARRIOTT Marks for which monetary relief will not suffice.  Unless permanently restrained and enjoined by this Court, said irreparable harm will continue.  Therefore, Marriott is entitled to a permanent injunction under Section 34 of the Lanham Act, 15 U.S.C. § 1116.

### COUNT THREE:
**(Contributory Infringement)**
**(Against Defendants ResortCom, Whisl, Prestige, Rapid Eagle, Vallarta Gardens, and Tafer Resorts, and John Does)**

149.   Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

150.    Defendants ResortCom, Whisl, Prestige, Rapid Eagle, Vallarta Gardens, and Tafer Resorts are contributorily liable for the direct infringement of telemarketers Cancun Ink Corp. and Parrot Caribbean.

151.    Defendants ResortCom, Whisl, Prestige, Rapid Eagle, Vallarta Gardens, and Tafer Resorts have actual and/or constructive knowledge of the trademark violations committed by telemarketers Defendants Cancun Ink Corp. and Parrot Caribbean.  Despite that knowledge, upon information and belief, Defendants ResortCom, Whisl, Prestige, Rapid Eagle, Vallarta Gardens, and Tafer Resorts continued and/or continue to use telemarketers Cancun Ink Corp. and Parrot Caribbean as well as Vallarta Gardens to sell their products and services.

152.    The confusion, mistake, or deception contributorily caused by the Defendants is in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

153.    As a direct and proximate result of Defendants' contributory trademark infringement, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including without limitation, lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion.  Marriott is entitled to disgorgement of Defendants' profits, to any damages, including treble damages, and to costs of this action.

154.    The aforesaid acts have caused, and are causing, great and irreparable harm to Marriott and the public.  The harm to Marriott includes harm to the value and goodwill associated with the MARRIOTT Marks for which monetary relief will not suffice.  Unless permanently restrained and enjoined by this Court, said irreparable harm will continue.  Therefore, Marriott is entitled to a permanent injunction under Section 34 of the Lanham Act, 15 U.S.C. § 1116.

**COUNT FOUR:**
**(False Designation of Origin)**
**(Against Defendants DVC, Cancun Ink Corp., Parrot Caribbean, and Vallarta Gardens, and John Does)**

155.    Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

156.    The copying and/or use by Defendants of Marriott's name and the MARRIOTT Marks constitute a false designation of origin that wrongly and falsely designates that goods marketed and sold by Defendants now, or in the future, originate from or are connected with, authorized by, or otherwise associated with Marriott.

157.    The above acts by Defendants constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

158.    The foregoing actions of Defendants have been knowing, deliberate, willful, and in utter disregard of Marriott's rights.

159.    Each Defendant is independently liable for its own misconduct, and Defendant Vallarta Gardens is liable for the misconduct of Defendants Cancun Ink Corp. and/or Parrot Caribbean.

160.    As a direct and proximate result of Defendants' false designation of origin, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion. Marriott is entitled to disgorgement of Defendants' profits, to recover any damages, and to costs of the action.

161.    The foregoing actions of Defendants have caused great and irreparable injury to Marriott and, unless said acts are enjoined by this Court, said acts will continue and Marriott and

Marriott's customers will continue to suffer great and irreparable injury for which monetary relief will not suffice.  Therefore, Marriott is entitled to a permanent injunction under Section 34 of the Lanham Act, 15 U.S.C. § 1116.

<u>**COUNT FIVE:**</u>
**(Trademark Dilution)**
**(Against Defendants DVC, Cancun Ink Corp., Parrot Caribbean, and Vallarta Gardens, and John Does)**

162.    Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

163.    The MARRIOTT Marks are famous trademarks within the meaning of 15 U.S.C. § 1125(c), and became famous before Defendants began using the MARRIOTT Marks.  The MARRIOTT Marks are advertised and used extensively throughout the United States and are highly distinctive and recognizable by the trade and consuming public.

164.    Defendants are engaged in a commercial use of the MARRIOTT Marks in interstate commerce by using the MARRIOTT Marks in connection with the advertising and sale of their products and services directed at MARRIOTT's consumers located throughout the United States, including Virginia.

