**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| MARRIOTT INTERNATIONAL, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:21-cv-00610-AJT/JFA |
| DYNASTY MARKETING GROUP, LLC, *et al.*, | |
| Defendants. | |

**<u>PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS
FILED BY RESORTCOM INTERNATIONAL, LLC</u>**

Attison L. Barnes, III (VA Bar No. 30458)
David E. Weslow (for *pro hac vice*)
Kevin G. Rupy (for *pro hac vice*)
Duane C. Pozza (for *pro hac vice*)
Stacey J. LaRiviere (VA Bar No. 92354)
WILEY REIN LLP
2050 M St. NW
Washington, DC 20036
Tel: (202) 719-7000
abarnes@wiley.law
dweslow@wiley.law
krupy@wiley.law
dpozza@wiley.law
slariviere@wiley.law

*Counsel for Plaintiff Marriott International, Inc.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY ................................................................................. 2

I.    ARGUMENT ........................................................................................................ 3

    A.   ResortCom's Motion Should Be Denied In Its Entirety. .................................... 4

       1.   Contributory Infringement ............................................................................ 4

          a.   Marriott Adequately Alleged that ResortCom Monitored or Exercised Control Over Numerous Defendant Group 1 Entities, And Were Willfully Blind to Their Conduct, or Failed to Take Sufficient Remedial Action. .................................................................. 6

          b.   Marriott Properly Alleged ResortCom was Constructively Aware of Defendant Group 1 Entities' Infringement. ................................................................................ 8

          c.   Marriott Alleged Numerous Instances of Direct Infringement. .............................. 10

       2.   Federal Unfair Competition Claim ............................................................... 11

          a.   Marriott Generally Pleaded a Claim for Federal Unfair Competition. ................... 12

          b.   Marriott Specifically Pleaded a Federal Unfair Competition Claim Against ResortCom. ................................................................................................................ 13

       3.   TSR Claim ................................................................................................... 14

          a.   Marriott Alleged Numerous Underlying TSR Violations. ..................................... 14

          b.   ResortCom Provided Substantial Assistance to Defendants Violating the TSR. ... 15

          c.   ResortCom Knew or Consciously Avoided Knowing that Other Defendants Violated the TSR. ...................................................................................................... 18

       4.   Virginia Unfair Competition ........................................................................ 19

          a.   ResortCom is a Supplier. ...................................................................................... 20

          b.   Marriott has Standing Under the VCPA. .............................................................. 20

          c.   Marriott Alleged Reliance and Damages. ............................................................. 22

       5.   Virginia Tortious Interference ..................................................................... 23

          a.   Marriott Pleaded a Specific Business Relationship or Expectancy. ...................... 23

          b.   ResortCom Knew of These Business Relationships or Expectancies. .................. 23

          c.   Marriott Adequately Alleged the Remaining Elements. ......................................... 24

       6.   Virginia Common Law Conspiracy ............................................................. 25

II.    CONCLUSION .................................................................................................. 27

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                      **Page(s)**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
   722 F.3d 1229 (10th Cir. 2013) ............................................................................5

*AdvanFort Co. v. Int'l. Registries, Inc.*,
   No. 1:15-cv-220, 2015 WL 4254988 (E.D. Va. July 13, 2015)................................................25

*Alexander v. Southeastern Wholesale Corp.*,
   978 F. Supp. 2d 615 (E.D. Va. 2013) ...................................................................20

*Alliance Tech. Grp. v. Achieve 1, LLC*,
   No. 3:12-cv-701, 2013 WL 143500 (E.D. Va. Jan. 11, 2013)................................................23

*Anand v. Ocwen Loan Servicing, LLC*,
   754 F.3d 195 (4th Cir. 2014) ............................................................................7

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................4

*New Mexico ex rel. Balderas v. Real Estate Law Center, P.C.*,
   401 F. Supp. 3d 1229 (D.N.M. 2019) .....................................................................19

*Ballagh v. Fauber Enters., Inc.*,
   773 S.E. 2d 366 (Va. 2015)................................................................................22

*BHR Recovery Cmtys., Inc. v. Top Seek, LLC*,
   355 F. Supp. 3d 416 (E.D. Va. 2018) .............................................................10, 21

*Blount v. Greenbrier Pontiac Oldsmobile-GM Trucks Kia, Inc.*,
   No. 3:08-cv-622, 2009 WL 2431587 (E.D. Va. Aug. 7, 2009) ............................................22

*Borg v. Warren*,
   545 F. Supp. 3d 291 (E.D. Va. 2021) .............................................................26, 27

*Buffalo Wings Factory, Inc. v. Mohd*,
   622 F. Supp. 2d 325 (E.D. Va. 2007) ...................................................................23

*CFPB v. Rosen*,
   No. 2:21-cv-07492, 2022 WL 1514439 (C.D. Cal. Apr. 5, 2022)....................................16, 18

*Coach, Inc. v. Goodfellow*,
   717 F.3d 498 (6th Cir. 2013) ............................................................................5

*Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*,
   249 F.3d 204 (4th Cir. 2001) ............................................................................24

*Diane Von Furstenberg Studio v. Snyder*,
    No. 1:06-cv-1356, 2007 WL 2688184 (E.D. Va. Sept. 10, 2007) .........................................5, 9

*FTC v. First Data Merchant Servs. LLC*,
    No. 1:20-cv-3867 (S.D.N.Y. 2020) (Dkt. No. 15) ....................................................................19

*FTC v. Glob. Mktg. Grp., Inc.*,
    594 F. Supp. 2d 1281 (M.D. Fla. 2008).....................................................................................19

*FTC v. HES Merch. Servs. Co.*,
    No. 6:12-cv-1618, 2014 WL 6863506 (M.D. Fla. Nov. 18, 2014)...........................................17

*FTC v. Hornbean Special Situations, LLC*,
    No. 1:17-cv-03094 (N.G. Ga. 2017) (Dkt. No. 445) ................................................................19

*FTC v. Nudge, LLC*,
    No. 2:19-cv-00867, 2021 WL 3145700 (D. Utah July 26, 2021)............................................15

*Gov't Emps. Ins. Co v. Google, Ins.*,
    330 F. Supp. 2d 700 (E.D. Va. 2004) .........................................................................................5

*Grijalva v. Kevin Mason, P.A.*,
    No. 8:18-cv-02010, 2019 WL 8221076 (C.D. Cal. Dec. 30, 2019).........................................17

*H. D. Oliver Funeral Apartments, Inc. v. Dignity Funeral Servs., Inc.*,
    964 F. Supp. 1033 (E.D. Va. 1997) ..........................................................................................21

*Hall v. Virginia*,
    385 F. 3d 421 (4th Cir. 2004) ...................................................................................................13

*Harrell v. Colonial Holdings, Inc.*,
    923 F. Supp. 2d 813 (E.D. Va. 2013) ..................................................................................12, 25

*Inwood Lab'ys., Inc. v. Ives Lab'ys., Inc.*,
    456 U.S. 844 (1982).....................................................................................................................5

*JTH Tax LLC v. DM3 Ventures, Inc.*,
    No. 3:20-cv-176, 2020 WL 6551214 (E.D. Va. Nov. 6, 2020) ................................................20

*Match.Com, LLC v. Fiesta Catering Int'l., Inc.*,
    No. 1:12-cv-363, 2013 WL 428056 (E.D. Va. Jan. 31, 2013)...............................................5, 8

*Merriman v. Auto Excellence, Inc.*,
    55 Va. Cir. 330 (Va. Cir. Ct. 2001)...........................................................................................21

*Orbital ATK, Inc. v. Walker*,
    No. 1:17-cv-163, 2017 WL 2982010 (E.D. Va. July 12, 2017)..................................................3

*Owens v. DRS Auto. Fantomworks, Inc.*,
    764 S.E.2d 256 (2014) ..........................................................................19

