**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| MARRIOTT INTERNATIONAL, INC.,<br><br>          Plaintiff,<br><br>v.<br><br>DYNASTY MARKETING GROUP, LLC,<br>*et al.*,<br><br>          Defendants. | Civil Action No. 1:21-cv-00610-AJT/JFA |

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FILED BY DEFENDANTS**
**WHISL TELECOM, LLC AND RAPID EAGLE INC. D/B/A VOIP ESSENTIAL**

Attison L. Barnes, III (VA Bar No. 30458)
David E. Weslow (for *pro hac vice*)
Kevin G. Rupy (for *pro hac vice*)
Duane C. Pozza (for *pro hac vice*)
Stacey J. LaRiviere (VA Bar No. 92354)
WILEY REIN LLP
2050 M St. NW
Washington, DC 20036
Tel: (202) 719-7000
abarnes@wiley.law
dweslow@wiley.law
krupy@wiley.law
dpozza@wiley.law
slariviere@wiley.law

*Counsel for Plaintiff Marriott International, Inc.*

# **TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY ................................................................................... 1

I.   ARGUMENT ................................................................................................................. 2

   A.   The VoIP Providers' Motion Should Be Denied In Its Entirety. ........................... 2

     1.   Contributory Infringement ............................................................................ 3

       a.   Marriott Adequately Alleged that the VoIP Providers Monitored Numerous Defendants, Were Willfully Blind to their Conduct, And Failed to Take Sufficient Remedial Action. ............................................................................................... 4

         i.   Marriott Properly Pleaded that Whisl Monitored And/Or Controlled Prestige, Was Willfully Blind to its Conduct, And Failed to Take Sufficient Remedial Action. 4

         ii.   Marriott Properly Pleaded that Rapid Eagle Monitored DVC, Was Willfully Blind to its Conduct, and Failed to Take Sufficient Remedial Action. ........................ 6

       b.   Marriott Properly Alleged the VoIP Providers Were Constructively Aware of their Customers' and Telemarketers' Infringement ................................................... 7

       c.   Marriott Alleged Numerous Instances of Direct Infringement. ............................ 10

     2.   Federal Unfair Competition Claim ............................................................... 13

       a.   Marriott Sufficiently Pleaded a Claim for Federal Unfair Competition. ............... 13

     3.   TSR Claim .................................................................................................... 15

       a.   The VoIP Providers Are Not Common Carriers. ................................................ 15

         i.   Marriott's Allegations Defeat NARUC Test. .................................................. 17

         ii.   Marriott Adequately Alleged that VoIP Services are Information Services. ....... 18

       b.   The VoIP Providers Provided Substantial Assistance to Defendants Violating the TSR. .................................................................................................................. 20

       c.   The VoIP Providers Knew or Consciously Avoided Knowing that Other Defendants Violated the TSR. ................................................................................................ 21

     4.   Virginia Unfair Competition ........................................................................ 22

       a.   Marriott has Standing Under the VCPA. .......................................................... 22

       b.   The VoIP Providers Are Suppliers. .................................................................. 23

       c.   Marriott Alleged Reliance and Damages. .......................................................... 24

       d.   The Provision of VoIP Services Is Not Exempt from the VCPA. ......................... 24

     5.   Virginia Tortious Interference ..................................................................... 25

       a.   Marriott Pleaded a Specific Business Relationship or Expectancy. ...................... 26

       b.   The VoIP Providers Knew of These Business Relationships or Expectancies. ....... 26

       c.   Marriott Adequately Alleged the Remaining Elements. ....................................... 27

i

    6.    Virginia Common Law Conspiracy ................................................................ 28

        a.   Defendant Group 1 Conspiracy ............................................................ 28

        b.   Defendant Group 2 Conspiracy ............................................................ 30

II.  CONCLUSION ...................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                              **Page(s)**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
   722 F.3d 1229 (10th Cir. 2013) ............................................................................3

*AdvanFort Co. v. Int'l Registries, Inc.*,
   No. 1:15-cv-220, 2015 WL 4254988 (E.D. Va. July 13, 2015).............................28

*Alexander v. Se. Wholesale Corp.*,
   978 F. Supp. 2d 615 (E.D. Va. 2013) ..................................................................24

*Alliance Tech. Grp., LLC v. Achieve 1, LLC*,
   No. 3:12-cv-701, 2013 WL 143500 (E.D. Va. Jan. 11, 2013)........................26, 27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................2

*New Mexico ex rel. Balderas v. Real Estate Law Center, P.C.*,
   401 F. Supp. 3d 1229 (D. N. M. 2019) ................................................................21

*BHR Recovery Cmtys., Inc. v. Top Seek, LLC*,
   355 F. Supp. 3d 416 (E.D. Va. 2018) ....................................................10, 11, 23

*Blount v. Greenbrier Pontiac Oldsmobile—GMC Trucks Kia, Inc.*,
   No. 3:08-cv-622, 2009 WL 2431587 (E.D. Va. Aug. 7, 2009) .............................22

*Borg v. Warren*,
   545 F. Supp. 3d 291 (E.D. Va. 2021) ..............................................................28, 30

*Buffalo Wings Factory, Inc. v. Mohd*,
   622 F. Supp. 2d 325 (E.D. Va. 2007) ..................................................................25

*Carlucci v. Han*,
   907 F. Supp. 2d 709 (E.D. Va. 2012) ..................................................................15

*CFPB v. Daniel A. Rosen, Inc.*,
   No. 2:21-cv-07492, 2022 WL 1514439 (C.D. Cal. Apr. 5, 2022)....................20, 21

*Charter Advanced Servs. (MN), LLC v. Lange*,
   903 F.3d 715 (8th Cir. 2018) ...................................................................16, 18, 19

*Clark v. Avatar Techs. Phl, Inc.*,
   No. H-13-2777, 2014 WL 309079 (S. D. Tex. Jan. 28, 2014)..............................18

*Clark v. Time Warner Cable*,
   523 F.3d 1110 (9th Cir. 2008) .............................................................................16

*Coach, Inc. v. Goodfellow,*
  717 F.3d 498 (6th Cir. 2013) ............................................................................3

*Com. Funding Corp. v. Worldwide Sec. Servs. Corp.,*
  249 F.3d 204 (4th Cir. 2001) ..........................................................................27

*Diane Von Furstenberg Studio v. Snyder,*
  No. 1:06-cv-1356, 2007 WL 2688184 (E.D. Va. Sept. 10, 2007) .............................3

*Free Conferencing Corp. v. Comcast Corp.,*
  No. CV 15-4076, 2016 WL 7637664 (C.D. Cal. May 31, 2016) ...........................20

*FTC v. AT&T Mobility, LLC,*
  883 F.3d 848 (9th Cir. 2018) ......................................................................16, 18

*FTC v. Educare Ctr. Servs., Inc.,*
  433 F. Supp. 3d 1008 (W.D. Tex. 2020)...................................................15, 18, 20

*FTC v. Glob. Mktg. Grp., Inc.,*
  594 F. Supp. 2d 1281 (M. D. Fla. 2008) ..........................................................21

*FTC v. Nudge, LLC,*
  No. 2:19-cv-00867, 2021 WL 3145700 (D. Utah July 26, 2021)..........................20

*FTC v. Verity Int'l, Ltd.,*
  443 F.3d 48 (2d Cir. 2006).............................................................................16

*FTC v. WV Universal Mgmt., LLC,*
  877 F.3d 1234 (11th Cir. 2017) ......................................................................21

*Gov't Emps. Ins. Co. v. Google, Inc.,*
  330 F. Supp. 2d 700 (E.D. Va. 2004) ................................................................4

*Grijalva v. Kevin Mason, P.A.,*
  No. 8:18-cv-02010, 2019 WL 8221076 (C.D. Cal. Dec. 30, 2019)..........................21

*Hall v. Virginia,*
  385 F.3d 421 (4th Cir. 2004) ...........................................................................4

*Harrell v. Colonial Holdings, Inc.,*
  923 F. Supp. 2d 813 (E.D. Va. 2013) ...........................................................13, 28

*Henderson v. Hickory Hill Ret. Cmty., LLC,*
  No. CL19-187, 2019 WL 11815232 (Va. Cir. Ct. Oct. 2, 2019)............................25

*Hurley v. Messer,*
  No. 3:16-9949, 2018 WL 4854082 (S.D. W. Va. Oct. 4, 2018).............................18

iv

*Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*,
   456 U.S. 844 (1982)................................................................................................................3

*JTH Tax LLC v. DM3 Ventures, Inc.*,
   No. 3:20-cv-176, 2020 WL 6551214 (E.D. Va. Nov. 6, 2020) .............................................22

*Manassas Autocars, Inc. v. Couth*,
   645 S.E.2d 443 (Va. 2007).....................................................................................................25

*Match.Com, LLC v. Fiesta Catering Int'l, Inc.*,
   No. 1:12-cv-363, 2013 WL 428056 (E.D. Va. Jan. 31, 2013)............................................3, 7

*Merriman v. Auto Excellence, Inc.*,
   55 Va. Cir. 330 (Va. Cir. Ct. 2001).......................................................................................22

*Orbital ATK, Inc. v. Walker*,
   No. 1:17-cv-163, 2017 WL 2982010 (E.D. Va. July 12, 2017)...............................................2

