# EXHIBIT B

Case 1:21-cv-00610-AJT-JFA   Document 176-2   Filed 11/16/22   Page 2 of 31 PageID# 1645

11/3/2022      Marriott International, Inc. v. Dynasty Marketing Group, LLC et al.    Bruno Borra

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

_____

MARRIOTT INTERNATIONAL, INC.,  )

                        Plaintiff, )

v                              ) Civil Action No.

                               ) 1:21-cv-00610-AJT/JFA

DYNASTY MARKETING GROUP, LLC,  )

et al.,                        )

                    Defendants.)

_____)

DEPOSITION OF BRUNO BORRA

APPEARING REMOTELY

November 3, 2022

9:00 a.m.

Reported by: Eileen Mulvenna, CSR/RMR/CRR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

                                                            Page 11

1    BRUNO BORRA,

2        having been duly sworn by Eileen Mulvenna,

3        a Notary Public of the State of New York,

4        was examined and testified as follows:

5    EXAMINATION

6    BY MR. BARNES:

7            Q.    Good morning, Mr. Borra.  As you

8    heard, my name is Attison Barnes.  I represent

9    Marriott in this case.

10               Could you spell your full name,

11   please.

12           A.    It's Bruno Borra; B-R-U-N-O,

13   B-O-R-R-A.

14           Q.    And what's your residence address?

15           A.    ██████████████████████████████,

16   ████████████.

17           Q.    And do you understand that your

18   deposition is being taken in a case filed by

19   Marriott against your company?

20           A.    Yes, sir.

21           Q.    Did you receive a notice of deposition

22   in this case for you to appear today?

Page 14

1      A.     Yeah.

2      Q.     What did you do to prepare for your

3  testimony today on those 20 topics?

4      A.     On the -- well, they're pretty simple

5  answers.  I don't know what you want me to prepare

6  for.

7      Q.     Okay.  Did you do any preparation for

8  your testimony today other than look at the topics?

9      A.     No, because I know how to answer them.

10      Q.     Did you review any documents in

11  preparation for your testimony on those areas?

12      A.     Just the answers I sent to Mr. Griffin

13  that he wanted me to answer.

14      Q.     Did you have any discussions with

15  anyone other than your counsel to prepare for the

16  deposition on those areas of inquiry?

17      A.     No.

18      Q.     Have you been deposed before,

19  Mr. Borra?

20      A.     No.

21      Q.     So you may have had a discussion with

22  your counsel, but I just want to make sure we're on

Page 44

1   included.  Calypso Cay.  And then, little by little

2   I started losing contracts because of this.

3          Q.      What about AMResorts?

4          A.      Yes, them, too.

5          Q.      Any other ones?

6          A.      That I can recall, not off the top of

7   my head, no.

8          Q.      And you had similar relationships with

9   each of them?

10         A.      Yeah, it's the same thing, just send

11   them customers that qualify for the tour.

12         Q.      You haven't produced any of the

13   contracts with those entities.  Did you know that

14   Marriott asked for you to produce those contracts?

15         A.      Yes, but I didn't want to get my

16   contracts canceled.  If I get them canceled, they

17   don't have to fulfill my packages.

18         Q.      You understand that you were asked to

19   provide that in the discovery, though?

20         A.      Yeah, I know.

21         Q.      And the only document you produced

22   with respect to TAFER was a one-page sheet from

Page 63

1        A.     I just took a picture, and then -- the

2   app, you take a picture, and then you send it to

3   them you.

4        Q.     All right.  You send it to them over

5   an app?

6        A.     Yes.

7        Q.     And did you go back and look at

8   whether you could -- you could find that

9   communication over the app?

10       A.     No.  It's been more than a year.

11       Q.     But you didn't look for it?

12       A.     No, I'm pretty sure it's gone, too,

13   because everything deletes after more than a year.

14       Q.     But, again, you didn't look for it?

15       A.     No.

16       Q.     And then did you know the person who

17   actually recorded it?

18       A.     No.

19       Q.     Did you receive a recording back?

20       A.     Yeah, it's the one that I implemented

21   in the dialer.

22       Q.     And where is that -- how did you get

Page 65

1          Q.      So you still have that document and

2     you haven't produced it -- or that recording?

3          A.      I believe I have it.  I'm not sure.

4          Q.      All right.  But you didn't look before

5     you were responding to the discovery whether you had

6     it or not; right?

7          A.      No, because you guys already have the

8     script to the transcript already.