165.    Defendants' actions are disparaging and damaging and have caused and are likely to continue to cause dilution of the MARRIOTT Marks through, at the very least, tarnishing.

166.    Defendants' actions tarnish the MARRIOTT Marks by, at the very least, using the MARRIOTT Marks in unsolicited, burdensome, and intrusive telemarketing.

167.    Defendants' actions also dilute the MARRIOTT Marks by blurring and impairing the distinctiveness of the MARRIOTT Marks.

168.     Each Defendant is independently liable for its own misconduct, and Defendant Vallarta Gardens is liable for the misconduct of Defendants Cancun Ink Corp. and/or Parrot Caribbean.

169.     The dilution caused by Defendants is in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

170.     As a direct and proximate result of Defendants' dilution, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion. Marriott is entitled to disgorgement of Defendants' profits, to recover any damages, and to costs of the action.

171.     The foregoing actions of Defendants have caused great and irreparable injury to Marriott and, unless said acts are enjoined by this Court, said acts will continue and Marriott and Marriott's customers will continue to suffer great and irreparable injury for which monetary relief will not suffice. It is therefore entitled to a permanent injunction under Section 34 of the Lanham Act, 15 U.S.C. § 1116, as well as Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

**COUNT SIX:**
**(Unfair Competition)**
**(Against All Defendants)**

172.     Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

173.     Defendants actions constitute use of terms, names, symbols, and devices, and use of false designation of origin in interstate commerce, all of which have caused and are likely to continue to cause confusion, mistake, or deception as to the source of origin of the products and

services provided by Defendants, in that consumers and potential consumers are likely to believe that such products and services are provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Marriott.

174.    Defendants' actions have caused and are likely to continue to cause confusion, mistake, or deception in that consumers and potential consumers have believed and are likely to continue to believe there is sponsorship, approval, licensing, affiliation, association, or some legitimate connection between the products and services provided by Defendants and those provided by Marriott.

175.    Specifically, Defendants' use of Marriott's name and the MARRIOTT Marks as alleged herein has caused and is likely to continue to cause confusion and mistake and to deceive customers as to the source of origin of Defendants' products and services.

176.    Each Defendant is independently liable for its own misconduct, and Defendants Vallarta Gardens and Tafer Resorts are jointly and severally liable for the misconduct of Defendants Cancun Ink Corp. and/or Parrot Caribbean.

177.    The confusion, mistake, or deception caused by Defendants is in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).

178.    As a direct and proximate result of Defendants' unfair competition, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and good will, corrective advertising and all other costs of resolving consumer confusion.  Marriott is entitled to disgorgement of Defendants' profits, to recover any damages, and to costs of the action.

179.    The foregoing actions of Defendants have caused great and irreparable injury to Marriott and, unless said acts are enjoined by this Court, said acts will continue and Marriott and Marriott's customers will continue to suffer great and irreparable injury for which monetary relief will not suffice.  It is therefore entitled to a permanent injunction under Section 34 of the Lanham Act, 15 U.S.C. § 1116.

**COUNT SEVEN:**
**(False Advertising)**
**(Against Defendants DVC, Cancun Ink Corp., Parrot Caribbean, and Vallarta Gardens, and John Does)**

180.    Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

181.    The use by Defendants of Marriott's name and the MARRIOTT Marks in robocalls constitutes literal false or misleading representations of fact that the products sold by Defendants are indeed not sponsored by, approved by, or certified by Marriott.

182.    The use by Defendants of Marriott's name and the MARRIOTT Marks in robocalls constitutes literal false or misleading representations of fact that Defendants and Marriott are affiliated in some manner.

183.    Defendants are using these false representations in order to influence consumer's purchasing decisions by using Marriott's widespread popularity.

184.    By placing robocalls to consumers throughout the United States, Defendants placed the false or misleading statements into interstate commerce.

185.    Defendants' acts have actually deceived consumers and diverted sales away from Marriott.

186.    Defendants' acts have also damaged Marriott's goodwill associated with such promotional packages.

187.    The above acts by Defendants constitute false advertisements in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

188.    The foregoing actions of Defendants have been knowing, deliberate, willful, and in utter disregard of Marriott's rights.