*Sidya v. World Telecom Exch. Comms., LLC*,
    870 S.E.2d 199 (Va. 2022)....................................................................23

*Smith v. Wright*,
    No. 2:19-cv-559, 2020 WL 6053154 (E.D. Va. May 6, 2020)................25

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002)................................................................................3

*Tobey v. Jones*,
    706 F.3d 379 (4th Cir. 2013) ..................................................................4

**Statutes**

Virginia Consumer Protection Act - Va. Code Ann. § 59.1 ................................. *passim*

**Rules**

Fed. R. Civ. P. 8(a)(2)...........................................................................................3, 4

Fed. R. Civ. P. 9(b) ...................................................................................................22

Telemarketing Sales Rule - 16 C.F.R. § 310 .................................................14, 15, 17

**Regulations**

60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995)..........................................................16

68 Fed. Reg.  4,580, 4,612 (Jan. 29, 2003) .............................................................16

Plaintiff Marriott International, Inc. ("Marriott" or "Plaintiff"), by counsel and pursuant to Local Rule 7(F)(1), opposes Defendant ResortCom International, LLC's ("ResortCom") Motion to Dismiss and states as follows:

## INTRODUCTION AND SUMMARY

As alleged in the First Amended Complaint ("FAC"), ResortCom is a U.S.-based services company that facilitates the scheme at issue causing harm to the consuming public and to Marriott's brand.   In its Opposition, however, ResortCom cherry-picks certain allegations to downplay its role while ignoring: (1) key allegations in the FAC; (2) inferences fairly drawn from those allegations; and (3) applicable caselaw.  As set forth below, Marriott's specific and genuine factual allegations establish the plausibility of each claim consistent with controlling authority, and ResortCom's motion should be denied.

First, Marriott stated sufficient facts to demonstrate that ResortCom contributorily infringed on the MARRIOTT mark.  Among other things, Marriott alleged that ResortCom continued to provide timeshare-related services (including payment processing) to Defendant Group 1 entities,[1] despite knowledge of their direct infringement, giving rise to ResortCom's liability.

Second, Marriott's allegations are more than sufficient to state a federal unfair competition claim based on joint liability, and Marriott also alleged sufficient facts to support a claim in light of ResortCom's service agreements with Vallarta Gardens and Tafer Resorts; its contractual duties under those agreements; and the blended payment processing and resort-type roles ResortCom plays in the Marriott robocall scams.

---

[1] This term refers to Vallarta Gardens, Tafer Resorts, Cancun Ink Corp., Parrot Caribbean, Vacancy Rewards, Whisl and Prestige but not, for the purposes of this motion, ResortCom, unless otherwise stated.  *See* FAC ¶ 71.

Third, Marriott properly pleaded a substantial assistance claim under the Telemarketing Sales Rule ("TSR").  As set forth in the FAC, ResortCom provided substantial assistance by supplying payment processing services and additional timeshare-related services to Defendant Group 1 entities to enable the scheme in the United States.  Marriott also adequately alleged that ResortCom knew or consciously avoided knowing of the Defendant Group 1 entities' unlawful practices.

Finally, Marriott properly pleaded all required elements of its civil claims under the Virginia Consumer Protection Act ("VCPA") and its common law claims for tortious interference and conspiracy.  At the very least, the FAC alleges facts upon which this Court may conclude that ResortCom is a supplier under, and that Marriott is a consumer protected by, the VCPA.  And Marriott's claim comports with the VCPA's intended purpose.  In addition, Marriott is not required to plead a competitive relationship between ResortCom and Marriott, and the tortious interference claim is adequately pleaded.  Lastly, Marriott's conspiracy claim satisfies the well-settled standard.

For these reasons, this Court should deny ResortCom's Motion.

## I.   ARGUMENT

A party seeking dismissal under Fed. R. Civ. P. 12(b)(6) must show that, after "construing the facts in the light most favorable to the non-moving party," the pleadings "fail to state any cognizable claim for relief, and the matter can, therefore, be decided as a matter of law."  *Orbital ATK, Inc. v. Walker*, No. 1:17-cv-163, 2017 WL 2982010, at *4 (E.D. Va. July 12, 2017) (quoting *O'Ryan v. Dehler Mfg. Co., Inc.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000)); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 658 (E.D. Va. 2014), *aff'd*, 811 F.3d 653 (4th Cir. 2016)).  The complaint must meet only the "simplified pleading standard" of Rule 8(a)(2), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

3

To determine whether a complaint meets the Rule 8(a)(2) standard, a court must "assume [the] veracity [of the genuine factual allegations] and then determine whether they plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A complaint will survive when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.  A court must construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff, see *Tobey v. Jones*, 706 F.3d 379, 390 (4th Cir. 2013), and "draw on its judicial experience and common sense" to determine whether a reasonable inference can be made, and thus whether the pleader has stated a plausible claim for relief.  *Ashcroft*, 556 U.S. at 679.

### A.     **ResortCom's Motion Should Be Denied In Its Entirety.**

#### 1.     **Contributory Infringement**

ResortCom is contributorily liable for several Defendant Group 1 entities' infringement on the MARRIOTT mark.  In an effort to avoid liability, ResortCom downplays its multi-faceted role in the scam,[2] misleadingly cites to noncontrolling authority when setting forth the elements of contributory infringement, *see* ResortCom's Mem. in Supp. of Mot. to Dis., Dkt. No. 57 ("Mot. to Dis.") at 11-12, and relies on decisions resolving motions or appeals **after the factual record has been fully developed**.  *See, e.g.*, *id.* at 12—14 (citing *Diane Von Furstenberg Studio v. Snyder*, No. 1:06-cv-1356, 2007 WL 2688184, at *4 (E.D. Va. Sept. 10, 2007) (evaluating a motion for summary judgment); *Rosetta Stone Ltd. v. Google, Inc.*, 730 F. Supp. 2d 531, 546-547 (E.D. Va. 2010) (same); *BMG Rights Mgmt. (US) LLC v. Cox Comms., Inc.*, 881 F.3d 293, 308 (4th Cir.

---

[2] ResortCom seizes on affidavits referenced in the FAC and points to contradictory language to suggest that ResortCom is not involved in the Marriott scam.  *See* Mot. to Dis. at 8-10.  That argument is unavailing, particularly given Marriott's specific allegations regarding ResortCom's conduct and entry into service contracts with two other Defendant Group 1 entities.  At the very least, this issue suggests a need for discovery.

2018) (evaluating an appeal after a trial); and *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (same)).

Consistent with controlling authority at the motion to dismiss stage, Marriott sufficiently alleged that ResortCom "continue[d] to supply [a] product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood Lab'ys., Inc. v. Ives Lab'ys., Inc.*, 456 U.S. 844, 854 (1982). For entities that are not manufacturers or distributors, contributory liability may be imposed where an entity was "willfully blind to the ongoing violations" of the infringers. *Diane Von Furstenberg Studio*, 2007 WL 2688184, at *4 (internal citations omitted). And such an entity must exercise "the requisite degree of control over the activity of third-party infringers to justify" the extension of liability. *Id*. (internal citation omitted).[3] Other courts have construed the *Inwood* test to impose liability when a defendant is aware of the infringement but fails to take reasonable remedial measures. *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1252 (10th Cir. 2013); *see Coach, Inc. v. Goodfellow*, 717 F.3d 498, 504—06 (6th Cir. 2013). This is consistent with the ruling of a court in this District finding sufficient the allegation of facts giving rise to the inference that a defendant could have ended the infringement. *See, e.g.*, *Match.Com, LLC v. Fiesta Catering Int'l., Inc.*, No. 1:12-cv-363, 2013 WL 428056 at *7 (E.D. Va. Jan. 31, 2013) (noting that actual knowledge of infringement and contribution of "continuing to license or otherwise facilitat[ing] [ ] use of" domain names and trademarks were enough).