*Owens v. DRS Auto. Fantomworks, Inc.*,
   764 S.E.2d 256 (Va. 2014).....................................................................................................22

*Payton v. Kale Realty, LLC*,
   164 F. Supp. 3d 1050 (N. D. Ill. 2016) ..................................................................................18

*Philips v. Pitt Cnty. Mem'l Hosp.*,
   572 F.3d 176 (4th Cir. 2009) ...................................................................................................5

*Reed v. Litton Loan Servicing L.P.*,
   64 Va. Cir. 447 (Va. Cir. Ct. 2004)........................................................................................25

*Sidya v. World Telecom Exch. Commc'ns, LLC*,
   870 S.E.2d 199 (Va. 2022).....................................................................................................26

*Size, Inc. v. Network Sols., Inc.*,
   255 F. Supp. 2d 568 (E.D. Va. 2003) .....................................................................................10

*Smith v. Wright*,
   No. 2:19-cv-559, 2020 WL 6053154 (E.D. Va. May 6, 2020)...............................................28

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002)..................................................................................................................2

*Tiffany (NJ) Inc. v. eBay Inc.*,
   600 F.3d 93 (2d Cir. 2010)..................................................................................................9, 10

*Tobey v. Jones*,
   706 F.3d 379 (4th Cir. 2013) ..............................................................................................2, 15

*U.S. Telecom Ass'n v. FCC*,
  295 F.3d 1326 (D.C. Cir. 2002) ...........................................................................17

V*onage Holdings Corp. v. Minnesota Pub. Utils. Comm'n*,
  290 F. Supp. 2d 993 (D. Minn. 2003) ..............................................................18, 19

**Statutes**

47 U.S.C. § 153 .............................................................................................16, 18

Virginia Consumer Protection Act - Va. Code Ann. § 59.1 ...........................22, 24, 25

**Rules**

Fed. R. Civ. P. 8(a)(2) .........................................................................................2

Telemarketing Sales Rule - 16 C.F.R. § 310 ...........................................................15

**Regulations**

47 C.F.R. § 64.1200(n)(3) .....................................................................................3

68 Fed. Reg. at 4,580, 4,612 (Jan. 29, 2003) .........................................................20

**Other Authorities**

*In re: Commc'ns Assistance for Law Enf't Act & Broadband Access & Servs.*,
  20 FCC Rcd. 14989 ¶¶ 39–45 (2005) ..................................................................16

Public Notice, Federal Communications Comission, *FCC Concludes Assessment
  of Best Practices to Combat Unlawful Robocalls to Hospitals* (Jun. 11, 2021) ......................6

*USF-ICC Transformation Order*, 26 FCC Rcd. 17663, 18013-14 ¶ 954 (2011) ..........................16

Plaintiff Marriott International, Inc. ("Marriott" or "Plaintiff"), by counsel and pursuant to Local Rule 7(F)(1), opposes Defendants' Whisl Telecom, LLC ("Whisl") and Rapid Eagle Inc. d/b/a VoIP Essential ("Rapid Eagle") (collectively "VoIP providers") Motion to Dismiss and states as follows:

## INTRODUCTION AND SUMMARY

The VoIP providers would have this Court believe they are pure as the driven snow.  That is not the case, as the VoIP providers facilitate the scheme at issue, causing significant harm to the consuming public and to Marriott's brand.  Indeed, the VoIP providers seek to avoid liability by ignoring: (1) key allegations in the First Amended Complaint ("FAC"); (2) inferences fairly drawn from those allegations; and (3) applicable caselaw.  As set forth below, Marriott's specific and genuine factual allegations establish the plausibility of each claim consistent with controlling authority, and the VoIP providers' Motion should be denied for many reasons:

- Marriott alleged sufficient facts to demonstrate that the VoIP providers contributorily infringed on the MARRIOTT mark.  Indeed, the VoIP providers continued to provide services to other defendants,[1] despite knowledge of their infringing conduct.

- Even if the VoIP providers' "common carriers" defense were ripe at this stage (it is not), the VoIP providers' analysis is incomplete and contrary authority reflects their activities are "information" services subject to the Telemarketing Sales Rule ("TSR").  Marriott properly pleaded a substantial assistance claim under the TSR.  As set forth in the FAC, Whisl and Rapid Eagle's provision of VoIP services enabled the scheme, and Marriott also clearly alleged that the VoIP providers knew or consciously avoided knowing of the prohibited practices.

- Marriott properly pleaded all required elements of its civil claims under the Virginia Consumer Protection Act ("VCPA") and its common law claims for tortious interference and conspiracy.  At the very least, the FAC alleges facts from which this Court may conclude that the VoIP providers are suppliers whose services are not exempt from, and that Marriott is a consumer protected by, the VCPA.  And Marriott's claims comport with the VCPA's intended purpose.  In addition, Marriott is not required to plead a competitive relationship between the VoIP providers and Marriott,

---

[1] The Defendant Group 1 entities include Vallarta Gardens, Tafer Resorts, Cancun Ink Corp., Parrot Caribbean, Vacancy Rewards, and ResortCom, but, for the purposes of this motion, do not include Whisl, unless otherwise stated.  *See* FAC ¶ 71.

and the tortious interference claims are adequately pleaded.  Based on the FAC, the Court may infer that the defendants acted in concert, and Marriott's allegations satisfy pleading standards for conspiracy.

-   Finally, Marriott's allegations are more than sufficient to state a federal unfair competition claim based on joint liability.

For these reasons, this Court should deny the VoIP providers' Motion.

## I.   <u>ARGUMENT</u>

A party seeking dismissal under Fed. R. Civ. P. 12(b)(6) must show that, after "construing the facts in the light most favorable to the non-moving party," the pleadings "fail to state any cognizable claim for relief, and the matter can, therefore, be decided as a matter of law." *Orbital ATK, Inc. v. Walker*, No. 1:17-cv-163, 2017 WL 2982010, at *4 (E.D. Va. July 12, 2017) (quoting *O'Ryan v. Dehler Mfg. Co., Inc.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 658 (E.D. Va. 2014), *aff'd*, 811 F.3d 653 (4th Cir. 2016)).  The complaint must meet only the "simplified pleading standard" of Rule 8(a)(2), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A court must "assume [the] veracity [of the genuine factual allegations] and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A complaint will survive when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.  A court must construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff, *see Tobey v. Jones*, 706 F.3d 379, 390 (4th Cir. 2013), and "draw on its judicial experience and common sense" to determine whether a reasonable inference can be made, and thus whether the pleader has stated a plausible claim for relief.  *Ashcroft*, 556 U.S. at 679.

### A.    <u>The VoIP Providers' Motion Should Be Denied In Its Entirety.</u>

### 1.    Contributory Infringement

The VoIP providers are contributorily liable for several Defendant Group 1 entities' infringement on the MARRIOTT mark.  In an effort to escape liability, the VoIP providers contend that they must "know of the *actual trademark infringement*" and rely on non-controlling authority. *See* Mem. in Supp. of Mot. to Dis. ("Mot. to Dis.") at 4–5.[2]

However, according to controlling authority, Marriott sufficiently alleged that the VoIP providers "continue[d] to supply [a] product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 854 (1982).  For entities that are not manufacturers or distributors, contributory liability may be imposed where an entity was "willfully blind to the ongoing violations" of the infringers. *Diane Von Furstenberg Studio v. Snyder*, No. 1:06-cv-1356, 2007 WL 2688184, at *4 (E.D. Va. Sept. 10, 2007) (internal citations omitted).  And such an entity must exercise "the requisite degree of control over the activity of third-party infringers to justify" the extension of liability. *Id*. (internal citation omitted). Federal Courts of Appeal have construed the *Inwood* test as permitting the imposition of liability when a defendant is aware of the infringement but fails to take reasonable remedial measures. *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1252 (10th Cir. 2013); *see Coach, Inc. v. Goodfellow*, 717 F.3d 498, 505–06 (6th Cir. 2013) (same).  This is consistent with the ruling of a court in this district finding sufficient the allegation of facts giving rise to the inference that a defendant could have ended the infringement. *See, e.g.*, *Match.Com, LLC v. Fiesta Catering Int'l, Inc.*, No. 1:12-cv-363, 2013 WL 428056 at *7 (E.D. Va. Jan. 31, 2013) (noting that

---

[2] The VoIP providers' statement that they "have no affirmative duty to engage in the illegal act of listening in on millions of calls, make instant decisions about trademark enforcement, and block infringing calls," *see* Mot. to Dis. at 5, is contrary to law.  The FCC requires VoIP providers to "[t]ake affirmative, effective measures to prevent new and renewing customers from using [their] network to originate illegal calls, including . . . exercising due diligence in ensuring that its services are not used to originate illegal traffic."  47 C.F.R. § 64.1200(n)(3).

actual knowledge of infringement and contribution of "continuing to license or otherwise facilitate [ ] use of" domain names and trademarks was enough to state a claim for contributory infringement).