9          Q.      All right.  You have the recording.

10    Okay.

11         A.      I'm not sure I have the recording, no.

12         Q.      All right.  Well, I think you said you

13    still have that laptop.

14                 So you -- you had this recording.  Who

15    did you give it to once you had the recording on

16    your laptop?

17         A.      I uploaded to the dialer.  That's it.

18         Q.      And who did you upload it to?

19         A.      Whitetail.

20         Q.      Whitetail?

21         A.      Yeah, the dialer company.

22         Q.      And where is Whitetail?

Page 68

1      January of 2021 with Whitetail?

2              A.      Yeah.

3              Q.      All right.  You haven't produced that

4      document; correct?

5              A.      I don't have that document anymore.

6              Q.      Did you look for it?

7              A.      No, because I know I don't have it.

8              Q.      Why would you know you don't have it?

9              A.      Because I delete all those e-mails.

10     It's just an e-mail you send by Adobe and sign it.

11             Q.      But you haven't looked for it?

12             A.      Because I'm not going to look for them

13     if I don't have them, and I know I don't have them.

14             Q.      And in the contract with Whitetail,

15     what were you asking them to do?

16             A.      Same thing as this company, just use

17     the predictive dialer.

18             Q.      And it was through this company

19     Whitetail that you uploaded the voice recording

20     mentioning Marriott?

21             A.      Yeah.

22             Q.      And approximately how many -- did you

11/3/2022      Marriott International, Inc. v. Dynasty Marketing Group, LLC et al.    Bruno Borra

Page 69

1   upload it once?  So you used the same message the

2   whole time?

3          A.     Yeah, I believe -- or there was two

4   versions, one for, like, the summer and then one for

5   the winter, I believe.

6          Q.     Right.  One was a 4th of July message;

7   right?

8          A.     Yeah, that one.  That's the summer

9   one.

10          Q.     What was the winter one?

11          A.     I guess over the holidays, I believe,

12   or...

13          Q.     And both of them mentioned Marriott;

14   right?

15          A.     I don't -- I don't remember.  I know

16   one of them mentioned -- I think the 4th of July one

17   mentioned Marriott for sure, but I don't know about

18   the other one.

19          Q.     And let's talk first about the 4th of

20   July message.  Approximately how many calls were

21   made using the 4th of July message with Marriott in

22   it?

11/3/2022      Marriott International, Inc. v. Dynasty Marketing Group, LLC et al.     Bruno Borra

Page 70

1          A.      I have no idea.

2          Q.      Did you ever -- what's that?

3          A.      I just dropped the voice message, and

4     the software itself drops it automatically

5     [inaudible] how much is dropped.

6          Q.      Yeah, did you know that it was more

7     than a million calls?

8          A.      No.

9          Q.      Did you know it was more than 500,000

10    calls?

11              MR. ADAMS:  Object to the form of the

12         question.

13              THE WITNESS:  I assume it's probably

14         more than hundred K.  That's for sure.

15    BY MR. BARNES:

16         Q.      All right.  But you don't know, and

17    you haven't looked into that?

18         A.      No, I don't know the exact number.

19    That's something only the dialer company would know.

20    They keep records of that.

21         Q.      And for responding to the discovery,

22    you didn't look into how many calls were made using

11/3/2022     Marriott International, Inc. v. Dynasty Marketing Group, LLC et al.    Bruno Borra

Page 81

1    document that was produced by VoIP Essential.  You

2    didn't produce it, although it's responsive to

3    discovery in this case.  And I'd like to go through

4    it because it refers to your relationship with VoIP

5    Essential and communications that were going back

6    and forth.  So let's start with the

7    last page, which was the first page of the

8    conversation.

9              And I'm going to ask Dan to pull up

10   the bottom and blow that up to make it look a little

11   bigger.

12             So at the bottom of the page, under

13   the words where it says "confidential," this is

14   Friday, August 27, 2021.  Do you see that?

15        A.    Uh-huh.

16        Q.    And this is from -- this e-mail is

17   from Dynasty Marketing.

18        A.    Yeah.

19        Q.    And would you have been -- would you

20   have had access to these e-mails?

21        A.    To that e-mail, yeah.  I'm pretty sure

22   I can look for it.

Page 82

1          Q.     Okay.  But you hadn't looked for it

2      yet in order to respond to discovery; right?

3          A.     The thing is all the questions you

4      guys are asking for, you guys got to be more

5      specific.  I don't know what documents you guys are

6      looking for.  I'm just giving you what I know.