189.    As a direct and proximate result of Defendants' false advertising, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion.  Marriott is entitled to disgorgement of Defendants' profits, to recover any damages, and to costs of the action.

190.    Defendants' conduct has caused irreparable damage to Marriott's business, reputation and, unless said acts are enjoined by the Court, said acts will continue and Marriott and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.  It is therefore entitled to a permanent injunction under Section 34 of the Lanham Act, 15 U.S.C. § 1116.

### COUNT EIGHT
**(Violating the Prohibition against Deceptive Telemarketing Acts or Practices, Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108 and Telemarketing Sales Rule, 16 C.F.R. § 310, Deceptive Telemarketing Acts or Practices, 16 C.F.R. § 310.3)**
**(Against Defendants DVC, Cancun Ink Corp., Vallarta Gardens, Tafer Resorts, Vacancy Rewards, and John Does)**

191.    Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

192.    Defendants engaged in deceptive telemarketing practices by misrepresenting its affiliation with, endorsement, or sponsorship by falsely claiming to be affiliated with Marriott.

193.   The above acts by Defendants constitute deceptive telemarketing practices in violation of 16 C.F.R. § 310.3(a)(2)(vii).

194.   Marriott has suffered not less than $50,000.00 in actual damages due to Defendants' misconduct, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and good will, corrective advertising and all other costs of resolving consumer confusion.  To date, vendor costs incurred in mitigating further damage as a result of Defendants' robocall scam exceeds $50,000. For example, Marriott has retained YouMail to synthesize over one billion CDRs and retained ITG to conduct tracebacks to certain named Defendants.  In addition to vendor costs, Marriott has expended resources to resolve its customers' complaints about the robocalls—its customers mistakenly believe Marriott is to blame.  The costs of services provided by YouMail and ITG combined with Marriott's complaint resolution process exceed $50,000.  As these services are continuing in nature given Defendants' ongoing conduct, Marriott anticipates that this figure will increase.  Marriott is therefore entitled to damages as well as its fees and costs in bringing this action.

195.   Defendants' conduct has caused irreparable damage to Marriott's business, reputation, and goodwill, and, unless said acts are enjoined by the Court, said acts will continue and Marriott and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.  Marriott is therefore entitled to a permanent injunction under 15 U.S.C. § 6104(a).

### COUNT NINE:
**(Violating the Prohibition against Abusive Telemarketing Acts or Practices, Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108, and Telemarketing Sales Rule, 16 C.F.R. § 310, Abusive Telemarketing Acts or Practices, 16 C.F.R. § 310.4)**

**(Against Defendants DVC, Cancun Ink Corp., Vallarta Gardens, Tafer Resorts, Vacancy Rewards, and John Does)**

196.    Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

197.    Defendants have engaged in abusive telemarketing practices by initiating outbound telephone calls that deliver a prerecorded message and failing to receive the express consent of the recipient in writing that meets the statutory requirements.  16 C.F.R. § 310.4(b)(v).

198.    Defendants also have failed to make the requisite disclosures in selling goods or services.  Defendants have failed to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call the true identity of the seller and the nature of the good or service provided.  *See* 16 C.F.R. § 310.4(d)(1) (noting "the identity of the seller") and (3) (noting "the nature of the goods or services").

199.    The above acts by Defendants constitute abusive telemarketing practices in violation of 16 C.F.R. § 310.4(d)(1) and (3).

200.    Marriott has suffered not less than $50,000.00 in actual damages due to Defendants' misconduct, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and good will, corrective advertising and all other costs of resolving consumer confusion.  To date, vendor costs incurred in mitigating further damage as a result of Defendants' robocall scam exceeds $50,000. For example, Marriott has retained YouMail to synthesize over one billion CDRs and retained ITG to conduct tracebacks to certain named Defendants.  In addition to vendor costs, Marriott has expended resources to resolve its customers' complaints about the robocalls—its customers mistakenly believe Marriott is to blame.  The costs of services provided by YouMail and ITG combined with Marriott's complaint resolution process exceed $50,000.  As these services are

continuing in nature given Defendants' ongoing conduct, Marriott anticipates that this figure will increase.  Marriott is therefore entitled to damages as well as its fees and costs in bringing this action.