Marriott alleged that ResortCom either monitored or exercised the requisite level of control over certain Group 1 Defendants sufficient to warrant liability. *See, e.g.*, *Gov't Emps. Ins. Co v.*

---

[3] In applying the relevant standard, a court in this District distilled the level of control required to an analogy—finding the control a flea market operator exercised over clients sufficient in contrast to the insufficient control exercised by a "neutral stakeholder with no direct involvement in the activities of the allegedly infringing party." *Diane Von Furstenberg Studio*, 2007 WL 2688184, at *5 (quoting *Size, Inc. v. Network Sols., Inc.*, 255 F. Supp. 2d 568, 573 (E.D. Va. 2003)).

*Google, Ins.*, 330 F. Supp. 2d 700, 705 (E.D. Va. 2004) (noting that the allegation that a defendant "monitors and controls" the infringers satisfies the element of actual or constructive knowledge). In light of the relationships alleged in the FAC, ResortCom was no neutral stakeholder and was, at best, willfully blind to or failed to take sufficient remedial measures concerning the infringing conduct. And, in its Opposition, ResortCom does not challenge that Marriott properly pleaded direct infringement claims. *See* Mot. to Dis. at 11 n.13.

> a. <u>Marriott Adequately Alleged that ResortCom Monitored or Exercised Control Over Numerous Defendant Group 1 Entities, And Was Willfully Blind to Their Conduct, or Failed to Take Sufficient Remedial Action.</u>

Although a provider of many services, ResortCom concedes that it is, at least, a payment processor. *See* Mot. to Dis. at 2. Marriott's FAC describes a payment processor's role in the scam. *See infra* Section I(A)(1)(b) (setting forth the payment processor's role in the scam and the knowledge a payment processor would have based on its relationship with a resort, which includes a resort's use of the MARRIOTT mark). Marriott then specifically alleges that ResortCom serves as the Defendant Group 1 entities' payment processor. *See* FAC ¶¶ 89-90. And ResortCom's payment processing service was used by the Defendant Group 1 entities to complete the Marriott robocall scam targeting victims in the United States and involving the direct infringement of the MARRIOTT mark. *See id.* ¶ 89.

In addition to ResortCom's provision of payment processing services to the direct infringers, Marriott alleged ResortCom's services relationship with at least two Defendant Group 1 entities, one of whom was a direct infringer. Marriott further alleged that ResortCom provides timeshare-related services to and has contractual relationships with direct infringer Vallarta Gardens, see *infra* Section I(A)(1)(b), and Tafer Resorts. Those services include "helping resorts manage their timeshare membership accounts with billing, processing, reservation, and other

related services." *See* FAC ¶ 90.  ResortCom even documented this relationship by entering into Master Services Agreements with Vallarta Gardens and Tafer Resorts.[4]  *See* FAC ¶ 92.  Those agreements reflect that ResortCom provides "new sales processing" for Vallarta Gardens and "contract processing" for Tafer Resorts as well as "welcome calls," "special marketing" programs, and "multiple merchant accounts, as needed" for both Vallarta Gardens and Tafer Resorts.[5]  *See* Ex. 1, Dkt. No. 57-1, and Ex. 2, Dkt. No. 57-2, to Mot. to Dis. With respect to Tafer Resorts, Marriott avers an intertwined relationship between ResortCom and Tafer Resorts—ResortCom's board includes members from Tafer Resorts; another timeshare exchange company's[6] board is comprised of the principal of Tafer Resorts and ResortCom's Chief Operations Officer and outside counsel; and Tafer Resorts publicizes that it regularly collaborates with ResortCom.  *See* FAC ¶¶ 76, 78.  Marriott specifically alleged that these "[s]tructural overlaps. . . reflect[] coordination and shared knowledge."  *Id.* ¶ 75.  Marriott further pleads that customer service representatives often promote a Tafer Resort, Villa Del Palmar.  *See Id.* ¶ 105.  And regarding ResortCom's connection to direct infringer Vallarta Gardens, Marriott further alleged that ResortCom retained chargeback records[7] for Vallarta Gardens.  *See Id.* ¶ 94.  Moreover, ResortCom entered into an agreement with Vallarta Gardens establishing an escrow for chargebacks.  *See Id.* ¶ 95.  Consequently, ResortCom permitted that business relationship to continue despite knowing that Vallarta Gardens

---

[4] Marriott also alleged that Villa Del Palmar is a Tafer Resort.  *See* FAC ¶¶ 102, 103, 105.

[5] A court may "consider extrinsic evidence" supplementing allegations when that evidence consists of documents that are attached to or incorporated into the complaint, "integral to the complaint," and "authentic."  *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014) (citation omitted).

[6] This entity shares a corporate address with ResortCom.  *See* FAC ¶ 76.

[7] "A 'chargeback' occurs when an individual is dissatisfied with a good or service and successfully disputes the charge with the individual's issuing bank.  The issuing bank pays the individual.  The issuing bank then recovers that amount from, ultimately, the merchant."  *See* FAC ¶ 94 n.17.  High chargeback rates indicate deceptive practices.  *See id.* ¶ 94.

chargebacks were so voluminous that they reflected deceptive practices. *See infra* Section I(A)(1)(b). As such, ResortCom had sufficient control such that it could have stopped its infringing conduct, and/or was willfully blind to and actively participated in the infringing conduct.

With respect to directly infringing telemarketers, Marriott's FAC explains that they are paid by resorts to generate Marriott robocalls, and that payment processors, like ResortCom, process payments from deceived consumers to telemarketers. *See* FAC ¶ 3. From this, the Court may at least infer a contractual relationship between ResortCom and the telemarketers, as the combination of entities working in concert targeted and harmed U.S. residents as well as Marriott. Additionally, Marriott alleged that Tafer Resorts maintains a broker list which lists Cancun Ink Corp. *See id.* ¶ 79. Given that Marriott made allegations about the overlaps between ResortCom and Tafer Resorts, the Court may also properly infer that ResortCom exercised some control over Cancun Ink Corp. Considering the allegations and inferences drawn therefrom that are set forth above, Marriott adequately alleged that ResortCom exercised sufficient control over direct infringer Cancun Ink Corp. such that it could have stopped its infringing conduct.

Accordingly, Marriott adequately alleged that ResortCom exercised control over or monitored multiple Defendant Group 1 entities and was either willfully blind to or failed to take sufficient remediation steps following the Defendant Group 1 entities' direct infringement.

                        b.    <u>Marriott Properly Alleged ResortCom was Constructively Aware of<br>Defendant Group 1 Entities' Infringement.</u>

ResortCom relies on inapplicable authority concerning **patent** infringement to suggest that ResortCom must possess "actual knowledge" of the underlying infringement to be held liable, *see* Mot. to Dis. at 13-14, and ignores that this Court has held that "constructive knowledge" is sufficient for a claim of contributory **trademark** infringement. *Match.Com, LLC*, 2013 WL 428056, at *7.

In describing the Defendants' scam, Marriott alleged that:

[p]ayment [p]rocessors process payments for Resorts involving consumer purchases based on use of brand name "Marriott":
- [v]acation packages for short trips to the Resort, and
- [v]acation packages at the Resort.

*See* FAC at ¶ 3 (containing diagram depicting relationships between and critical roles played by categories of defendants).  Marriott pleaded that ResortCom generally "ha[d] notice of" and thus understood that the Defendant Group 1 entities made robocalls due to ResortCom being subject to robocalling suits.  *See* FAC ¶ 96.  Marriott then averred that ResortCom served as, *inter alia*, the Defendant Group 1 entities' payment processor and provided multiple instances of ResortCom processing payments for victims of Marriott robocalls that also involved other Defendant Group 1 entities.  *See id.* ¶¶ 89, 97, 104, 105.  From these allegations, an inference arises that ResortCom is, or should have been, aware of the underlying infringing use of the MARRIOTT mark.