Marriott alleged that the VoIP providers monitored the conduct of certain defendants sufficient to warrant liability. *See, e.g.*, *Gov't Emps. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 705 (E.D. Va. 2004) (alleging a defendant "monitors and controls" the infringers satisfies the element of actual or constructive knowledge). In light of the relationships alleged in the FAC, the VoIP providers were no neutral stakeholders and were, at best, willfully blind to or failed to take sufficient remedial measures concerning the infringing conduct. And, in their Motion, the VoIP providers do not challenge that Marriott properly pleaded direct infringement claims.

a. <u>Marriott Adequately Alleged that the VoIP Providers Monitored Numerous Defendants, Were Willfully Blind to their Conduct, And Failed to Take Sufficient Remedial Action.</u>

Marriott adequately alleged that Whisl and Rapid Eagle provide VoIP services,[3] *see* FAC ¶¶ 10–11, and that they are no neutral stakeholders—Marriott alleged that Whisl not only monitors and controls the conduct of Prestige and Rapid Eagle not only monitors the conduct of DVC given notice of tracebacks[4] and roles played in the Marriott robocall scam, but the VoIP providers were willfully blind to and failed to take sufficient remedial action regarding infringing conduct.

i. *Marriott Properly Pleaded that Whisl Monitored And/Or Controlled Prestige, Was Willfully Blind to its Conduct, And*

---

[3] This Court may take judicial notice of the FCC's definition of VoIP services—the FCC defines VoIP services as "a technology that allows you to make voice calls using a broadband Internet connection. . . ." *See* https://www.fcc.gov/general/voice-over-internet-protocol-voip; *Hall v. Virginia*, 385 F.3d 421, 424 n. 3 (4th Cir. 2004) (noting that a court may take judicial notice of facts in the public record in reviewing a 12(b)(6) motion).
[4] The Industry Traceback Group ("ITG"), the FCC's registered Traceback Consortium, and companies across various industries (*e.g.*, wireline, wireless, VoIP, and cable industries) work together to "trace, source, and stop illegal robocalls." *See* FAC ¶ 86. Notice of these "tracebacks" is sent to upstream providers. *See* FAC ¶ 14.

*Failed to Take Sufficient Remedial Action.*

Marriott's FAC describes a VoIP providers' role in the scam.  *See infra* Section I(A)(1)(b) (telemarketers hire VoIP providers "to originate lead generation robocalls using the brand name 'Marriott' and noting that VoIP providers can generate high volumes of calls for little cost"). Marriott then specifically alleges a service relationship between the VoIP providers and two other bad actors, one of whom was a direct infringer.   Whisl and Prestige "originated or routed at least a portion of" the "714,000 campaign-matched calls to consumers in the District between February 2, 2021 and May 16, 2021."  *See* FAC ¶ 24.

Marriott further alleged that Whisl is the "direct downstream provider to Prestige, meaning that it directly accepted and transited the robocall traffic originated by Prestige. . . ."  *Id*. at ¶ 81. And in discussing the impermissible type of traffic Whisl accepted and transited, Marriott noted that Call Detail Records reflect that "Whisl received over one billion calls from Prestige," 99.8% of which spanned thirty seconds or fewer, more than 75% were zero seconds in duration, and all of which reflected so-called "snowshoeing characteristics"—meaning "a practice [deployed by bad actors] whereby a single telephone number is used to originate a very small number of calls [and is used to avoid detection]." *Id*. at ¶ 82.  Marriott then alleged that Whisl had "actual notice" of Prestige's conduct pursuant to nearly thirty tracebacks the ITG conducted over five months.  *Id*. at ¶ 86–87.  To describe what the ITG includes in a traceback, Marriott cited ITG's policies and procedures and specifically alleged that "a notification is sent to the terminating Voice Service Provider whose customer received the Suspicious Traffic."  *Id*. at ¶ 87 n. 14.  ITG's traceback reports reflect that the notices alerted the VoIP providers of the following:[5]

---

[5] Given that the FAC referenced the traceback reports, and because they are integral and authentic, the Court may consider ITG's traceback reports in evaluating the motion to dismiss.  *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); FAC ¶¶ 81, 86, 87.

Recorded voice offering hospitality incentive through high-volume calling campaign, including to wireless numbers.  Use of brand names, including Marriott, fraudulently without permission.  Suspected caller-ID spoofing due to high volume of originating numbers, including invalid numbers.  Failure to identify the entity responsible for the call.

*See* Exs. 1 and 2.

Regarding Whisl's monitoring and remediation of Prestige's conduct, Marriott averred that Whisl's mitigation efforts were *de minimis*—"a single email exchange with Prestige"—and Whisl certified to the ITG that Prestige was in compliance with relevant laws when it allegedly was not. FAC at ¶ 87.  Additionally, Marriott alleged that despite this knowledge, Whisl sought to not only continue but expand its relationship with bad actor Prestige by entering into an agreement to purportedly "strengthen [their] business relationship" to "develop new business together, to increase the volume of traffic, if it is to the benefit of the two parties."  *Id*. at ¶ 88.

As such, Whisl had sufficient control to stop the infringing conduct and/or was willfully blind to and actively participated in Prestige's facilitation of Marriott robocalls.

ii.   *Marriott Properly Pleaded that Rapid Eagle Monitored DVC, Was Willfully Blind to its Conduct, and Failed to Take Sufficient Remedial Action.*

Marriott specifically alleged that direct infringer "DVC generated the outbound calls which VoIP Essential/Rapid Eagle routed."  *Id*. at ¶ 109.  Marriott then pleaded that "DVC placed approximately 3.9 million Marriott robocalls to consumers, 96,500 of whom are Virginia residents," and that tracebacks reflected that Rapid Eagle served as the VoIP provider for eight of those robocalls.  *Id*. at ¶¶ 113, 115.[6]  Given the content of the notice, *see supra* Section I(A)(1)(a)(i), the Court may infer that Rapid Eagle became aware of DVC's conduct when it

---

[6] A single traceback from the ITG can be representative of millions of calls made by a single party. *See* Public Notice, Federal Communications Commission, *FCC Concludes Assessment of Best Practices to Combat Unlawful Robocalls to Hospitals*, DA 21-688, Appendix, p. 9 (Jun. 11, 2021).

received the first of eight tracebacks.  And Marriott sufficiently alleged that Rapid Eagle failed to remediate or was willfully blind to DVC's conduct given that Marriott pleaded that Rapid Eagle continued to retain DVC as a customer "even after receiving eight traceback requests during a one-month period from the ITG. . . ."  FAC ¶ 117.

Accordingly, Marriott adequately alleged that the VoIP providers monitored and/or controlled at least two defendants—Prestige and direct infringer DVC, were willfully blind to their wrongdoing, or failed to sufficiently remediate that conduct.

<strong>b.  <u>Marriott Properly Alleged the VoIP Providers Were Constructively Aware of their Customers' and Telemarketers' Infringement.</u></strong>

The VoIP providers rely on noncontrolling authority to suggest that they must possess "actual knowledge" of the underlying infringement to be held liable, *see* Mot. to Dis. at 4-5, and ignore that this Court has held that "constructive knowledge" is sufficient for a claim of contributory infringement.  *Match.Com, LLC,* 2013 WL 428056, at *7.

Marriott alleged facts that the VoIP providers were aware of the direct infringement engaged in by telemarketers and infringing conduct of their customers based on their roles in the scam and their course of dealings.  In describing roles that categories of defendants played in the Marriott robocall scam, Marriott alleged that

> [t]elemarketers hire VoIP providers to originate lead generation robocalls using brand name "Marriott".
> - VoIP providers can generate tens of millions of monthly robocalls to consumers.
> - Each call costs a fraction of a penny, meaning millions of calls can be made for a small cost to the Telemarketer.

*See* FAC at ¶ 3.  And when pressing "1," consumers "are connected to a [customer service representative] in a call center that 'closes' the deal and sells a package to the Resort to the unsuspecting consumer." *Id*.  Marriott also pleaded that Whisl "enable[s] telemarketers to conduct

7

[Marriott robocalls]." *See* FAC ¶¶ 6, 80, 82 (describing role of telemarketers in Defendant Group 1's scam), 116 (describing role of telemarketers in Defendant Group 2's scam); *supra* Section I(A)(1)(a)(i) (quoting the description of the robocalls in the traceback reports reflecting direct infringement of MARRIOTT mark). From these allegations, more than an inference arises that the VoIP providers were aware of or consciously avoided knowing of the telemarketers' underlying infringing use of the MARRIOTT mark.

Marriott also pleaded that through their course of dealings with their customers, the VoIP providers know the hallmarks of robocalling. Marriott averred that Whisl is aware of what constitutes robocalling given that its Chief Executive Officer is also the Chief Executive Officer of Globex, an entity subject to an enforcement action for robocalling, and of other entities that received cease and desist letters in 2020 and 2021 from federal agencies about their facilitation of robocalls. *See* FAC ¶ 84. Rapid Eagle has the same knowledge because it is defending a complaint filed by the Indiana Attorney General for routing 1.5 million abusive and deceptive robocalls, for which it was allegedly paid more than $100,000 to "look the other way." *See* FAC ¶ 117.

Marriott then averred that the VoIP providers were aware that their customers engaged in infringing conduct based on a robocall hallmark—inordinately high call volumes. *See* FAC ¶ 82. Marriott pleaded that Whisl served as Defendant Group 1's VoIP provider and that Rapid Eagle served as Defendant Group 2's VoIP provider. *See* FAC ¶¶ 71, 80, 109, and 115. Marriott pleaded that Whisl was "fully aware of the unlawful nature of the fraudulent robocalls [it] originate[s] and transmit[s] [for Prestige] given the volume of the traceback requests received, reflecting coordination and shared knowledge." *Id*. at ¶ 81. The Court can infer that the same is true for Rapid Eagle given that Marriott alleged it "understands that it is facilitating wrongful conduct" and advertises its ability to handle "huge volumes of traffic." *Id*. at ¶ 116.