7          Q.     All right.

8          A.      If you would have asked the question,

9      Please provide all the contact with the VoIP

10     Essential, I would have looked for it.  You didn't

11     ask those questions.

12         Q.     So we'll go through that, in terms of

13     the request that we asked.  But let's get to this

14     e-mail, which --

15              MR. BARNES:  Dan, what's our number on

16         this one?

17              THE VIDEOGRAPHER:  This is Exhibit 9.

18              MR. BARNES:  Exhibit 9.  So we'll mark

19         this as Exhibit 9.

20              (Exhibit 9, Bates Nos.

21         VE_MA_000176-184, Dynasty Marketing Group

22         Posts, received and marked.)

Page 87

1    information on the status of calls, calls not

2    called, dialable, penetration.  This is all

3    information you had access to while the calls were

4    being made; right?

5          A.     At the moment, yes, I have access to

6    that.

7          Q.     All right.  And you had access to this

8    e-mail, as well, in your system when you were

9    responding to the discovery in this case?

10         A.     Well, if you would have asked the

11   correct question, yes, I would have provided it.

12         Q.     Did you look for any communications

13   about the calls that were made during the period of

14   time of the lawsuit?

15         A.     No, because I didn't have that dialer

16   no more.

17         Q.     So let's look at the -- let's look at

18   the top, the second -- the September 7, 2:08 p.m.

19   e-mail.  And this is an e-mail from your company

20   where it says, "Yea but how would I be able to do

21   that to other lists that I have."

22                What do you mean "other lists that I

11/3/2022     Marriott International, Inc. v. Dynasty Marketing Group, LLC et al.     Bruno Borra

Page 90

1    September 20 of 2021; correct?

2          A.    Yes.

3          Q.    So within the last -- well, a little

4    over a year ago you had access to this information;

5    correct?

6          A.    Yes.

7          Q.    Did you do anything to search for

8    these types of metrics when you were responding to

9    the discovery in this case?

10         A.    I wasn't aware I got to provide

11   regarding VoIP Essential.

12         Q.    And do you still have this information

13   in your possession, what -- your communications with

14   VoIP Essential?

15         A.    The e-mail, yeah.  I believe so, yeah.

16         Q.    And do you realize that VoIP Essential

17   was a defendant in this case, one of the group

18   entities that had been sued along with Dynasty

19   Marketing Group?

20         A.    Yeah.

21         Q.    And you didn't provide any -- your

22   communications with VoIP Essential in this case;

Page 146

1    referring to Marriott?

2         A.     No.

3         Q.     Did you ever ask anyone at VoIP

4    Essential and/or Whitetail how many voicemails

5    mentioning Marriott were dropped between February of

6    2021 and January of 2022?

7         A.     No.

8         Q.     And after you received the complaint

9    in this case where Marriott's concern was how many

10   calls question made, did you do any investigation

11   into finding that out, how many times a call was

12   made using a voicemail that mentioned Marriott?

13        A.     Well, it did not mention Marriott

14   only.  It mentioned Hilton, too.  But, no, it was

15   just a software.  It's a system that works by

16   itself.

17        Q.     And did you not, during the period of

18   time that you were running the voicemail have access

19   to the metrics to show how many times that voicemail

20   was dropped?

21        A.     Those reports were always incorrect.

22   As you can see -- I know you have a conversation

Page 147

1   with me and Sean.  He will say that some of them are

2   incorrect.  Some of them are correct.  I don't

3   believe those voicemails were dropped that much on

4   the particular days.  I don't think it had the same

5   accuracy as Whitetail.  I think the VICIdial dialer

6   system was -- or VoIP Essential was not as

7   competitive as the Whitetail one.

8           Q.     Mr. Borra, after you received

9   Deposition Exhibit No. 2, which was the topics for

10  your corporate designee deposition today, did you do

11  anything to determine the number of calls that were

12  made using Marriott's name?

13          A.     No, because I don't have access to

14  those portal admin log-ins no more.

15          Q.     Did you -- did you seek that

16  information from either Whitetail or VoIP Essential?

17          A.     No, because I was not made aware that

18  I had to look for those records.

19          Q.     Did you understand that -- did you

20  understand that for a 30(b)(6) deposition, that you

21  would need to get educated on the areas of inquiry

22  those 20 items that we mentioned earlier?