201.    Defendants' conduct has caused irreparable damage to Marriott's business, reputation, and goodwill, and, unless said acts are enjoined by the Court, said acts will continue and Marriott and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.  Marriott is therefore entitled to a permanent injunction under 15 U.S.C. § 6104(a).

## COUNT TEN
**(Assisting and Facilitating Abusive and Deceptive Acts or Practices, 16 C.F.R. § 310.3(b))**
**(Against ResortCom, Whisl, Prestige, Ascendant, Rapid Eagle, and Vacancy Rewards, and John Does)**

202.    Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

203.    The TSR prohibits any person from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that [constitutes deceptive or abusive acts or practices]" under the Rule. 16 C.F.R. § 310.3(b).

204.    Defendant Prestige provided substantial assistance to Defendant Group 1's abusive and deceptive telemarketing practices by providing VoIP call termination services that allow the illegal calls to be routed through the network for delivery to consumers.

205.    Defendant Prestige knew, or consciously avoided knowing, about Defendants Cancun Ink Corp., Parrot Caribbean, Vallarta Gardens, and Tafer Resorts' abusive and deceptive telemarketing practices when it continued to provide VoIP call termination for calls associated with those Defendants, after receiving clear indicia that the calls were abusive and deceptive,

including numerous ITG tracebacks that identified calls as suspected of being unlawful, a high volume of calls with call durations of 30 seconds or less, and a high volume of calls reflecting "snowshoeing" as described above. *See supra* ¶ 81.

206.     Defendant Whisl provided substantial assistance to Defendant Group 1's abusive and deceptive telemarketing practices by providing VoIP call routing services to Defendant Prestige, allowing the deceptive calls to be routed through the network for delivery to consumers.

207.     Defendant Whisl knew, or consciously avoided knowing, about Defendants Cancun Ink Corp., Parrot Caribbean, Vallarta Gardens, and Tafer Resorts' abusive and deceptive telemarketing practices when it continued to provide VoIP call routing services for calls associated with those Defendants, through information that it learned through its course of dealing with Defendant Prestige, including call traffic displaying characteristics associated with fraudulent robocalls (*e.g.*, high volume and short duration) and through multiple ITG traceback reports also involving Defendant Prestige that would have identified calls as suspected of being unlawful.

208.     Defendant ResortCom provided substantial assistance to Defendant Group 1 through billing, payment processing, reservation booking, and other timeshare-related services.

209.     Defendant ResortCom knew, or consciously avoided knowing, about Defendants Tafer Resorts and Vallarta Gardens' abusive and deceptive telemarketing practices, ██████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

210.     Defendants Vallarta Gardens and Tafer Resorts provided substantial assistance to Defendants Cancun Ink Corp. and/or Parrot Caribbean by directing or causing them to transmit the "Marriott" robocalls on behalf of Defendants Tafer Resorts and/or Vallarta Gardens online, in-

person, and via telemarketing and by providing them approved marketing materials.

211. Defendants Vallarta Gardens and Tafer Resorts, knew, or consciously avoided knowing, about Defendants Cancun Ink Corp. and/or Parrot Caribbean's abusive and deceptive telemarketing practices (*e.g.*, material misrepresentations regarding Marriott) through various overlapping ownership structures, operational relationships, and numerous BBB complaints regarding the Defendant Group 1's marketing practices. *See supra* 71-96 (describing structural overlaps among Defendant Group 1).

212. Defendant Rapid Eagle provided substantial assistance to Defendant DVC's abusive and deceptive telemarketing practices by providing VoIP services that facilitated the delivery of DVC's deceptive and abusive telemarketing calls.