Moreover, Marriott specifically pleaded facts that give rise to the inference that ResortCom had constructive knowledge of at least Vallarta Gardens' infringing conduct.  Marriott alleged that as Vallarta Gardens' service provider, ResortCom maintained chargeback rates for Vallarta Gardens.  *See id.* ¶ 94.  Marriott further alleged that those rates exceeded 25%, that such rates were exceedingly high, and cited authority explaining that high chargeback rates constitute evidence of deceptive telemarketing practices.  *See id.*  Marriott then pleaded that ResortCom executed an agreement establishing an escrow account with Vallarta Gardens because of its high chargeback rates, which reflects that ResortCom acknowledged Vallarta Gardens' excessive chargeback rates.  *See id.* ¶ 95.  And despite this glaring red flag, ResortCom continued to do business with Vallarta Gardens through at least 2021 as evidenced by 2021 chargeback rates.  *See id.*  An inference arises that by continuing this relationship, ResortCom received "direct financial benefit from the infringing conduct."  *See e.g.*, *Diane Von Furstenberg Studio,* 2007 WL 2688184, at *5 (citing

with approval *Microsoft Corp. v. Black Cat Comput. Wholesale, Inc.*, 269 F. Supp. 2d 118, 123 (W.D.N.Y. 2002)) (explaining that receiving financial benefit from infringement supports a finding of contributory infringement).

c.   Marriott Alleged Numerous Instances of Direct Infringement.

Marriott alleged multiple instances of infringing conduct exhibited by an entity for whom ResortCom provides myriad services, Vallarta Gardens—Vallarta Gardens used the MARRIOTT mark; used the mark in commerce;  used the mark in connection with the sale of vacation packages; and used the mark in a manner likely to confuse consumers.  *See BHR Recovery Cmtys., Inc. v. Top Seek, LLC*, 355 F. Supp. 3d 416, 426 (E.D. Va. 2018) (citing *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001)).   Courts consider nine factors in assessing consumer confusion, which may not apply in every case, and may be afforded different weight:

> (1) the strength or distinctiveness of the plaintiffs mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*Id*. (quoting *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153 (4th Cir. 2012)).

ResortCom does not question Marriott's registration of the MARRIOTT mark with the U.S. Patent and Trademark Office (accepted as true at the motion to dismiss stage) and such registration constitutes *prima facie* "evidence of Marriott's exclusive right to use the mark[ ]." *See* FAC ¶¶ 37—42; Mot. to Dis. at 11 n.13.  Marriott also pleaded sufficient facts from which the Court may infer that Vallarta Gardens' infringed on the MARRIOTT mark as a Defendant Group 1 entity resort.  *See* FAC ¶ 71.  An FAC graphic explains that the Marriott robocall scam, in which resorts:

- [h]ire telemarketers to generate consumer leads using brand name "Marriott"[;]
- [u]se [p]ayment [p]rocessors to process payments from leads; [and]
- [s]ell vacation packages to leads that also benefit the Exchanges.

*See id.* ¶ 3.

From Marriott's allegations and graphic, at the very least an inference arises that Vallarta Gardens used the MARRIOTT mark when selling vacation packages as part of the Marriott robocall scheme.  In addition, Marriott pleaded several examples of Marriott robocalls involving misuse of the MARRIOTT mark wherein customer service representatives referenced Vallarta Gardens.  *See id.* ¶¶ 97, 104, 105.  Coupled with the allegation that such resorts hire telemarketers to generate leads using the mark, and that customer service representatives allegedly used the mark in the instances previously noted, the Court may infer that Vallarta Gardens is responsible for the infringement.  And in these robocalls, the mark used is identical to the MARRIOTT mark, which is a famous mark known worldwide, *see id.* ¶ 36, that Vallarta Gardens used for their commercial benefit and without authorization, *see id.* ¶ 71, and multiple victims were actually confused and deceived into purchasing vacation packages.  *See id.* ¶¶ 97, 104, 105.

For these reasons, Marriott sufficiently alleged that ResortCom exercised the requisite control over and monitored several Defendant Group 1 entities and possessed constructive knowledge of the infringement.

### 2. Federal Unfair Competition Claim

To challenge Marriott's federal unfair competition claim, ResortCom, citing non-controlling or inapposite authority,[8] advances an argument that this Court has already deemed meritless.  In this District, Marriott need only plead "that it has a valid trademark and that the

---

[8] ResortCom mistakenly relies on caselaw regarding false association or false endorsement.  *See* Mot. to Dis. at 15-16.

defendant's use of a colorable imitation is likely to cause confusion among customers." *Harrell v. Colonial Holdings, Inc.*, 923 F. Supp. 2d 813, 820 (E.D. Va. 2013). Marriott's allegations satisfy the elements of a claim for direct infringement considering that a federal unfair competition claim is essentially the same as a federal trademark infringement claim. *Id*.; *see supra* Section I(A)(1)(c) (setting forth the elements for direct infringement).

   a.   <u>Marriott Generally Pleaded a Claim for Federal Unfair Competition.</u>

ResortCom contends that Marriott failed to properly plead such a claim against ResortCom *specifically*, but this Court has already held that "there exists no 'bright-line prohibition'" on pleading allegations against defendants *generally*. *Harrell*, 923 F. Supp. 2d at 820 (quoting *Alliance Tech. Grp. v. Achieve 1, LLC*, No. 3:12-cv-701, 2013 WL 143500, at *3 (E.D. Va. Jan. 11, 2013)). The *Harrell* court denied a motion to dismiss a federal unfair competition claim when the plaintiff asserted joint liability and, *inter alia*, "[e]ach Defendant [wa]s affiliated with the others and appear[ed] to play a role in the operation of the Colonial Downs racetrack." *Id*. at 821. As in *Harrell*, Marriott asserted joint liability and alleged that ResortCom exercises a level of control over and monitors Defendant Group 1 entities. *See* FAC ¶ 176 (alleging that ResortCom is liable for its own conduct and that Vallarta Gardens and Tafer Resorts are "jointly and severally liable for the misconduct of Defendants Cancun Ink Corp. and/or Parrot Caribbean"); *supra* Section I(A)(1)(a) (describing ResortCom's exercise of control over some Defendant Group 1 entities based on structural overlaps, affiliations, and contractual relationships and explaining ResortCom's monitoring of Vallarta Gardens based on business records and an escrow agreement).

In addition, Marriott alleges that the Defendant Group 1 entities acted together with ResortCom and used the mark in a way that is likely to cause consumer confusion. Marriott alleged that the Defendant Group 1 entities and ResortCom "directly or indirectly market vacation packages at resorts associated with Vallarta Gardens and Tafer Resorts," and that the telemarketers

Parrot Caribbean and Cancun Ink Corp. "utilize a series of websites apparently intended to lend legitimacy to their marketing pitch (*e.g.*, pricetravelvip.com, BookVipAllInclusive.com, 5startravel.com.mx, allinclusivebeachfronts.com)." *See* FAC ¶¶ 74. Marriott then alleged specific instances of Marriott robocalls implicating numerous Defendant Group 1 entities and ResortCom. *See id.* ¶¶ 97-108. Taking these allegations together—that Marriott pleaded joint liability and pleaded that the Defendant Group 1 entities and ResortCom generally and specifically acted together—this claim survives a 12(b)(6) motion.

        b.   <u>Marriott Specifically Pleaded a Federal Unfair Competition Claim Against ResortCom.</u>

Although Marriott is not required to plead an unfair competition claim as to ResortCom, Marriott has done so. While ResortCom seeks to limit its role in the robocall scheme to payment processing, Marriott's allegations do not stop there. *See* Mot. to Dis. at 2. Marriott more broadly identifies ResortCom as a service provider and alleged many types of services to Vallarta Gardens, a direct infringer, and Tafer Resorts pursuant to Master Services Agreements.[9] *See supra* Section I(A)(1)(a). Those services include consumer-facing services like contract processing, conducting welcome calls, and marketing. *Id.* This Court can take judicial notice that on ResortCom's own website, ResortCom describes its analogous "reservation" services, which includes "actively engaging our members and their guests," "offer[ing] a plethora of options to enhance both the member and guest experience," "creating individualized vacation experiences," and "build[ing] trusting relationships with our members."[10] Reading these allegations together, an inference arises

---

[9] ResortCom impermissibly attempts to disclaim its contractual responsibilities by challenging the affidavits Marriott referenced in its FAC. *See* Mot. to Dis. at 8-10.