The FAC alleged that the VoIP providers were specifically aware of the infringing conduct of their customers. Whisl received over *one billion* calls from Prestige, had knowledge of Prestige's infringing conduct, and provided services in connection with numerous reported Marriott robocalls. *See* supra Section I(A)(1)(a)(i) (noting the type of traffic Whisl routed from Prestige, that Whisl received notice of nearly thirty tracebacks reflecting that Prestige routed Marriott robocalls, and explained traceback content); FAC ¶¶ 82 (noting Whisl received 1.2 billion calls for Prestige), 97 (describing a March 5, 2021 Marriott robocall that appears on Whisl's CDR data and was routed by Prestige wherein the victim purchased a package from Vallarta Gardens that was processed by ResortCom), 105 (explaining that one Marriott robocall was purportedly from "Marriott hotels," appears on Whisl's CDR data, was originated by Prestige, resulted in a charge processed by ResortCom, and culminated in the purchase of a package at Vallarta Gardens).

Marriott also pleaded that Rapid Eagle was specifically aware of DVC's infringing conduct given that it routed eight of DVC's Marriott robocalls despite knowing their content. *See supra* Section I(A)(1)(a)(ii). From these allegations, an inference arises that the VoIP providers were aware of or consciously avoided knowing of their customers infringing conduct.

The VoIP providers' cited authority is also distinguishable. The Second Circuit case on which the VoIP providers rely concerns a narrow ruling regarding a defendant (eBay) that undertook significant and stringent mitigation efforts (*e.g.*, expending $20 million, implementing a fraud engine, and administering a Verified Rights Owner Program) to stop the use of its services for direct infringement. The mitigation efforts addressed by the Second Circuit in the *eBay* case stand in stark contrast to facts alleged in the FAC pertaining to service providers directly emmeshed in a robocall scheme who failed to mitigate and actually fostered unlawful conduct. *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 98–99 (2d Cir. 2010). Although the ruling is

inapplicable to the present case, Marriott's FAC meets its high bar.   Marriott's allegations concerning the tracebacks and when notice of tracebacks was received reflects "contemporary knowledge" of the infringing robocalls.  *Id*. at 107; *see supra* Sections I(1)(a)(i) and (ii).

The VoIP providers also resort to the *Size* case which is inapplicable given that the *Size* defendant was a passive actor.   The court explained that the *Size* defendant was a domain registration provider that simply "'translate[d]' the domain name into the registrant's IP address and route[d] users to that address."  *Size, Inc. v. Network Sols., Inc.*, 255 F. Supp. 2d 568, at 573 (E.D. Va. 2003).   The Court also made clear that "[n]othing in Size's allegations suggests that [the domain registration provider] exceeded its role as a neutral stakeholder with no direct involvement in the activities of the allegedly infringing third party."  *Id*.   Here, Marriott has explicitly alleged otherwise.  *See supra* Section I(A)(1)(b) (reflecting the VoIP providers' continued provision of services when aware of infringing conduct).

### c.   Marriott Alleged Numerous Instances of Direct Infringement.

The VoIP providers do not dispute that Marriott alleged multiple instances of infringing conduct exhibited by multiple entities that the VoIP providers service—that Vallarta Gardens, the telemarketers, and DVC possessed the MARRIOTT mark; used the mark; used the mark in commerce; used the mark in connection with the sale of vacation packages; and used the mark in a manner likely to confuse consumers.  *See BHR Recovery Cmtys., Inc. v. Top Seek, LLC*, 355 F. Supp. 3d 416, 426 (E.D. Va. 2018) (citing *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001)).   Courts consider nine factors in assessing consumer confusion, which may not apply in every case, and may be afforded different weight:

> (1) the strength or distinctiveness of the plaintiff[']s mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6)

the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*Id.* (quoting *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 154 (4th Cir. 2012)).

The VoIP providers do not deny that Marriott alleges that it registered the MARRIOTT mark with the U.S. Patent and Trademark Office and such registration constitutes *prima facie* evidence of "Marriott's exclusive right to use the mark[]."  *See* FAC ¶¶ 37–42.  Marriott also pleaded sufficient facts from which the Court may infer that Vallarta Gardens, the telemarketers, and DVC infringed on the MARRIOTT mark.  Marriott alleged that Vallarta Gardens is a Defendant Group 1 entity resort.  *See* FAC ¶ 71.  An FAC graphic explains that in the Marriott robocall scam, resorts

- [h]ire telemarketers to generate consumer leads using brand name "Marriott"[;]
- [u]se [p]ayment [p]rocessors to process payments from leads;
- [s]ell vacation packages to leads that also benefit Exchanges.

*See* FAC at ¶ 3.  From these allegations and graphic, at the very least an inference arises that Vallarta Gardens used the MARRIOTT mark when selling vacation packages as part of the Marriott robocall scheme.

In addition, Marriott pleaded several examples of Marriott robocalls involving misuse of the MARRIOTT mark wherein customer service representatives referenced Vallarta Gardens.  *See* FAC ¶¶ 97, 104, and 105.  Coupled with the allegation that such resorts hire telemarketers to generate leads using the mark, and that customer service representatives allegedly used the mark in the instances previously noted, the Court may infer that Vallarta Gardens is responsible for the infringement.  And in these robocalls, the mark used is identical to the MARRIOTT mark, which is a famous mark known worldwide, *see* FAC ¶ 36, that Vallarta Gardens used for their commercial benefit and without authorization, *see* FAC ¶ 71, and multiple victims were actually confused and deceived into purchasing vacation packages.  *See* FAC ¶¶ 97, 104, and 105.

11

Regarding telemarketers the VoIP providers served, the FAC graphic explains that they are

- Paid by Resorts to generate millions of robocalls to close consumer leads to visit their resorts for a vacation pitch using brand name "Marriott".
- Even if only a small % of consumers buy a package (e.g., > 1%), Resorts obtain a return on investment.

*See* FAC ¶ 3.  Marriott then more specifically alleged that the Defendant Cancun Ink Corp. and Parrot Caribbean ("telemarketers") served as telemarketers to the Defendant Group 1 entities and placed about 714,000 Marriott robocalls.  *See* FAC ¶¶ 24, 71, 82.  Marriott further alleged that Whisl enables them to conduct their calls.  *See* FAC ¶ 80.  And Marriott averred that both telemarketers refer to several websites to legitimize their marketing pitches.  *Id*. at ¶ 74.  The FAC also reflects that Cancun Ink Corp. purportedly represented that it "work[s] with Marriott" when making Marriott robocalls, and that Parrott Caribbean, when placing a Marriott robocall, maintained that it had contractual relationships with "all the Marriott[]s in Orlando, Florida."  *See* FAC ¶¶ 107–108.  Given that the mark used is identical to the MARRIOTT mark, which is a famous mark known worldwide, *see* FAC ¶ 36, which the telemarketers used for their commercial benefit and without authorization, *see* FAC ¶ 71, they also engaged in direct infringement.

And Marriott alleged a direct relationship between Rapid Eagle, who routed the calls, and Defendant Group 2 infringer DVC.  The FAC notes that DVC is a "resort marketing organization" that "generate[d]" 3.9 million robocalls infringing on the MARRIOTT mark, a portion of which Rapid Eagle routes.  FAC ¶¶ 109, 113.  Marriott alleged eight discrete instances of Rapid Eagle routing Marriott robocalls DVC placed.  *See* FAC ¶ 117.  As the mark used is identical to the MARRIOTT mark, a famous mark known worldwide, *see* FAC ¶ 36, which DVC used for its commercial benefit without authorization, *see* FAC ¶ 109, it also engaged in direct infringement.

Because Marriott alleged that the VoIP providers monitored and or controlled certain defendants, to which they were willfully blind and failed to remediate, possessed constructive

knowledge of the infringement, and adequately pleaded multiple underlying claims for direct infringement of numerous entities, some of whom they service, Marriott sufficiently alleged claims for contributory infringement.

### 2. Federal Unfair Competition Claim

With regard to the federal unfair competition claim, the VoIP providers advance an argument this Court has already deemed meritless and ignore incorporated allegations.  In this district, Marriott need only plead "that it has a valid trademark and that the defendant's use of a colorable imitation is likely to cause confusion among customers."  *Harrell v. Colonial Holdings, Inc.*, 923 F. Supp. 2d 813, 820 (E.D. Va. 2013).  Marriott's allegations satisfy the elements of a claim for direct infringement given that a federal unfair competition claim is essentially the same as a federal trademark infringement claim.  *Id.*; *see supra* Section I(A)(1)(c).