Page 148

1          A.      Yeah, but I still didn't understand it

2    because I was not able -- I did not have access to

3    those documents of Whitetail or VICI or whatever

4    it's called software reports.  Because they make a

5    report, a website, and after your account is done,

6    they delete it.

7          Q.      Did you call either Whitetail or VoIP

8    Essential to determine whether or not they, in fact,

9    still had those records?

10         A.      No.  Because I believe in the contract

11   itself, it says after -- after you end your services

12   or they end your services, everything gets deleted.

13         Q.      But you didn't call them to find that

14   out; right?

15         A.      No.

16              THE WITNESS:  I'll be right back.  I'm

17         going to get my charger.  My phone is about

18         to die.

19              MR. BARNES:  Let's take a five-minute

20         break so you can get your charger.

21              THE VIDEOGRAPHER:  Okay.  The time is

22         11:36 a.m., and we're going off the record.

Page 153

1   than that; right?

2        A.     Yeah, I went to 2 percent.  That's why

3   they cut me off.

4        Q.     But you actually went to 5.5 percent,

5   which is --

6        A.     No, that's for the one right now.  The

7   one I'm current right now is 5.8 percent.

8        Q.     Oh, I'm talking about the -- do you

9   recall what level of chargebacks you went to in --

10  for 2021?

11       A.     Well, for PayPal alone, it was

12  2 percent.  And that's when they cut me off.  For

13  this, I don't know.  I'll say probably around 5.

14  I've been averaging 5 percent, like, a month.

15       Q.     And do you know what the industry

16  standard for chargebacks is?

17       A.     Probably 1 percent, I believe.

18            MR. ADAMS:  I'll object to the form of

19            the question.

20  BY MR. BARNES:

21       Q.     And if I were to ask you how many

22  chargebacks there were between February of 2021 and

11/3/2022      Marriott International, Inc. v. Dynasty Marketing Group, LLC et al.     Bruno Borra

Page 154

1    June of 2021, would you be able to tell me?

2           A.     Off the top of my head, no.

3           Q.     And you wouldn't be able to tell me

4    what the reasons for each one of those chargebacks

5    was; right?

6           A.     No.  Basically, buyer remorse.  They

7    just change their mind.

8           Q.     So did you also -- the next document

9    after this spreadsheet, it has a title "Pending

10   Reservations."

11          A.     Yes, that was my -- one of my customer

12   service agents who does our Excel sheet.

13          Q.     Okay.  Who -- we're looking at that on

14   the screen.  So it's labeled in your responses as

15   Exhibit 2j; is that right?  You see at the bottom of

16   the page on the right?

17          A.     Uh-huh.

18          Q.     So who in your office would have

19   created this document?

20          A.     One of my customer service agents that

21   doesn't work with me no more.

22          Q.     Who was that?

Page 158

1                 THE REPORTER:   There was cross talk.

2     BY MR. BARNES:

3           Q.     Is that right, Mr. Borra?  You said

4     yes?

5           A.     Yes, there was confirmations.

6           Q.     And for what resorts would there be

7     confirmations during this period of time,

8     February 2021 through, let's say, January of 2022?

9           A.     It depends on the resort that the

10    customer chose.

11          Q.     And so tell me the typical line of

12    communication.  You would send them an e-mail that

13    says, I have a customer that wants to book a room,

14    and they would respond back?

15          A.     No, they fill out their booking form

16    on the website.  I get the e-mail.  I call -- or we

17    call the customer to confirm everything is correct.

18    We send it to the resort to verify they qualify.

19    And if they don't qualify, we tell them that

20    property you cannot take a tour.  Is there another

21    property you would like to take a tour to, and we

22    just look for something to offer them, the

11/3/2022      Marriott International, Inc. v. Dynasty Marketing Group, LLC et al.      Bruno Borra

Page 159

1    qualifications.

2          Q.      And so as a result of those

3    confirmations, a number of consumers stayed at the

4    various resorts; right?

5          A.      Yeah.

6          Q.      Do you know in that time period,

7    February of 2021 to January of 2022, how many

8    consumers you placed at the various resorts?

9          A.      No, I don't have exact number off the

10   top of my head.  No.

11         Q.      Did you understand that the deposition

12   notice asked you to be prepared to talk about the

13   bookings?

14         A.      The thing is that we're a small

15   company.  We're not trying to keep track where

16   everything is [inaudible].  We send you the

17   reservation form.  We call you confirming.  We send

18   it to the resort.  They tell you if you got a

19   confirmation or not.  It's as simple as that.  We

20   don't try to do it hard.