213. Defendant Rapid Eagle knew, or consciously avoided knowing, about Defendant DVC's abusive and deceptive telemarketing practices (*e.g.*, material misrepresentations) when Rapid Eagle continued to do business with Defendant DVC as a customer even after receiving numerous traceback requests from ITG for calls placed on behalf of Defendant DVC, which indicated to Rapid Eagle that Defendant DVC was engaged in misleading telemarketing.

214. Marriott has suffered not less than <u>$50,000.00</u> in actual damages due to Defendants' misconduct, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion. To date, vendor costs incurred in mitigating further damage as a result of Defendants' robocall scam exceeds $50,000. For example, Marriott has retained YouMail to synthesize over one billion CDRs and retained ITG to conduct tracebacks to certain named Defendants. In addition to vendor costs, Marriott has expended resources to resolve its customers' complaints about the robocalls—its customers

mistakenly believe Marriott is to blame.  The costs of services provided by YouMail and ITG combined with Marriott's complaint resolution process exceed $50,000.  As these services are continuing in nature given Defendants' ongoing conduct, Marriott anticipates that this figure will increase.  Marriott is therefore entitled to damages as well as its fees and costs in bringing this action.

215.    Defendants' conduct has caused irreparable damage to Marriott's business, reputation, and goodwill, and, unless said acts are enjoined by the Court, said acts will continue and Marriott and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.  Marriott is therefore entitled to a permanent injunction under 15 U.S.C. § 6104(a).

### COUNT ELEVEN:
### (Virginia Unfair Competition)
### (Against All Defendants)

216.    Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

217.    Defendants are misrepresenting to consumers that the goods provided by Defendants are the goods of Marriott in violation of VA. CODE ANN. § 59.1-200(A)(1).

218.    Defendants are misrepresenting to consumers that Defendants' goods are sponsored by, approved by, or certified by Marriott or that Marriott is a source of such goods in violation of VA. CODE ANN. § 59.1-200(A)(2).

219.    Defendants are misrepresenting to consumers that Defendants' goods are affiliated, connected, or associated with Marriott in violation of VA. CODE ANN. § 59.1-200(A)(3).

220.    Defendants are misrepresenting to consumers that Defendants' goods are similar to those of Marriott in terms of standards, quality, grade, style, or model in violation of VA. CODE ANN. § 59.1-200(A)(6).

221.    Defendants' conduct is in violation of VA. CODE ANN. § 59.1-200(A)(14).

222.    As a direct and proximate result of the unfair competition, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion.

223.    The foregoing actions of Defendants have caused great and irreparable injury to Marriott and, unless said acts are enjoined by this Court, said acts will continue and Marriott and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.

## COUNT TWELVE:
### (Virginia False Advertising)
### (Against Defendants DVC, Cancun Ink Corp., Parrot Caribbean, and Vallarta Gardens, and John Does)

224.    Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

225.    Defendants' conduct advertising for Defendants' goods by publishing, disseminating, circulating, or placing before the public information that is untrue, deceptive, or misleading, and/or which uses other methods, devices, or practices which are fraudulent, deceptive or misleading, namely indicating that Marriott endorses, and that Marriott is in any way affiliated with Defendants' robocall scams, causing actual confusion in the marketplace in violation of VA. CODE ANN. § 18.2-216.

226.   Defendants' advertisements, as described above, contain a false representation, which is untrue, deceptive, and misleading.

227.   Defendants have caused such advertisements to be distributed via robocalls to consumers in Virginia.

228.   As a direct and proximate result of the false advertising, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion.

229.   Defendants' conduct has caused irreparable damage to Marriott's business, reputation, and goodwill, and, unless said acts are enjoined by the Court, said acts will continue and Marriott and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.

### COUNT THIRTEEN:
**(Virginia Common Law Tortious Interference)**
**(Against All Defendants)**

230.   Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

231.   Many of the consumers Defendants target are Marriott customers who routinely contract with Marriott for products and services.

232.   Defendants knew that many of the individuals whom they targeted were Marriott customers as evidenced by CSRs explaining to victims of the "Marriott" robocalls that their information was obtained from Marriott.

233.     Despite that knowledge, Defendants commenced with the fraudulent "Marriott" robocalls, constituting trademark counterfeiting, infringement and dilution, false advertising, and unfair competition, as outlined above.