[10] This Court may take judicial notice of the information on ResortCom's website. *See What We Do*, Resortcom, https://corporate.resortcom.com/timeshare-financial-services/ (last visited July 15, 2022); *Hall v. Virginia*, 385 F. 3d 421, 424 n. 3 (4th Cir. 2004) (noting that a court may take judicial notice of facts in the public record in reviewing a 12(b)(6) motion).

that in providing these consumer-facing services, ResortCom is aware of and plays an integral part of the misuse of the MARRIOTT mark.  This inference is further bolstered by the graphic that appears on page six of the FAC, which explains relationships between, and roles played, by payment processors and resorts in the robocall scam.  *See supra* Section I(A)(1)(b) (describing the role of payment processors) and (c) (describing the role of resorts).

And ResortCom's actions are likely to cause confusion.  *See, e.g.*, FAC ¶ 67 (explaining generally that many customers "were confused by the robocall scams and ultimately purchased the advertised promotions"), *id.* ¶¶ 97, 104, 105 (noting instances when ResortCom processed payments made by actually confused consumers as a result of Marriott robocalls) and *id.* ¶ 175 (explaining that "Defendants' use of Marriott's name and the MARRIOTT Marks as alleged herein has caused and is likely to continue to cause confusion and mistake and to deceive customers [in the United States] as to the source of origin of Defendants' products and services").

Such allegations are more than sufficient to defeat ResortCom's motion to dismiss.

### 3.    TSR Claim

Marriott adequately alleged that ResortCom violated the substantial assistance provision of the TSR, 16 C.F.R. § 310.3(b).  The TSR prohibits "a person [from] provid[ing] substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule." 16 C.F.R. § 310.3(b).  ResortCom's arguments (that *ResortCom* must violate the TSR, that payment processing alone does not amount to substantial assistance, and that ResortCom must have actual knowledge of violations of the TSR) are contrary to law.

### a.    Marriott Alleged Numerous Underlying TSR Violations.

By arguing that Marriott did not allege that *ResortCom* itself violated 16 C.F.R. §§ 310.3(a), (c) or (d), or 310.4 (*see* Mot. to Dis. at 17-18), ResortCom misreads the statute,

mischaracterizes cited caselaw, and contradicts itself.[11]  Neither § 310.3(b) nor caselaw require that *ResortCom* both be the entity that commits the underlying violation of the TSR and the provisioner of substantial assistance.  Such a construction would render the substantial *assistance* provision superfluous or indeed meaningless.

Marriott alleged that several Defendant Group 1 entities (Cancun Ink Corp., Vallarta Gardens, Tafer Resorts, Vacancy Rewards) violated § 310.3(a)(2)(vii) by "misrepresenting its affiliation with, endorsement, or sponsorship by falsely claiming to be affiliated with Marriott," *see* FAC ¶¶ 191-195, and that those same defendants violated § 310.4(b) by "initiating outbound telephone calls that deliver a prerecorded message" without obtaining the requisite consent and (d) by "fail[ing] to make the requisite disclosures in selling goods and services."  *See* FAC ¶¶ 196-201.  Marriott alleged several examples of these violations.  *See id.* ¶¶ 97-108 (detailing Marriott robocalls made by Defendant Group 1 entities to specific victims).  Accordingly, Marriott properly pleaded underlying TSR violations.

### b.   ResortCom Provided Substantial Assistance to Defendants Violating the TSR.

ResortCom is not the uninvolved payment processor it claims to be.  *See* Mot. to Dis. at 18-21.  Rather, ResortCom provides myriad timeshare-related services to numerous Defendant Group 1 entities and is a major player in the Marriott robocall scheme.

"[S]ubstantial assistance . . . requires 'some connection between the substantial assistance provided to a deceptive telemarketer and resulting violations of core provisions of the revised proposed Rule.'"  *FTC v. Nudge, LLC*, No. 2:19-cv-00867, 2021 WL 3145700, at *4 (D. Utah July

---

[11] ResortCom later concedes that "[a]lthough some courts, as outlined below, have found that payment processors provided substantial assistance to telemarketing violations *by others*, the payment processors in those cases had active roles in the marketing process through their participation and control over those activities, and thus, had awareness of the violations."  Mot. to Dis. at 19 (emphasis added).

26, 2021) (citing TSR, 60 Fed. Reg. 30, 406, 30, 414 (June 8, 1995) (codified at 16 C.F.R. § 310)).

This connection need not be direct, *see CFPB v. Rosen*, No. 2:21-cv-07492, 2022 WL 1514439,

at \*4 (C.D. Cal. Apr. 5, 2022) (citing with approval *FTC v. HES Merch. Servs. Co.*, No. 6:12-cv-

1618, 2014 WL 6863506, at \*7 (M.D. Fla. Nov. 18, 2014)), and "[t]he threshold for what

constitutes substantial assistance is low."  *Id*. at \*4 (quoting *FTC v. Lake*, 181 F. Supp. 3d 692,

699 (C.D. Cal. 2016)).   And where, as here, when "actual knowledge cannot be proven, but there

are facts and evidence that support an inference of deliberate ignorance," the conscious avoidance

standard is to be applied.  TSR, 68 Fed. Reg.  4,580, 4,612 (Jan. 29, 2003) (codified at 16 C.F.R.

§ 310).

> According to the FTC, even the following acts qualify as "substantial assistance":
>
> providing lists of contacts to a seller or telemarketer that identify persons over the age of 55, persons who have bad credit histories, or persons who have been victimized previously by deceptive telemarketing or direct sales; providing any certificate or coupon which may later be exchanged for travel related services; providing any script, advertising, brochure, promotional material, or direct marketing piece used in telemarketing; or providing an appraisal or valuation of a good or service sold through telemarketing when such an appraisal or valuation has no reasonable basis in fact or cannot be substantiated at the time it is rendered.

TSR, 60 Fed. Reg.  43,842, 43,852 (Aug. 23, 1995).  As Marriott alleged, providing merchant

accounts "despite a slew of red flags indicating . . . fraudulent telemarketing" activity also

constitutes substantial assistance.  *See* FAC ¶ 52 (citing *FTC v. WV Universal Mgmt., LLC*, 877

F.3d 1234, 1239 (11th Cir. 2017)).

ResortCom appears to contend that its role in the scam is limited to payment processing,

and that it must have participated in marketing and exhibited some type of control over the

telemarketers' conduct to be liable.  *See* Mot. to Dis. at 19-20.  At the outset, Marriott alleged that

ResortCom engaged in far more than payment processing, and no authority provides that as a

matter of law, a payment processor must play a role in the marketing process to be found liable for

a substantial assistance violation.  Consequently, ResortCom's reliance on *Grijalva v. Kevin Mason, P.A.*, No. 8:18-cv-02010, 2019 WL 8221076 (C.D. Cal. Dec. 30, 2019) is misplaced, and ResortCom's attempt to distinguish *FTC v. HES Merchant Services Co.*, No. 6:12-cv-1618, 2014 WL 6863506 (M.D. Fla. Nov. 18, 2014), fails.