#### a. Marriott Sufficiently Pleaded a Claim for Federal Unfair Competition.

The VoIP providers contend that Marriott failed to properly plead such a claim against any defendant specifically, but this Court has already held that "there exists no 'bright-line prohibition'" on pleading allegations against "'Defendants generally'" and the VoIP providers ignore numerous allegations in the FAC.  *Harrell*, 923 F. Supp. 2d at 820 (citation omitted).  The *Harrell* court denied a motion to dismiss a federal unfair competition claim when the plaintiff asserted joint liability and *inter alia*, "[e]ach Defendant [wa]s affiliated with the others and appears to play a role in the operation of the Colonial Downs racetrack."  *Id.* at 821.  As in *Harrell*, Marriott asserted joint liability and pleaded that the Defendants were affiliated with one another, that some monitored or exercised control over others, and that they acted together in carrying out the robocall scams for a common purpose—fast profit.  *See  supra* Sections I(A)(1)(a)(i) (describing Whisl's monitoring of and control over Prestige) and (ii) (describing Rapid Eagle's monitoring of DVC);

(1)(b) (detailing VoIP providers' constructive knowledge of their customers' and telemarketers' infringement and continued provision of services); *see infra* Section I(A)(6)(a) (describing structural overlaps among the Defendant Group 1 entities reflecting coordination and shared knowledge); FAC ¶ 176 (alleging that the VoIP providers are liable for their own conduct and that Vallarta Gardens and Tafer Resorts are "jointly and severally liable for the misconduct of Defendants Cancun Ink Corp. and/or Parrot Caribbean").

Marriott alleges that the entities acted together and used the mark in a way that is likely to cause consumer confusion.  Marriott alleged that the Defendant Group 1 entities "directly or indirectly market vacation packages at resorts associated with Vallarta Gardens and Tafer Resorts" and that the telemarketers Parrot Caribbean and Cancun Ink Corp. "utilize a series of websites apparently intended to lend legitimacy to their marketing pitch (*e.g.*, pricetravelvip.com, BookVipAllInclusive.com, 5startravel.com.mx, allinclusivebeachfronts.com)." *See* FAC ¶ 74. Marriott also pleaded that the Defendant Group 1 entities used U.S.-based Whisl and Prestige to facilitate the calls of Cancun Ink Corp. and Parrott Caribbean. *See* FAC ¶ 80.  Marriott then alleged specific instances of Marriott robocalls implicating numerous Defendant Group 1 entities.  *See* supra Section I(A)(1)(b) (describing two Marriott robocalls calls involving both Whisl and Prestige); FAC ¶¶ 103 (noting a Marriott robocall to a Marriott Bonvoy victim that appears on Whisl's CDR data resulting in the victim paying $830 for a package, and noting that supporting documents reference a Tafer resort), and 104 (setting forth a Marriott robocall that appears on Whisl's CDR data was placed to the victim's Virginia telephone number, and that the victim paid $5,600 for a vacation package from Vallarta Gardens, which was processed by ResortCom).

Marriott also generally alleges that the Defendant Group 2 entities acted together and used the mark in a way that is likely to cause consumer confusion.  Marriott pleads that DVC and Rapid

Eagle "coordinate a unique variation of the robocall scam trading on Marriott's brand by marketing vacation timeshare packages with a holiday theme."  FAC ¶ 109.  And DVC placed 3.9 million Marriott robocalls to consumers, 96,500 of whom are Virginia residents, of which Rapid Eagle routed eight.  *Id*. at ¶¶ 112–114.

Marriott robocalls implicate the VoIP providers and numerous Defendant Group 1 and 2 entities.  *See* FAC ¶¶ 103–04 and 109, 112–14.  Taking these allegations together—that Marriott properly pleaded joint liability and that the VoIP providers, Defendant Group 1 entities, and Group 2 entities generally and specifically acted together— this claim survives a 12(b)(6) motion.

### 3. TSR Claim

The VoIP providers seek to have this Court make new law to avoid liability under the TSR.[7] In fact, the VoIP providers attempt to characterize themselves as telecommunications carriers, but they ignore that the FCC has declined to categorize VoIP services, side-step a critical part of the common carrier inquiry, disregard contrary caselaw, and omit unhelpful allegations.  As set forth in the FAC, Marriott properly pleaded violations of the TSR's substantial assistance provision. 16 C.F.R. § 310.3(b).  The TSR prohibits "a person [from] provid[ing]substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or 310.4 of this Rule."  16 C.F.R. § 310.3(b).

### a. The VoIP Providers Are Not Common Carriers.

Incorrectly asserting common carrier status, the VoIP providers miss a critical distinction

---

[7] A "12(b)(6) motion . . . 'does not resolve contests surrounding. . . the applicability of defenses.'" *See Tobey*, 706 F.3d 379, 387 (citation omitted).  Moreover, whether the VoIP providers are common carriers is a fact-intensive inquiry, *FTC v. Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d 1008, 1018 (W.D. Tex. 2020), and courts in this district find such inquiries are inappropriate for resolution on a motion to dismiss. *See Carlucci v. Han*, 907 F. Supp. 2d 709, 737 (E.D. Va. 2012).

in the analysis.  Because the term "common carrier" is undefined, Federal Courts of Appeal analyze the common law origin of the term and hold that the inquiry is activity-based and not status-based.  *See FTC v. AT&T Mobility, LLC*, 883 F.3d 848, 859–61 (9th Cir. 2018) (citing supporting authority from the D.C., Second, and Eleventh Circuits).  Activities are categorized as information services or telecommunications services—telecommunications services are exempt from the FTC's reach whereas information services are not.  *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 62 (2d Cir. 2006).  Information services are defined as the provision of "capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications."  47 U.S.C. § 153 (20).  Whereas telecommunications services are defined as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  47 U.S.C. § 153 (53).  Although these categories are mutually exclusive, the FCC has deemed hybrid services informational.  *See Verity*, 443 F.3d at 62; *In re: Commc'ns Assistance for Law Enf't Act & Broadband Access & Servs.*, 20 FCC Rcd. 14989 ¶¶ 39–45 (2005) (analyzing a different statute but providing insight into the FCC's interpretation of activity categories).

Another significant omission from the VoIP providers' overview is the fact that the FCC *has not* categorized VoIP services as informational or telecommunications services.  *See Charter Advanced Servs. (MN), LLC v. Lange*, 903 F.3d 715, 719 n. 3 (8th Cir. 2018); *USF-ICC Transformation Order*, 26 FCC Rcd. 17663, 18013-14 ¶ 954 (2011) (explaining that "the [FCC] has not classified interconnected VoIP services or similar one-way services as 'telecommunications services' or 'information services'") (footnote omitted); *Clark v. Time Warner Cable*, 523 F.3d 1110, 1113 (9th Cir. 2008).  And most courts conducting this activity-based analysis in connection to TCPA or TSR claims find that VoIP services are informational.

*See infra* Section I(A)(3)(a)(ii).

                i.     *Marriott's Allegations Defeat* NARUC *Test.*

The VoIP providers bypass the telecommunications or information services inquiry and apply the purportedly "controlling" *NARUC* test to argue that they are common carriers. *See* Mot. to Dis. at 16–17. Yet no court assessing liability under the TSR has applied the *NARUC* test. *See infra* Section I(A)(3)(a)(ii). Even if this Court were to make new law, Marriott's allegations defeat the *NARUC* test because the VoIP providers (1) do not hold themselves out indifferently to all potential users or hold themselves out indiscriminately to serve all within a class; nor do they (2) allow customers to transmit messages of their own design and choosing. *See U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1329 (D.C. Cir. 2002).

According to the FAC, the VoIP providers do not hold themselves out indifferently to all potential users—they favor high volume customers. *See* FAC ¶¶ 88 and 116. And Whisl purportedly sought to augment its relationship with Prestige to, *inter alia*, "increase the volume of traffic. . . ." FAC ¶ 88. From these allegations, an inference arises that the VoIP providers do not provide services uniformly and indiscriminately to all customers. And despite their contention otherwise, *see* Mot. to Dis. at 17, Marriott's allegations reflect that the VoIP providers had a role in the content of the calls. Marriott pleaded that both VoIP providers were aware of the wrongful content of the calls they routed based on the traceback notices they received, took *de minimis* (if any) mitigatory action, refused to terminate those beneficial relationships, and thus facilitated the unlawful scam. *See supra* Section I(A)(1)(a) (describing VoIP providers' notice of tracebacks, subsequent inaction, and continued provision of services) and (b) (describing VoIP providers' constructive knowledge of infringing conduct).[8] Thus Marriott has not alleged any facts from

---

[8] And even if the Court finds that the VoIP providers are common carriers under the *NARUC* test, the VoIP providers can still be liable because they had "actual notice of an illegal use of [their]

which this Court may find that the VoIP providers are common carriers.

It follows that the VoIP providers' reliance on *FTC v. AT&T Mobility LLC* is misplaced. 883 F.3d 848.  AT&T, unlike the VoIP providers, is a true telecommunications carrier exempt from the reach of the FTC Act and TSR. *See* 47 U.S.C. § 153 (51) (stating that telecommunications carriers "shall be treated as a common carrier under this chapter to the extent that it is engaged in providing telecommunications services. . .").

          ii.      *Marriott Adequately Alleged that VoIP Services are Information Services.*

The VoIP providers ignore the information/telecommunication inquiry likely because Whisl and Rapid Eagle publicly characterize their own services as "interconnected VoIP" services. *See* Mot. to Dis. at 16 n. 9.  Courts assessing liability under the TSR or TCPA have categorized VoIP services as "information services."[9] *Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d 1008, 1018 (W.D. Tx. 2020) (citing *Charter Advanced Servs. (MN), LLC* and several district court cases out of D.C., Missouri, and Minnesota in support of holding that VoIP services are "informational" and defendants are subject to TSR) (citing *Charter Advanced Servs. (MN), LLC,* 903 F.3d 715, 719 & n. 3 (explaining how VoIP provider alters format of calls rendering the service informational)) and (citing *Vonage Holdings Corp. v. Minnesota Pub. Utils. Comm'n*, 290 F. Supp. 2d 993, 999 (D. Minn. 2003) (noting that "[t]he process of transmitting customer calls over the Internet requires [the provider] to 'act on' the format and protocol of the information" and that the provider used telecommunications services "rather than provid[ed] them")); *Hurley v. Messer*, No. 3:16-9949, 2018 WL 4854082, at *4 (S.D. W. Va. Oct. 4, 2018) (refusing to dismiss TCPA claims asserted

---

services." *Payton v. Kale Realty, LLC*, 164 F. Supp. 3d 1050, 1057 (N. D. Ill. 2016) (citation omitted); *see supra* Section I(A)(1)(a) and (b).