21         Q.      But you understand that you were asked

22   to be prepared to talk about the bookings?

Page 163

1   waiting for the customer to send their ID.  It's

2   just a checklist, basically.  Once it gets done, you

3   know, we mark it, Okay.  This is done.  This is a

4   checklist.

5        Q.     And the two documents that you -- the

6   one before and this one, are these the only

7   reservation documents that you have?

8        A.     Yeah.  You just keep it as simple as

9   possible, yes.

10       Q.     Okay.  So we don't have all the

11   confirmation e-mails that you would have sent back

12   and forth with the resorts.  All you have are these

13   two documents for the --

14       A.     Yes.  Like I said, if I was to go one

15   by one, it would be thousands of pages of e-mails,

16   right.

17       Q.     Let's then go to the next document

18   that you produced.  What is this document?  It

19   appears to be --

20       A.     That's what --

21       Q.     -- a customer ID and customer

22   information?

11/3/2022     Marriott International, Inc. v. Dynasty Marketing Group, LLC et al.     Bruno Borra

Page 164

1          A.     Yeah, that's what I send the customer

2     who wants to make a purchase with us for them to

3     have an invoice, you know.  The paper trail,

4     basically.

5          Q.     All right.  So you would have this

6     type of customer information with a package of what

7     they purchased for each customer that bought during

8     the period of time, February of 2021 to January of

9     2022?

10         A.     Yes [inaudible].

11         Q.     But you haven't produced those in

12    response to discovery; right?  You just produced

13    this one which doesn't have any names or address or

14    phone numbers?

15         A.     I mean, I don't have permission to

16    share every person's information.

17         Q.     Well, do you know -- do you have an

18    understanding that we have a protective order in

19    this case for confidentiality?

20         A.     No, I didn't know that.

21         Q.     All right.  But you just decided not

22    to produce the individual reservations for the

Page 173

1   was chargeback against the income that you would

2   have received for the telemarketing?

3        A.     Yeah.  And, also, PayPal kept money,

4   too, just in case of future chargebacks.

5        Q.     And of the amount that you received

6   from both Maverick and PayPal, do you have a

7   calculation of the money that you actually -- the

8   profit that you actually took home?

9        A.     From, like, everything in general?

10       Q.     For this period of time, yeah, with

11   both Maverick and PayPal.

12       A.     Well, 60 percent goes to employees.

13   And then 20 --

14       Q.     But, again -- let's say how much comes

15   to Dynasty first.

16       A.     After, let's say, take out 5 percent

17   from those 300K, all that comes to Dynasty after

18   that.  But then I have to distribute between

19   employees and bills.

20       Q.     And have you done a calculation of

21   what your profit was?

22       A.     Like me personally or the company?

Page 174

1          Q.     The company.

2          A.     No more than 10 percent or 5.   Between

3    5 and 10 percent.

4          Q.     But you haven't done a calculation of

5    that?

6          A.     No.

7          Q.     We talked a little bit earlier about

8    TAFER Resorts?

9          A.     Yeah.

10         Q.     Which individuals did you work with at

11   TAFER?

12         A.     I don't -- I don't remember.  I just

13   sent an e-mail to see if I can reserve fulfillment.

14   There's not one particular division.  They just send

15   a response, like yes or no.

16         Q.     So you're not aware of any individuals

17   that you would have worked with at TAFER?

18         A.     No.

19                MR. BARNES:  So let me show you

20        Tab 91.  I believe this will be No. 27.

21                Is that right, Dan?

22                THE VIDEOGRAPHER:  That's correct.

Page 176

1   works, but different division replies.  That's all I

2   know.

3        Q.    Okay.  In this document -- and we

4   can -- let's go to page 2.  There are various PDFs

5   that are referenced.  For example, there's a TAFER

6   group request at the top of the second page.

7   There's a TAFER group request a little bit below

8   that.  There are, on the next page, broker contact

9   information.  On the next page, there are broker

10  rates for additionals 2021, reservation and

11  verification process, reservation format.

12              None of those documents, Mr. Borra,

13  have been produced to us even though they appear to

14  have been attached to this e-mail chain that you

15  provided.

16              Is there any reason why those

17  documents weren't produced?

18       A.    I wasn't aware that they had to be

19  produced.  Those are just, like, qualifications and

20  rates for particular holidays and stuff.