234.     As a direct and proximate result of Defendants' direct and indirect telemarketing and promotional efforts, certain Marriott customers targeted by Defendants utilized products and services provided by Defendants rather than those provided by Marriott.

235.     As a direct and proximate result of Defendants' direct and indirect telemarketing and promotional efforts, certain Marriott customers targeted by Defendants ceased their business relationship with Marriott.

236.     Because of Defendants' actions, Defendants have been unjustly enriched and Marriott has suffered and will continue to suffer damages, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion.

237.     Defendants' conduct has caused, and is continuing to cause, harm to Marriott's business, reputation, and goodwill, and, unless said acts are enjoined by the Court, said acts will continue and Marriott will continue to suffer great and irreparable injury for which monetary relief will not suffice.

238.     Defendants' actions were willful, deliberate, and/or intentional.

### COUNT FOURTEEN:
**(Virginia Common Law Conspiracy Claim)**
**(Against Defendant Group 1 and John Does)**

239.     Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

240.     Defendants have acted in concert, knowingly and intentionally conspiring to effectuate their abusive and deceptive robocall scam by directly or indirectly counterfeiting, infringing, and diluting Marriott's marks, directly or assisting and facilitating violations of the TSR, engaging in false advertising and unfair competition, and tortiously interfering with Marriott's business relationships for the Defendants' benefit and at Marriott's and the consumers' expense.

241.     By engaging in the foregoing conduct, Defendants entered into an agreement to accomplish an unlawful purpose.

242.     Defendants' conduct was wanton, willful, malicious, and in conscious disregard of Marriott's rights.

243.     As a direct and proximate result of the conspiracy, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion.

244.     Defendants' conduct has caused irreparable damage to Marriott's business, reputation, and goodwill, and, unless said acts are enjoined by the Court, said acts will continue and Marriott and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.

### COUNT FIFTEEN:
**(Virginia Common Law Conspiracy Claim)**
**(Against Defendant Group 2 and John Does)**

245.     Marriott repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

246.     Defendants have acted in concert, knowingly and intentionally conspiring to effectuate their abusive and deceptive robocall scam.  DVC directly and Rapid Eagle indirectly counterfeits, infringes, and dilutes Marriott's marks.  Rapid Eagle assists and facilitates DVC's violation of the TSR.  And in promoting, marketing and advertising the robocall scam, DVC engages in false advertising and tortiously interferes with Marriott's business relationships for the Defendants' benefit and at Marriott's and the consumers' expense.  Consequently, both DVC and Rapid eagle unfairly compete.

247.     By engaging in the foregoing conduct, Defendants entered into an agreement to accomplish an unlawful purpose.

248.     Defendants' conduct was wanton, willful, malicious, and in conscious disregard of Marriott's rights.

249.     As a direct and proximate result of the conspiracy, Defendants have been unjustly enriched, and Marriott has suffered actual damages, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion.

250.     Defendants' conduct has caused irreparable damage to Marriott's business, reputation, and goodwill, and, unless said acts are enjoined by the Court, said acts will continue and Marriott and the consuming public will continue to suffer great and irreparable injury for which monetary relief will not suffice.

## **PRAYER FOR RELIEF**

WHEREFORE, Marriott respectfully requests of this Court:

1.     That judgment be entered in favor of Marriott on all counts.

2.      That the Court preliminarily and permanently enjoin Defendants, their officers, directors, principals, agents, servants, employees, successors and assigns, and all those in active concert or participation with them, jointly and severally, from:

a.      Copying, distributing, altering, displaying, hosting, selling and/or promoting the MARRIOTT Marks;

b.      Using any copy or colorable imitation of the MARRIOTT Marks in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, printing, importation, production, circulation, or distribution of any product or service, in such fashion as to relate or connect such product or service in any way to Marriott, or to any goods or services sold, manufactured, sponsored, approved by, or connected with Marriott;