Regarding *Grijalva*, ResortCom cherry-picks a favorable quote but ignores that in the court's review of the second amended complaint, it found that the two allegations regarding the entities' involvement "boil down to [acting] as the sole and exclusive payment processor" for the scheme.  2019 WL 8221076. at *2.  Unlike *Grijalva*, Marriott alleged that as part of the scam, ResortCom provides payment processing and timeshare-related services to Defendant Group 1 entities, some of whom it maintains contractual relationships with despite numerous red flags, and provided specific examples of ResortCom's involvement in the Marriott robocalls.  *See supra* Section I(A)(1)(b) and (c).

With respect to *HES*, ResortCom conflates the conduct of other defendants to suggest that the court held the payment processor liable only because it was "deeply enmeshed" in the scheme. *See* Mot. to Dis. at 19-20.  Rather, the *HES* court explained that a plaintiff "*does not* have to show a 'direct connection' between the [defendant's] assistance and the misrepresentation for an entity to be liable under § 310.3(b)."  *HES Merch. Serv. Co.*, 2014 WL 6863506, at *7 (emphasis added). The *HES* court went on to hold that, "as a matter of law," the payment processor's provision of "two merchant accounts was essential to the success of the scheme," and that "[a]bsent these accounts, the TYS Defendants would have been unable to process credit card payments."  *Id*. Likewise, in the FAC, Marriott notes the importance of payment processing to the scam.  *See supra* Section I(A)(1)(b).  By virtue of ResortCom's presence in the United States, making consumers more comfortable paying money to a U.S.-based entity instead of a foreign entity, ResortCom

cannot now distance itself from liability.  Consequently, this Court should find, as a matter of law, that ResortCom provided substantial assistance.

Second, contrary to ResortCom's repeated efforts to minimize its role, ResortCom also provided other timeshare-related services necessary to the robocall scam, including reservation and billing services, to infringers Vallarta Gardens and Tafer Resorts (whose representative sits on ResortCom's Board).  ResortCom's Opposition contradicts the terms of its service agreements by arguing that ResortCom does not provide "marketing or telemarketing services for their resort clients" and that the services it does offer "are purely financial in nature." *See* Mot. to Dis. at 27. An inference can surely be made about ResortCom's marketing efforts on behalf of Vallarta Gardens and Tafer Resorts by conducting welcoming calls.  *See supra* Section I(A)(1)(a) (describing contractual relationships) and (2)(b) (describing ResortCom's participation in the scheme); *see, e.g.*, *Rosen, Inc.*, 2022 WL 1514439, at *5 (explaining that defendant violated the TSR's substantial assistance provision in part for providing software to manage customers); Mot. to Dis. at 18 (citing *Grijalva*, 2019 WL 8221076, at *4 (providing that substantial assistance may be found when a defendant "formulated, directed, controlled [. . .] or participated in the unlawful telemarketing acts and practices" of other, more directly liable, defendants)).

c.    <u>ResortCom Knew or Consciously Avoided Knowing that Other Defendants Violated the TSR.</u>

ResortCom also contends that it must know or consciously avoid knowing of alleged TSR violations to be liable.  *See* Mot. to Dis. at 22.  However, courts are clear that "it is sufficient to establish knowledge, or conscious avoidance, of the *prohibited practice, and not of the TSR violation*." *Rosen, Inc.*, 2022 WL 1514439, at *5 (citing *FTC v. Chapman*, 714 F.3d 1211, 1216-19 (10th Cir. 2013)) (discussing a defendant's knowledge or lack thereof regarding other defendants' misrepresentations and not TSR violations) (emphasis added); *New Mexico ex rel.*

18

*Balderas v. Real Estate Law Center, P.C.*, 401 F. Supp. 3d 1229, 1305 (D.N.M. 2019) (noting knowledge of the prohibited practice is sufficient); *FTC v. Glob. Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1288 (M.D. Fla. 2008) (finding sufficient that a defendant consciously avoided knowing telemarketers were engaged in deceptive acts and practices as opposed to having violated specific provisions of the TSR).

Marriott adequately alleged that ResortCom knew or consciously avoided knowing that infringer Vallarta Gardens engaged in a prohibited practice.  As set forth in the FAC, ResortCom had a generalized understanding of robocalling practices given it was named in several robocalling suits.  *See supra* Section I(A)(1)(b).  In addition, ResortCom understood that Vallarta Gardens' chargeback rates were indicative of deceptive telemarketing, which ResortCom acknowledged by entering into an escrow agreement, but continued to do business with them through at least 2021. *See supra id.*[12]

### 4.    Virginia Unfair Competition

The VCPA prohibits certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction. . . ."  Va. Code Ann. § 59.1-200(A).  And when the claim is predicated on misrepresentations, reliance and damages must also be pleaded.  *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (2014).

---

[12] The FTC regularly settles cases against payment processors providing substantial assistance under the TSR.  *See, e.g.*, *FTC v. First Data Merchant Servs. LLC*, No. 1:20-cv-3867 (S.D.N.Y. 2020) (Dkt. No. 15) (entering stipulated order for permanent injunction and monetary relief –$40 million—against a payment processor, among others, for violating numerous statutes and rules, including the substantial assistance provision of the TSR); *FTC v. Hornbean Special Situations, LLC*, No. 1:17-cv-03094 (N.G. Ga. 2017) (Dkt. No. 445) (entering stipulated order for permanent injunction and monetary relief in excess of $2 million against a payment processor, among others, for violating numerous statutes and rules, including the substantial assistance provision of the TSR).

As an initial matter, because Marriott properly pleaded its federal unfair competition claim, it follows that Marriott properly pleaded its Virginia Unfair Competition claim. *JTH Tax LLC v. DM3 Ventures, Inc.*, No. 3:20-cv-176, 2020 WL 6551214, at *4 (E.D. Va. Nov. 6, 2020) ("[U]nder Virginia law, 'a claim for unfair competition is essentially identical to the elements of the same claim under the Lanham Act.'") (quoting *Nationstar Mortg., LLC v. Ahmad*, 155 F. Supp. 3d 585, 592 (E.D. Va. 2015)).  ResortCom's arguments are easily defeated.

a. <u>ResortCom is a Supplier.</u>

As much as ResortCom seeks to confine its role in the robocall scam to payment processing, the FAC makes clear that ResortCom provides myriad timeshare-related services to infringer Vallarta Gardens and Tafer Resorts.  *See supra* Sections I(A)(1)(a) (describing timeshare-related services provided by ResortCom to Vallarta Gardens and Tafer Resorts) and (b) (explaining ResortCom's role as payment processor) and 2(b) (explaining the consumer-facing services ResortCom provides to Vallarta Gardens and Tafer Resorts).  Suppliers are "seller[s] . . . who . . . engage[] in consumer transactions."   Va. Code Ann. § 59.1-198.  The relevant definition of a "consumer transaction" is one involving "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes."  *Id*.  Several courts in this District have held that a "direct sale to a consumer is not required for the transaction to be covered by the VCPA," *Alexander v. Southeastern Wholesale Corp.*, 978 F. Supp. 2d 615, 622 (E.D. Va. 2013) (citing multiple cases stating same).  Marriott's allegations that ResortCom not only processed payments but **engaged in consumer-facing services** on behalf of direct infringer Vallarta Gardens and Tafer Resorts warrant the inference that ResortCom is a supplier.

b. <u>Marriott has Standing Under the VCPA.</u>

Implicit in Marriott's allegations is that *Marriott* is a consumer.  The VCPA extends to

protect corporations, like Marriott, *see* Va. Code Ann. § 59.1-198, who are harmed as a result of direct transactions between a supplier and consumer. *See, e.g.*, *Merriman v. Auto Excellence, Inc.*, 55 Va. Cir. 330, 331 (Va. Cir. Ct. 2001) (explaining that the VCPA's protection was not limited to transactions "directly between a supplier and the ultimate consumer"); Mot. to Dis. at 25 (citing *Branin v. TMC Enters., LLC*, 832 F. Supp. 2d 646, 650-51 (W.D. Va. 2011) (same)). Marriott alleged how it was harmed by numerous qualifying consumer transactions. *See* FAC ¶¶ 97-108 (describing Marriott robocalls made by Defendant Group 1 ResortCom resulting in victims' purchases of vacation packages, some of which were processed by ResortCom); *id.* ¶¶ 216-223 (describing the harm Defendants caused Marriott by misrepresenting that advertised goods are provided by Marriott, by misrepresenting that advertised goods are sponsored, approved, or certified by Marriott, by misrepresenting that advertised goods are affiliated, connected, or associated with Marriott, and by misrepresenting that advertised goods are similar in quality to Marriott's).