[9] The one court in disagreement, *Clark v. Avatar Techs. Phl, Inc.*, No. H-13-2777, 2014 WL 309079 (S. D. Tex. Jan. 28, 2014), has been criticized for its lack of analysis.  *See FTC v. Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d at 1018.

against VoIP providers because they, at least, "offered a calling platform and 'knowingly allowed [their] client(s) to use that platform for unlawful purposes'") (citation omitted).

Marriott alleged that Whisl and Rapid Eagle *use* (as opposed to *provide)* telecommunications services in the provision of their VoIP services and transform their customers' communications. *Charter Advanced Servs. (MN), LLC*, 903 F.3d 715, 719. Marriott alleged that both Whisl and Rapid Eagle provide "voice over internet protocol . . . services." *See* FAC ¶¶ 8, 10, 11. According to the diagram, the VoIP providers "generate tens of millions of monthly robocalls to consumers." *See* FAC ¶¶ 3, 10, 11. Marriott also alleged that Whisl serves as the downstream provider for Prestige, and Rapid Eagle originates calls for DVC. *See* FAC ¶¶ 81, 87, 109. Whisl also "enabled [infringing] telemarketers to conduct their calls," "accepted and transited the robocall traffic originated by Prestige. . .," and "allow[ed] the deceptive calls to be routed through the network for delivery to consumers." FAC ¶¶ 81, 206. And Rapid Eagle routed outbound calls generated by DVC and thereby "facilitated the delivery of DVC's deceptive and abusive telemarketing calls" that it knew to be infringing. *See* FAC ¶¶ 109, 212; Section I(A)(1)(b). From these allegations, it is clear that the VoIP providers route calls over a network and that the VoIP providers acted on calls either routed by or originated by their customers "in such a way as to 'transform' that information." *Charter Advanced Servs. (MN), LLC*, 903 F.3d 715, 719 (noting that defendant provided ability to transform information through net protocol conversion and made it available via telecommunications) (citation omitted); *Vonage Holdings Corp.*, 290 F. Supp. 2d 993, 999 ("transmitting customer calls over the Internet requires Vonage to 'act on' the format and protocol of the information . . ." and concluding that Vonage provides information services because it uses rather than provides telecommunications services) (citing 47 C.F.R. § 64.702(a)). Consequently, the VoIP providers supply information services.

19

Other district courts have declined to apply common carrier status to VoIP providers because it would disrupt the FCC's carefully balanced regulatory scheme.  *See, e.g.*, *Educare*, 433 F. Supp. 3d at 1019; *Free Conferencing Corp. v. Comcast Corp.*, No. CV 15-4076, 2016 WL 7637664, at *4 (C.D. Cal. May 31, 2016).  Thus, for many reasons, the VoIP providers are not shielded from liability pursuant to the TSR.

> b.   The VoIP Providers Provided Substantial Assistance to Defendants Violating the TSR.

The VoIP providers ignore contrary authority and rely on inapposite authority concerning entities that contract with telemarketers or provide telemarketing services to suggest that in order to hold VoIP providers liable, a higher degree of involvement is required.  *See* Mot. to Dis. at 18. Marriott adequately alleged that Whisl and Rapid Eagle provided substantial assistance through their provision of VoIP services.

"'[S]ubstantial assistance,' . . . requires 'some connection between the substantial assistance provided to a deceptive telemarketer and resulting violations of core provisions of the revised proposed Rule.'"  *FTC v. Nudge, LLC*, No. 2:19-cv-00867, 2021 WL 3145700, at *4 (D. Utah July 26, 2021) (citing TSR, 60 Fed. Reg. 30, 406, 30,414 (June 8, 1995) at 30414).  This connection need not be direct, *see CFPB v. Daniel A. Rosen, Inc.*, No. 2:21-cv-07492, 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022) (citing with approval *FTC v. HES Merch. Servs. Co.*, No. 6:12-cv-1618, 2014 WL 6863506, at *7 (M.D. Fla. Nov. 18, 2014)), and "[t]he threshold for what constitutes substantial assistance is low."  *Id*. at *5 (quoting *FTC v. Lake*, 181 F. Supp. 3d 692, 699 (C.D. Cal. 2016)).  And where, as here, when "actual knowledge cannot be proven, but there are facts and evidence that support an inference of deliberate ignorance," the conscious avoidance standard is to be applied.  Statement of Basis, 68 Fed. Reg. at 4,580, 4,612 (Jan. 29, 2003) (codified at 16 C.F.R. § 310).  Marriott alleged that providing merchant accounts "despite a slew of red

flags" indicating "fraudulent telemarketing" activity constituted substantial assistance.  *See* FAC ¶ 52 (citing *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1239 (11th Cir. 2017)).

Marriott's allegations regarding Whisl and Rapid Eagle's provision of VoIP services to Prestige and DVC despite knowledge of their wrongdoing permits the Court to infer that they provided merchant accounts to their respective customers.  *See supra* Section I(A)(1)(a) (noting the relationship between the VoIP providers and their customers) and (b) (describing the VoIP providers' knowledge); *see, e.g.*, *WV Universal Mgmt., LLC*, 877 F.3d at 1239; *see Grijalva v. Kevin Mason, P.A.*, No. 8:18-cv-02010, 2019 WL 8221076, at *4 (C.D. Cal. Dec. 30, 2019) (explaining that participating in unlawful conduct of more directly liable defendants triggers substantial assistance liability).

c.  <u>The VoIP Providers Knew or Consciously Avoided Knowing that Other Defendants Violated the TSR.</u>

The VoIP providers do not challenge the scienter element.  *See* Mot. to Dis. at 18.  Courts have found that "it is sufficient to establish knowledge, or conscious avoidance, of the *prohibited practice, and not of the TSR violation*."  *Daniel A. Rosen, Inc.*, 2022 WL 1514439, at *5 (citing *FTC v. Chapman*, 714 F.3d 1211, 1217–19 (10th Cir. 2013)) (discussing a defendant's knowledge or lack thereof regarding other defendants' misrepresentations and not TSR violations) (emphasis added); *New Mexico ex rel. Balderas v. Real Estate Law Center, P.C.*, 401 F. Supp. 3d 1229, 1305 (D. N. M. 2019) (noting knowledge of the prohibited practice is sufficient); *FTC v. Glob. Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1288 (M. D. Fla. 2008) (holding that a defendant consciously avoided knowing telemarketers were engaged in deceptive acts and practices but not of TSR violations).

Marriott adequately alleged that the Whisl and Rapid Eagle knew or consciously avoided knowing that their customers engaged in a prohibited practice.  As set forth in the FAC, the VoIP

21

providers understood the nature of the robocalls the telemarketers placed based on their relationship to the telemarketers and had knowledge of the content of the robocalls their customers, either routed or originated.  *See supra* Section I(A)(1)(b).  And both Whisl and Rapid Eagle continued to provide VoIP services to their customers and telemarketers despite knowing that their customers made Marriott robocalls and undertook *de minimis*, if any, mitigation efforts.  *See supra* Section I(A)(1)(a).  And Whisl even sought to augment its relationship with Prestige.  *Id.*

### 4.     Virginia Unfair Competition

The VCPA prohibits certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction."  Va. Code Ann. § 59.1-200.  And when the claim is predicated on misrepresentations, reliance and damages must also be pleaded.  *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014).  Marriott properly pleaded its federal unfair competition claim, so it follows that Marriott properly pleaded its Virginia Unfair Competition claim.  *JTH Tax LLC v. DM3 Ventures, Inc.*, No. 3:20-cv-176, 2020 WL 6551214, at *4 (E.D. Va. Nov. 6, 2020) ("[U]nder Virginia law, 'a claim for unfair competition is essentially identical to the elements of the same claim under the Lanham Act.") (citation omitted).  The VoIP providers' arguments to the contrary are easily defeated.