21       Q.    It relates to your contractual

22  relationship with TAFER; correct?

Page 189

1       Q.      And for TAFER or for Vallarta Gardens,

2   and for none of these resorts have you provided the

3   confirmation documents in discovery?

4       A.      No, I was unaware of that.

5       Q.      And you still have those; right?

6       A.      Yeah.  For every individual that have

7   been there, yeah.

8       Q.      And would that apply also to AMResorts

9   and to West Gate and the others that you mentioned

10  earlier including Luxor?

11      A.      Yes.

12      Q.      You mentioned earlier a company called

13  Calypso Cay Resort?

14      A.      Yes.

15      Q.      What is Calypso Cay Resort?

16      A.      It's a resort by Disney.  You have to

17  take a presentation tour to get to.

18      Q.      Do you know who owns Calypso Cay

19  Resort?

20      A.      No.  I know who worked there, but I

21  don't know who owns it.

22      Q.      Well, who do you know who worked

Page 190

1    there?

2           A.     My ex-sister-in-law works there.

3           Q.     Okay.  And so what's her name?

4           A.     Vanessa Ramirez.

5           Q.     And does Vanessa live in Orlando?

6           A.     Yes.

7           Q.     Do you know Vanessa's address?

8           A.     No.

9           Q.     And do you know whether Calypso Cay

10   has a call center?

11          A.     Yes.

12          Q.     And how do you know that?

13          A.     Like in this industry, you just know.

14   Since I'm in Orlando, you know.

15          Q.     I'm sorry?

16          A.     Since I'm in the industry, you know

17   who's doing what at all the other call centers.

18          Q.     And do you know whether Calypso Cay is

19   involved in marketing using Marriott's name?

20          A.     In a way, yeah.

21          Q.     And how do you know that?

22          A.     Because I seen it, what I heard.

Page 191

1        Q.      And what have you -- what have you

2    seen first?

3        A.      I don't feel comfortable talking about

4    it on recording.

5        Q.      Why not?

6        A.      I just -- I just don't.  I'm

7    authorized to talk about it, but not on the record.

8        Q.      And do you know those -- the call

9    centers have contracts with TAFER?

10       A.      Yeah.

11       Q.      Which one, Calypso Cay?

12       A.      Well, it's not Calypso Cay.  Like it's

13   just a person that works in Calypso Cay high rank

14   that has his own call center that brings customers

15   into Calypso Cay.

16       Q.      And who is that?

17       A.      I'd rather talk about this, like, off

18   the record, not, like, on the record.

19       Q.      And, again, why is that?

20       A.      Just for my safety.

21       Q.      Because you're fearful for your safety

22   if you disclose certain information?

Page 192

1        A.      Yes.

2        Q.      Have you been threatened?

3        A.      No, but I just know these particular

4    people.

5        Q.      Okay.  And what is the -- so what --

6    what contracts do you know that these people have

7    with TAFER?

8        A.      The same, the same as what I had.  You

9    know, just send people that qualify, yeah.

10       Q.      So, again, for Calypso Cay, what have

11   you seen that would make you think they're using

12   Marriott's name?

13       A.      I know who they're calling.

14       Q.      You know who they're calling?  And

15   just give me -- like who are they calling?

16       A.      I can say this off the record.  I

17   don't want -- I'd rather discuss this off the

18   record, not on the record.

19       Q.      Are you -- are they calling -- well, I

20   guess they're using -- they're using Marriott's

21   name.  So they're -- they're calling -- are they

22   calling Marriott customers?

11/3/2022     Marriott International, Inc. v. Dynasty Marketing Group, LLC et al.     Bruno Borra

Page 193

1           A.     I don't want to discuss this on the

2     record.

3           Q.     Other than Calypso Cay Resort --

4                  MR. BARNES:  And, Phillip, we may need

5           to talk about this if he's not going to

6           answer the questions.  And we may need to

7           raise it with the Court.

8     BY MR. BARNES:

9           Q.     But other than Calypso Cay, are you

10    aware of other entities using Marriott's name?

11          A.     Like other call centers, yeah, but not

12    like entities.

13          Q.     Okay.  What other call centers are

14    using Marriott's name?

15          A.     I'd rather talk about this, like, off

16    the record.

17          Q.     And do those call centers also have

18    contracts with TAFER, to your knowledge?

19          A.     I believe so, yeah.

20          Q.     And do they also have contracts with

21    Vallarta Gardens?

22          A.     I believe so.