c.      Representing or suggesting in any manner or by any method that products or services not sponsored, approved, or authorized by Marriott are sponsored, approved, or authorized by or originate with Marriott, or from otherwise taking action likely to cause confusion, mistake, deception of the public as to the origin, approval, sponsorship, or certification of such products or services;

d.      Representing or suggesting in any manner or by any method whatsoever that any business conducted by Defendants is connected, affiliated, or otherwise associated with Marriott, including but not limited to any Marriott rewards program, a prior Marriott visit, or a Marriott representative;

e.      Using robocalls or similar means to reference, copy, distribute, and/or promote Marriott's name or the MARRIOTT Marks; and

f.      Engaging in any other activity constituting unfair competition with Marriott or constituting an infringement, counterfeiting, dilution, or false designation of origin of the

MARRIOTT Marks.

3.      That those in active concert or participation with Defendants and those with notice of the injunction, including without limitation any Internet search engines, web-hosting and Internet-service providers, domain-name registrars, and domain-name registries, cease facilitating access to any or all domain names and websites or accounts through which Defendants engage in unlawful access to, use, reproduction, and distribution of the MARRIOTT Marks and/or seek to deceive consumers regarding their relationship with Marriott;

4.      That the domain-name registries and registrars for the domain names associated with Defendants and any other domain names or websites used by Defendants to deceive consumers regarding their relationship with Marriott, or their administrators, place the domain names on registryHold/serverHold or such other status to render the names/sites non-resolving;

5.      That Defendants be required to pay Plaintiff's statutory damages pursuant to 15 U.S.C. § 1117(c), 15 U.S.C. § 6104(a), and 17 U.S.C. § 504(c);

6.      That in connection with Defendants' acts of trademark counterfeiting, trademark infringement, contributory trademark infringement, false designation of origin, trademark dilution, unfair competition, and false advertising, the Court require Defendants to pay all damages sustained by Marriott, disgorge Defendants' profits, and order that the amount of damages awarded Marriott be increased three times the amount thereof, as available at law;

7.      That in connection with Defendants' Telemarketing and Consumer Fraud and Abuse Prevention Act and TSR violations, order Defendants to pay all damages sustained by Marriott and disgorge Defendants' profits;

8.      That in connection with Defendants' unfair competition and tortious interference, requiring Defendants to pay all damages sustained by Marriott, direct Defendants to disgorge

profits, and order that punitive damages be awarded for willful and deliberate deceptive acts committed with oppression, fraud, or malice;

9.      That the Court order an accounting from each Defendant to assess the revenues and profits obtained from each Defendant associated with use of Marriott's name or marks;

10.      That Defendants are required to employ adequate measures consistent with the requirements of the Telemarketing and Consumer Fraud and Abuse Prevention Act, as well as the TSR;

11.      That each Defendant, within thirty (30) days after entry of judgment or issuance of an injunction, file with the Court and serve upon Marriott's counsel a written report under oath setting forth in detail the manner in which each Defendant has complied with the Court's order(s);

12.      That the Court order an award of costs and reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a), 15 U.S.C. § 6104(d), 17 U.S.C. § 505, or as otherwise permitted by law, incurred by Marriott in connection with this action;

13.      That Marriott be awarded pre-judgment interest and post-judgment interest on the above damages awards; and

14.      That the Court order an award to Marriott of such other and further relief as the Court may deem just and proper.

Dated: May 17, 2022                          MARRIOTT INTERNATIONAL, INC.
                                             By counsel


                                   By:     _/s/ Attison L. Barnes, III_____
                                           Attison L. Barnes, III (VA Bar No. 30458)
                                           David E. Weslow (for *pro hac vice*)
                                           Kevin G. Rupy (for *pro hac vice*)
                                           Duane C. Pozza (for *pro hac vice*)
                                           Stacey J. LaRiviere (VA Bar No. 92354)
                                           WILEY REIN LLP
                                           2050 M St. NW

Washington, DC 20036
Tel: (202) 719-7000
abarnes@wiley.law
dweslow@wiley.law
krupy@wiley.law
dpozza@wiley.law
slariviere@wiley.law

*Counsel for Plaintiff Marriott International, Inc.*