Despite a lack of support in the authority it cites, ResortCom makes a desperate argument that Marriott lacks standing to assert a VCPA claim because it believes (falsely) that Marriott is a competitor. *See* Mot. to Dis. at 25. Even if ResortCom were to try to establish competition at some point in this case, there are no allegations in the FAC that the parties are competitors, nor did Marriott allege that it serves as a payment processor or sells similar services. ResortCom's cited caselaw provides that "courts in this district have decided that competitors lack standing under the VCPA *because the legislature intended the statute to protect consumers*." *BHR Recovery Cmtys., Inc.*, 355 F. Supp. 3d at 424 (emphasis added); *H. D. Oliver Funeral Apartments, Inc. v. Dignity Funeral Servs., Inc.*, 964 F. Supp. 1033, 1039 (E.D. Va. 1997) ("The VCPA is to promote fair and ethical standards between suppliers and the consuming public . . . .  A competitor

does not fit into that equation.").   But ResortCom cannot ignore the allegations in the FAC that Marriott is acting to safeguard the consuming public from abusive and deceptive behavior.  *See* Compl., Dkt. No. 1, ¶¶ 61—63; FAC ¶¶ 126, 129—130.  Marriott further alleged that it acted in accordance with its unique status—Marriott used its own resources and issued a public statement to assist other consumers deceived by the robocall scam, worked with a federal agency to stop the scammers from continuing to harm other consumers, and filed the instant action.  *See* Compl. ¶¶ 59, 61; FAC ¶¶ 124, 126, 127.  Thus, Marriott's assertion of a VCPA claim against ResortCom squarely comports with the statute's intended purpose.

c.     <u>Marriott Alleged Reliance and Damages.</u>

ResortCom improperly holds Marriott to Rule 9(b)'s strictures when Marriott is not required to plead the VCPA elements "with the same kind of particularity as common law fraud claims."  *Blount v. Greenbrier Pontiac Oldsmobile-GM Trucks Kia, Inc.*, No. 3:08-cv-622, 2009 WL 2431587, at *6 (E.D. Va. Aug. 7, 2009); *Ballagh v. Fauber Enters.*, *Inc.*, 773 S.E.2d 366, 368 (Va. 2015); *see* Va. Code Ann. § 59.1-200(A) (prohibiting a supplier from engaging in various fraudulent acts or practices "in connection with a consumer transaction"); *see supra* Section I(A)(4)(b) (explaining that suppliers can be liable for violating the VCPA when they were not directly involved in the consumer transaction).  Marriott alleged that ResortCom knew that in processing payments, it enabled telemarketers to make misrepresentations to consumers who relied on those misrepresentations and purchased vacation packages.  *See* FAC ¶¶ 97, 104, 105.  In addition, Marriott alleged that ResortCom furnished other consumer-facing services to two defendants (*e.g.*, billing and reservations), one of whom is a direct infringer.

Further, Marriott averred how it was damaged as a result of the consumer transactions— including "actual damages, including without limitation lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of

22

reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion." *See id.* ¶ 222.  Accordingly, ResortCom's motion should be denied.

### 5.   Virginia Tortious Interference

Marriott sufficiently pleaded a claim for tortious interference.  The elements of the claim are: "(1) there was a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) the defendant had knowledge of that relationship or expectancy; (3) there is a reasonable certainty that absent the defendant's intentional misconduct, the plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to the plaintiff." *Buffalo Wings Factory, Inc. v. Mohd*, 622 F. Supp. 2d 325, 336 (E.D. Va. 2007).  In addition, Marriott alleged improper methods.  *See Alliance Tech. Grp., LLC*, 2013 WL 143500, at *8.

### a.   Marriott Pleaded a Specific Business Relationship or Expectancy.

Marriott properly pleaded the existence of business relationships or expectancies by alleging ongoing relationships between Marriott and the victims of the Marriott robocall scam with whom Marriott "routinely contract[s]," *see* FAC ¶ 231, including members of its loyalty program, Marriott Bonvoy.  *See id.* ¶ 44.  Marriott further referenced Marriott Bonvoy members who are known victims of the Marriott robocall scam operated by the Defendant Group 1 entities (including ResortCom).  *See id.* ¶¶ 44, 99, 103.  By alleging ongoing relationships between Marriott and its customers with whom it routinely contracts and specific relationships with Marriott Bonvoy members who were victims of the scam, Marriott properly pleaded the existence of business relationships and expectancies.  *See, e.g, Sidya v. World Telecom Exch. Comms., LLC*, 870 S.E.2d 199, 204 (Va. 2022) (noting that a business expectancy included "World Telecom's ongoing relationships with its customers and vendors"); *Alliance Tech. Grp., LLC*, 2013 WL 143500, at *8 (noting that a plaintiff's customer contracts constituted a business expectancy).

### b.   ResortCom Knew of These Business Relationships or Expectancies.

As a backdrop, Marriott alleged the varied types of customer-facing services ResortCom provided to Defendants Vallarta Gardens and Tafer Resorts. *See supra* Section I(A)(1)(a) (describing ResortCom's other timeshare-related services including conducting "welcoming calls" and marketing) and (b) (detailing ResortCom's payment-processing services). In other words, ResortCom provided services to consumers contacted by Vallarta Gardens and Tafer Resorts using the Marriott brand. *See supra* Section I(A)(2)(b). Marriott specifically alleged that the Defendants placed the calls to "market vacation packages via deceptive robocalls to residents of this District, many of whom are or were Marriott customers" and "specifically target[] Marriott customers." FAC ¶ 8, 23. And Marriott pleaded that one iteration of the scam involved targeting victims who were members of Marriott's "friends and family rewards program" and specifically noted that "Defendants often state that the consumer qualified for the promotion because he or she was [] a member of Marriott's loyalty program, Marriott Bonvoy. . . ." *Id.* ¶¶ 60, 61. From these allegations, the Court may at least infer that ResortCom knew of the Marriott robocall victims' business relationships or expectancies with Marriott.

### c.     Marriott Adequately Alleged the Remaining Elements.

Marriott alleged that ResortCom deployed improper means when intentionally interfering with the relationships and expectancies noted above and caused a breach or termination of those relationships or expectancies. Liability attaches where, as here, when the interferor "knows that the interference is certain or substantially certain to occur as a result of his [or her] actions." *Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 212-13 (4th Cir. 2001) (citation omitted). And Marriott sufficiently alleged that "as a direct and proximate result" of this misconduct, customers purchased products and services offered by Defendants instead of Marriott, and certain Marriott customers ceased their business relationships with Marriott. *See* FAC ¶¶ 121, 232-235. Marriott then notes it was damaged by this conduct in the form of, at least, "lost profits,

24

diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion." *Id*. ¶ 236.

Finally, Marriott is not required to allege that ResortCom is its competitor. "[T]he Virginia Supreme Court has never stated that . . . is a prerequisite to a tortious interference claim. . . ." *Smith v. Wright*, No. 2:19-cv-559, 2020 WL 6053154, at *16 n. 17 (E.D. Va. May 6, 2020) (citing *Schaecher v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015)); *AdvanFort Co. v. Int'l. Registries, Inc.*, No. 1:15-cv-220, 2015 WL 4254988, at *5 (E.D. Va. July 13, 2015) (citing *Schaecher* for the proposition that "the Supreme Court of Virginia indicates that it may be receptive to a claim for tortious inference even where a competitive relationship does not exist between the parties"). Accordingly, Marriott need not prove a competitive relationship for its tortious interference claim to survive a 12(b)(6) challenge.