### a.     Marriott has Standing Under the VCPA.

Implicit in Marriott's allegations is that *Marriott* is a consumer.  The VCPA extends to protect corporations, like Marriott, *see* Va. Code Ann. § 59.1-198, who are harmed as a result of direct transactions between a supplier and consumer.  *See, e.g.*, *Merriman v. Auto Excellence, Inc.*, 55 Va. Cir. 330, 331 (Va. Cir. Ct. 2001) (explaining that the VCPA's protection was not limited to transactions "directly between a supplier and the ultimate consumer"); *Blount v. Greenbrier Pontiac Oldsmobile—GMC Trucks Kia, Inc.*, No. 3:08-cv-622, 2009 WL 2431587, at *5–6 (E.D. Va. Aug. 7, 2009) (same).  Marriott alleged how it was harmed by numerous qualifying consumer

22

transactions.  *See* FAC ¶¶ 97–108 (describing Marriott robocalls made by Defendant Group 1 resulting in victims' purchases of vacation packages); 216–223 (describing the harm Defendants caused Marriott by misrepresenting that advertised goods are provided by Marriott; by misrepresenting that advertised goods are sponsored, approved, or certified by Marriott; by misrepresenting that advertised goods are affiliated, connected, or associated with Marriott; and by misrepresenting that advertised goods are similar in quality to Marriott's).

Without support in the authority they cite, the VoIP providers make a desperate argument that Marriott lacks standing to assert a VCPA claim because it believes (falsely) that Marriott is a competitor.  *See* Mot. to Dis. at 19.  Even if the VoIP providers were to try to establish competition at some point in this case, there are no allegations in the FAC that the parties are competitors, nor did Marriott allege that it provides VoIP services or sells similar services.  The VoIP providers' cited caselaw provides that "courts in this district have decided that competitors lack standing under the VCPA *because the legislature intended the statute to protect consumers*."  *BHR Recovery Cmtys., Inc.*, 355 F. Supp. 3d at 424 (emphasis added).  But the VoIP providers cannot ignore the allegations in the FAC that Marriott is acting as a safeguard for the consuming public from abusive and deceptive commercial behavior.  *See* Compl. ¶¶ 61–63; FAC ¶¶ 126, 129–130.  Marriott further alleged that it acted in accordance with its unique status—Marriott used its own resources and issued a public statement to assist other consumers deceived by the robocall scam, worked with a federal agency to stop the scammers from continuing to harm other consumers, and filed the instant action.  *See* Compl. ¶ 59, 61; FAC ¶¶ 124, 126, 127.  Thus, Marriott's assertion of a VCPA claim against the VoIP providers squarely comports with the statute's intended purpose.

b.    The VoIP Providers Are Suppliers.

As much as the VoIP providers seek to characterize their services as commercial, their services were used to facilitate consumer transactions.  *See* Mot. to Dis. at 20–21.  Suppliers are

"seller[s]. . .who . . . engage[] in consumer transactions."  Va. Code Ann. § 59.1-198.  The relevant

definition of a "consumer transaction" is one involving "[t]he advertisement, sale, lease, license or

offering for sale, lease or license, of goods or services to be used primarily for personal, family or

household purposes."  *Id*.  Several courts in this district have held that a "direct sale to a consumer

is not required for the transaction to be covered by the VCPA." *Alexander v. Se. Wholesale Corp.*,

978 F. Supp. 2d 615, 622 (E.D. Va. 2013) (citing one W.D. Va. and two E.D. Va. cases stating the

same).  Marriott's allegations that the VoIP providers understood their services would be used to

affect the consumer transactions at issue, *see supra* Section I(A)(1)(b), warrants the inference that

the VoIP providers are suppliers.

c.      Marriott Alleged Reliance and Damages.

Marriott is not required to plead that the VoIP providers made the representations directly

to the consumers.  Va. Code Ann. § 59.1-200 (A) (prohibiting a supplier from engaging in various

fraudulent acts or practices "in connection with a consumer transaction"); *see supra* Section

I(A)(4)(b) (explaining that suppliers can be liable for violating the VCPA when they were not

directly involved in the consumer transaction).  Marriott alleged that the VoIP providers knew that

they enabled telemarketers and a customer (direct infringer DVC) to make misrepresentations to

consumers who relied on those misrepresentations and purchased vacation packages and facilitated

the wrongful conduct of their customers.  *See supra* Section I(A)(1)(b) and (c).

Further, Marriott averred how it was damaged as a result of the consumer transactions—

including "actual damages, including without limitation lost profits, diversion of resources, costs

for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of

reputation and goodwill, corrective advertising and all other costs of resolving consumer

confusion." *See* FAC ¶ 222.  Accordingly, the VoIP providers' Motion should be denied.

d.      The Provision of VoIP Services Is Not Exempt from the VCPA.

24

The VCPA excludes from its reach "[a]ny aspect of a consumer transaction which aspect is authorized under laws or regulations of . . . the United States, or the formal advisory opinions of any regulatory body . . . of this Commonwealth or the United States." Va. Code Ann. § 59.1-199(A).   The VoIP providers advance an argument that the Virginia Supreme Court has categorically dismissed—inappropriately equating "authorize" with "regulate."  *See* Mot. to Dis. at 22 –23; *Manassas Autocars, Inc. v. Couth*, 645 S.E.2d 443, 447 (Va. 2007).  "Authorized actions are . . . sanctioned by statute or regulation."  *Id*. (holding that just because a type of advertising is regulated does not mean the advertising was authorized).  Consumer transactions brought about by misrepresentations are not authorized actions.  *See e.g.*, *Henderson v. Hickory Hill Ret. Cmty.*, *LLC*, No. CL19-187, 2019 WL 11815232, at *3 (Va. Cir. Ct. Oct. 2, 2019) (explaining that the VCPA "does not exempt entire industries from the VCPA, and that the VCPA did not regulate the type of misrepresentations" alleged); *Reed v. Litton Loan Servicing L.P.* 64 Va. Cir. 447, 448 (Va. Cir. Ct. 2004) (VCPA applied to claim of alleged fraud by loan servicer that charged fees not authorized under mortgage loan).  Accordingly, Marriott properly pleaded a violation of the VCPA.

### 5.    Virginia Tortious Interference

Marriott sufficiently pleaded claims for tortious interference.  The elements are: "(1) there was a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) the defendant had knowledge of that relationship or expectancy; (3) there is a reasonable certainty that absent the defendant's intentional misconduct, the plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to the plaintiff."  *Buffalo Wings Factory, Inc. v. Mohd*, 622 F. Supp. 2d 325, 336 (E.D. Va. 2007).  In addition, Marriott

alleged improper methods.  *See Alliance Tech. Grp., LLC v. Achieve 1, LLC*, No. 3:12-cv-701, 2013 WL 143500, at *8 (E.D. Va. Jan. 11, 2013).

a. <u>Marriott Pleaded a Specific Business Relationship or Expectancy.</u>

The VoIP providers acknowledge that Marriott alleged a business relationship or expectancy with members of its loyalty program, Marriott Bonvoy.  *See* FAC ¶¶ 44 (alleging a relationship with victims of the scam with whom Marriott "routinely contract[s]") and 231; Mot. to Dis. at 24 –25.  Marriott referenced Marriott Bonvoy members who are known victims of the Marriott robocall scam.  *See* FAC ¶¶ 44, 99, 119, 103.  And despite citing to Marriott Bonvoy's terms and conditions, the VoIP providers bizarrely conclude that there is no written contract between Marriott and Marriott Bonvoy members.  *See* Mot. to Dis. at 25-26.  By alleging ongoing relationships between Marriott and its customers with whom it routinely contracts, specific relationships with Marriott Bonvoy members who were victims of the scam, and incorporating by reference Marriott Bonvoy's terms and conditions, Marriott properly pleaded the existence of business relationships and expectancies.  *See, e.g, Sidya v. World Telecom Exch. Commc'ns, LLC*, 870 S.E.2d 199, 204 (Va. 2022) (noting that business expectancies include "ongoing relationships with [] customers and vendors"); *Alliance Tech. Grp., LLC*, 2013 WL 143500, at *8 (noting that a plaintiff's customer contracts constituted a business expectancy).

b. <u>The VoIP Providers Knew of These Business Relationships or Expectancies.</u>

Marriott pleaded that VoIP providers are hired by telemarketers who market the vacation packages to consumers.  *See supra* Section I(A)(1)(b).  And Marriott pleaded that one iteration of the scam involved targeting victims who were members of Marriott's "friends and family rewards program" and specifically noted that "Defendants often state that the consumer qualified for the promotion because he or she was either a member of Marriott's loyalty program, Marriott Bonvoy.

26

. . ." FAC ¶¶ 60 and 61.  Marriott also pleaded a relationship between the VoIP providers and telemarketers.  *See supra* I(A)(1)(b).  From these allegations, the Court may at least infer that the VoIP providers knew of the victims' business relationships or expectancies with Marriott.

c. <u>Marriott Adequately Alleged the Remaining Elements.</u>

Marriott alleged that the VoIP providers used improper means and caused a breach or termination of relationships or expectancies.  Liability attaches where, as here, when the interferor "knows that the interference is certain or substantially certain to occur as a result of his [or her] actions."  *Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 212–213 (4th Cir. 2001).  The VoIP providers acted intentionally given that they were aware of the expectancies or relationships, *see supra* Section 1(A)(5)(b), were aware of the unlawful conduct of the telemarketers, *see supra* I(A)(1)(b), and continued to provide them VoIP services.  *See supra* Section I(A)(1)(b).  In so doing, the VoIP providers violated numerous laws and engaged in tortious conduct.  *See generally*, Opp. Br. (July 21, 2022); *see, e.g.*, *Alliance Tech. Grp., LLC*, 2013 WL 143500 at *8 (noting that improper means may include "illegal or tortious" conduct) (citation omitted).  And Marriott sufficiently alleged that "as a direct and proximate result" of this misconduct, customers purchased products and services offered by Defendants instead of Marriott, and certain Marriott customers ceased their business relationships with Marriott.  *See* FAC ¶¶ 121, 232 –35.  Marriott then notes it was damaged by this conduct in the form of, at least, "lost profits, diversion of resources, costs for investigation and mitigation of harms caused by Defendants' wrongful conduct, loss of reputation and goodwill, corrective advertising and all other costs of resolving consumer confusion."  *Id*. at ¶ 236.