For the reasons stated above, Marriott's tortious interference claim must proceed.

### 6.    Virginia Common Law Conspiracy

Marriott adequately pleaded that ResortCom conspired with the other Defendant Group 1 entities. Under Virginia common law, a civil conspiracy is "(1) a combination of two or more persons, (2) by some concerted action, (3) to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Harrell*, 923 F. Supp. 2d at 825. "The 'unlawful act' element requires that at least one member of the conspiracy commit an 'underlying tort.'" *Id*. (quoting *Almy v. Grisham*, 639 S.E.2d 182, 188 (2007*)*).

The gravamen of Marriott's FAC with respect to Defendant Group 1 is that they directly or indirectly telemarketed vacation packages falsely trading on Marriott's brand to consumers

across the United States, including Virginia.  *See* FAC ¶ 71.  According to the FAC, the goal of the conspiracy, including the use of U.S.-based ResortCom as a payment processor to entice U.S. citizens to fall for the scam, was to obtain maximum profit by unlawful means—deceiving consumers into purchasing what they believed to be Marriott-sponsored vacation packages.  *Id*. The vacation packages are purportedly redeemable at resorts associated with Vallarta Gardens and Tafer Resorts.  *Id*. ¶ 74.  The FAC then alleges that the Defendant Group 1 entities acted together. *Id*. ¶ 71.

To support those allegations of concerted action, Marriott pointed to commonalities in board membership to demonstrate that the acts of one Defendant Group 1 entity were known by other Defendant Group 1 entities.  *See* FAC ¶ 75.  Specifically, Marriott alleged that members of ResortCom's board are affiliated with Tafer Resorts and that board members of a timeshare exchange company that shares a corporate address with ResortCom include individuals affiliated with Tafer Resorts and ResortCom.  *See supra* Section I(A)(1)(a).  Marriott also alleged numerous other connections between the Defendant Group 1 entities—that Defendant Villa Del Palmar is a Tafer Resort, *see* FAC ¶¶ 102, 103, 105, and that Tafer Resorts is linked to some telemarketers and websites identified in Marriott robocalls through its maintenance of a broker list.  *See id.* ¶ 79. Additionally, Marriott alleged contractual relationships between several Defendant Group 1 entities—ResortCom contracted to provide timeshare-related services to infringer Vallarta Gardens and Tafer Resorts.  *See supra* Section I(A)(1)(a).

Moreover, Marriott satisfied the well-settled pleading standard by alleging "some details of time and place and the alleged effect of the conspiracy."  *See Borg v. Warren*, 545 F. Supp. 3d 291, 321 (E.D. Va. 2021) (quoting *Firestone v. Wiley*, 485 F. Supp. 2d 694, 704 (E.D. Va. 2007)). Marriott averred specific examples of concerted action between ResortCom, infringer Vallarta

Gardens, Whisl, and Prestige, and set forth ResortCom's involvement—ResortCom processed payments as a result of five Marriott robocalls wherein customer service representatives marketed Vallarta Gardens.  *See* FAC ¶ 97 (describing a March 5, 2021 Marriott robocall), *id.* ¶ 104 (noting that the robocall was placed to the victim's Virginia telephone number and stating that she paid $5,600 for the vacation package), and *id.* ¶ 105 (explaining that in three of the calls promoting Vallarta Gardens, victims' payments were processed using a unique billing code associated with ResortCom).  Marriott also alleged that ResortCom was aware of Vallarta Gardens' prohibitive conduct based on its double-digit chargeback records and permitted that behavior to continue by entering into an escrow agreement.  *See supra* Section I(A)(3)(c).  Marriott also averred that this robocall scam continues, which is supported by the allegation that ResortCom maintained chargeback records of Vallarta Gardens into 2021, *see* FAC ¶ 95, that Marriott robocalls occurred in 2021, *id.* ¶ 97, that Whisl and Prestige's relationship continues, *id.* ¶ 87 (noting Whisl's mitigation efforts constituted one email from which the Court may infer that the relationship continues), and that Marriott continues to receive complaints about the robocall scam after the release of its public statement.  *See id.* ¶ 125.  With respect to damages, in addition to noting the specific monetary losses of some victims incurred as a result of those calls, Marriott alleged in detail how it and other consumers were harmed by the scam.  *See id.* ¶ 129-30.

"[T]hese facts form such a coherent and related pattern of actions that [Marriott has] clearly established a unity of design and purpose by [Defendant Group 1 entities and ResortCom] from which the Court can further infer that the parties agreed to accomplish a common unlawful purpose."  *Borg*, 545 F. Supp. at 321.  Accordingly, Marriott adequately alleged a claim for common law conspiracy, and ResortCom's motion to dismiss should be denied.

## II.   CONCLUSION

For the reasons set forth above, Marriott requests that this Court deny ResortCom's Motion

and grant such further relief as this Court deems proper.  To the extent the Court disagrees, Marriott requests leave to file a Second Amended Complaint.

Dated:  July 18, 2022                                MARRIOTT INTERNATIONAL, INC.
                                                                 By counsel


                                                                 /s/ Attison L. Barnes, III
                                                                 Attison L. Barnes, III (VA Bar No. 30458)
                                                                 David E. Weslow (for *pro hac vice*)
                                                                 Kevin G. Rupy (for *pro hac vice*)
                                                                 Duane C. Pozza (for *pro hac vice*)
                                                                 Stacey J. LaRiviere (VA Bar No. 92354)
                                                                 WILEY REIN LLP
                                                                 2050 M St. NW
                                                                 Washington, DC 20036
                                                                 Tel: (202) 719-7000
                                                                 abarnes@wiley.law
                                                                 dweslow@wiley.law
                                                                 krupy@wiley.law
                                                                 dpozza@wiley.law
                                                                 slariviere@wiley.law

                                                                 *Counsel for Plaintiff*
                                                                 *Marriott International, Inc.*

## **CERTIFICATE OF SERVICE**

On this 18th day of July, 2022, a true and correct copy of the foregoing was served by

electronically filing a copy with the Clerk of the Court using the ECF filing system:

Joseph Paul Bowser
Roth Jackson Gibbons Condlin PLC
11 S. 12th St.
Suite 500
Richmond, VA 23219
Tel: (804) 441-8701
jbowser@rothjackson.com

David D. Hudgins
Hudgins Law Firm PC
2331 Mill Road
Suite 100
Alexandria, VA 22314
Tel: (703) 739-3300
emailbox@hudginslawfirm.com

*Counsel for Defendant Rapid Eagle Inc. d/b/a
VoIP Essential and Defendant Whisl Telecom,
LLC*

*Counsel for Defendant Vacancy Rewards,
LLC*

Charles M. Sims
C. Quinn Adams
Lilias M. Gordon
O'Hagan Meyer PLLC
411 East Franklin St.
Suite 500
Richmond, VA 23219
Tel: (804) 403-7111
Tel: (804) 403-7100
csims@ohaganmeyer.com
lgordon@ohaganmeyer.com

Dana Johannes Finberg
O'Hagan Meyer PLLC
221 Caledonia Street
Sausalito, CA 94965
Tel: (415) 578-6902
dfinberg@ohaganmeyer.com

*Counsel for Defendant ResortCom
International, LLC*

/s/ Attison L. Barnes, III
Attison L. Barnes, III (VA Bar No. 30458)
WILEY REIN LLP
2050 M St. NW
Washington, DC 20036

29

Tel: (202) 719-7000
abarnes@wiley.law

*Counsel for Plaintiff Marriott International, Inc.*