Finally, Marriott is not required to allege that the VoIP providers are competitors.  "[T]he Virginia Supreme Court has never stated that a competitive relationship . . . is a prerequisite to a tortious interference claim. . . ."  *Smith v. Wright*, No. 2:19-cv-559, 2020 WL 6053154, at *16 n.

27

17 (E.D. Va. May 6, 2020) (citing *Schaecher v. Bouffault,* 772 S.E.2d 589, 602 (Va. 2015));

*AdvanFort Co. v. Int'l Registries, Inc.*, No. 1:15-cv-220, 2015 WL 4254988, at *5 (E.D. Va. July

13, 2015) (citing *Schaecher* for the proposition that "the Supreme Court of Virginia indicates that

it may be receptive to a claim for tortious inference even where a competitive relationship does

not exist between the parties").

### 6.      Virginia Common Law Conspiracy

Whisl mischaracterizes itself as an "intermediate VSP" and both VoIP providers weakly

argue that there was no "concerted action or agreement."  *See* Mot. to Dis. at 29.  The VoIP

providers are not telecommunications carriers, *see supra* Section I(A)(3)(a), and agreement may

be inferred from the parties' conduct.  *See Borg v. Warren*, 545 F. Supp. 3d 291, 321 (E.D. Va.

2021).  Under Virginia common law, a civil conspiracy is "(1) a combination of two or more

persons, (2) by some concerted action, (3) to accomplish some criminal or unlawful purpose, or to

accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means."

*Harrell*, 923 F. Supp. 2d at 825. "The 'unlawful act' element requires that at least one member of

the conspiracy commit an 'underlying tort.'"  *Id*. (citation omitted)

### a.      Defendant Group 1 Conspiracy

The gravamen of Marriott's FAC with respect to Defendant Group 1 (including the VoIP

providers) is that they directly or indirectly telemarketed vacation packages falsely trading on

Marriott's brand to consumers across the United States, including Virginia.  *See* FAC ¶ 71.

According to the FAC, the goal of the conspiracy, including the use of U.S.-based VoIP providers

to route the Marriott robocalls, was to obtain maximum profit by unlawful means—deceiving

consumers into purchasing what they believed to be Marriott-sponsored vacation packages.  *Id*.

The vacation packages are purportedly redeemable at resorts associated with Vallarta Gardens and

Tafer Resorts.  *Id*. ¶ 74.  The FAC alleges that the Defendant Group 1 entities acted together.  *Id*.

To support those allegations of concerted action, Marriott pointed to commonalities in board membership to demonstrate that the acts of one Defendant Group 1 entity were known by other Defendant Group 1 entities. *See* FAC ¶ 75. Specifically, Marriott alleged that members of ResortCom's board are affiliated with Tafer Resorts and that board members of a timeshare exchange company that shares a corporate address with ResortCom include individuals affiliated with Tafer Resorts and ResortCom. *See* FAC ¶¶ 75, 76, 78. Marriott also alleged numerous other connections between the Defendant Group 1 entities—that Defendant Villa Del Palmar is a Tafer Resort, *see* FAC ¶¶ 102, 103, 105, and that Tafer Resorts is linked to some telemarketers and websites identified in Marriott robocalls through its maintenance of a broker list. *See* FAC ¶ 79. Additionally, Marriott alleged contractual relationships between several Defendant Group 1 entities—ResortCom contracted to provide timeshare-related services to Vallarta Gardens and Tafer Resorts, and Whisl serves as Prestige's downstream provider. *See* FAC ¶¶ 71, 90, 92; *supra* Section I(A)(1)(a)(i).

Marriott averred specific examples of concerted action and described Whisl's involvement. *See supra* Section I(A)(1)(b). Marriott also alleged that Whisl was aware of Prestige's prohibited conduct based on almost thirty tracebacks, permitted that behavior to continue, and tried to grow that relationship via a bilateral agreement. Marriott then pleaded that this robocall scam continues, which is supported by the allegation that ResortCom maintained chargeback records of Vallarta Gardens into 2021, *see* FAC ¶ 95, that Marriott robocalls occurred in 2021, *see id.* ¶ 97, that Whisl and Prestige's relationship continues and is likely to grow, *see id.* ¶ 88 (setting forth the proposed bilateral agreement between Whisl and Prestige), and that Marriott continues to receive complaints about the robocall scam after the release of its public statement. *See* FAC ¶ 125. With respect to damages, in addition to noting the specific monetary losses some of victims incurred as a result of

Marriott robocalls calls, Marriott alleged in detail how it and other consumers were harmed as a result of the scam.  *See id.* ¶¶ 129 –30.

b.    Defendant Group 2 Conspiracy

Marriott described how the Defendant Group 2 entities, DVC and Rapid Eagle, carried out a holiday-variation of the Marriott robocall scam.  *See* FAC ¶ 109.  Marriott alleged a contractual relationship between DVC and Rapid Eagle—tracebacks reflect that Rapid Eagle served as the VoIP provider for eight Marriott robocalls DVC placed.  *See* FAC ¶ 116.  And in addition to being aware of the contents of the Marriott robocalls DVC placed, *see supra* Section I(A)(1)(b), Marriott alleged that Rapid Eagle sought to maintain its relationship with DVC even after it received repeated notice of DVC's involvement in the Marriott robocall scam.  *See* FAC ¶ 117.  Further, according to the FAC, Rapid Eagle publicly advertises that it is capable of handling "huge volumes of traffic," including "dialer traffic," and is amenable to working with "call center[s] or call shop[s]." *Id.* at ¶ 116.  Marriott then pleaded that the telemarketers involved in this iteration of the scam utilized those means to carry out the scam.  *Id.*

"[T]hese facts form such a coherent and related pattern of actions that [Marriott has] clearly established a unity of design and purpose by [Defendant Group 1 and Whisl and Defendant Group 2 and Rapid Eagle] from which the Court can further infer that the parties agreed to accomplish a common unlawful purpose."  *Borg*, 545 F. Supp. 3d 291, 321.  Accordingly, Marriott adequately alleged claims for common law conspiracy, and the VoIP providers' Motion should be denied.

## II.    CONCLUSION

For the reasons set forth above, Marriott requests that this Court deny the VoIP providers' Motion and grant such further relief as this Court deems proper.  To the extent the Court disagrees, Marriott requests permission to file a Second Amended Complaint.

Dated:  July 21, 2022                    MARRIOTT INTERNATIONAL, INC.
                                         By counsel


                                         /s/ Attison L. Barnes, III
                                         Attison L. Barnes, III (VA Bar No. 30458)
                                         David E. Weslow (for *pro hac vice*)
                                         Kevin G. Rupy (for *pro hac vice*)
                                         Duane C. Pozza (for *pro hac vice*)
                                         Stacey J. LaRiviere (VA Bar No. 92354)
                                         WILEY REIN LLP
                                         2050 M St. NW
                                         Washington, DC 20036
                                         Tel: (202) 719-7000
                                         abarnes@wiley.law
                                         dweslow@wiley.law
                                         krupy@wiley.law
                                         dpozza@wiley.law
                                         slariviere@wiley.law

                                         *Counsel for Plaintiff*
                                         *Marriott International, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of July, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record and mailed first class, postage prepaid, to all remaining parties as follows:

Oficinas Parrott Caribbean S.A. de C.V.
c/o Ministry of Foreign Affairs
Directorate-General of Legal Affairs
Plaza Juarez No. 20, Planta Baja
Col. Centro, Alcaldia Cuauhtemoc
C.P. 06010 Cuidad de Mexico
Mexico

Deep Blue Desarrollos S de R.L. de C.V.
d/b/a Vallarta Gardens Private Beach Club &
Spa Private Residence Club
c/o Ministry of Foreign Affairs
Directorate-General of Legal Affairs
Plaza Juarez No. 20, Planta Baja
Col. Centro, Alcaldia Cuauhtemoc
C.P. 06010 Cuidad de Mexico
Mexico

Club Caribe Villa Del Palmar S.A. de C.V.
c/o Ministry of Foreign Affairs
Directorate-General of Legal Affairs
Plaza Juarez No. 20, Planta Baja
Col. Centro, Alcaldia Cuauhtemoc
C.P. 06010 Cuidad de Mexico
Mexico

Cancun Ink Corp. S.A. de C.V.
c/o Ministry of Foreign Affairs
Directorate-General of Legal Affairs
Plaza Juarez No. 20, Planta Baja
Col. Centro, Alcaldia Cuauhtemoc
C.P. 06010 Cuidad de Mexico
Mexico

/s/ *Attison L. Barnes, III*
Attison L. Barnes, III (VA Bar No. 30458)
Wiley Rein LLP
2050 M St. NW
Washington, DC 20036
Tel: (202) 719-7000
abarnes@wiley.law

*Counsel for Plaintiff Marriott International, Inc.*