## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

MARRIOTT INTERNATIONAL, INC.,    )
                                      )
        Plaintiff,    )
                                        )
v.    )    Case No. 1:21-cv-0610 (AJT/WBP)
                                        )
DYNASTY MARKETING GROUP LLC,    )
*et al.*,    )
                                        )
        Defendants.    )

## CORRECTED[1] PROPOSED FINDINGS OF FACT AND RECOMMENDATIONS

Before the Court is Plaintiff Marriott International, Inc.'s ("Plaintiff") Motion for Default Judgment against Defendants Deep Blue Desarrollos S. de R.L. de C.V., d/b/a Vallarta Gardens Private Beach Club & Spa Private Residence Club, a.k.a. or succeeded by, Administradora y Commercializadora del Mar S.A. de C.V. ("Vallarta Gardens"), and Cancun Ink Corp. S.A. de C.V. ("Cancun Ink") (collectively, "Foreign Defendants[2]"). (ECF No. 10.) This serves as a proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C), and a copy will be provided to all interested parties.

### I.      Procedural Background

Since its filing on May 18, 2021, this case has had a long procedural history. The Complaint originally named John Does 1-10 as defendants. (ECF No. 1.) On May 17, 2022,

---

[1] This Proposed Findings of Fact and Recommendations is only changed as to the physical mail addresses of the Foreign Defendants listed in Section V.

[2] Currently, five defendants remain in this action: PrestigeDRVoIP.Com Inc; Cancun Ink; Oficinas Parrot Caribbean S.A. de C.V.; Club Caribe Villa Del Palmar, S.A. de C.V.; and Vallarta Gardens. Plaintiff's Motion seeks a default judgment solely against Cancun Ink and Vallarta Gardens. (ECF No. 238.) Plaintiff proposes to dismiss the remaining counts against all remaining defendants without prejudice if this Motion is granted. (ECF No. 239 at n.1.)

Plaintiff amended the Complaint to name the defendants it managed to identify during early discovery. ("Amended Complaint"; ECF No. 22). The named defendants are as follows: Dynasty Marking Group LLC ("Dynasty"), Rapid Eagle Inc. ("Rapid Eagle"), Whisl Telecom, LLC ("Whisl"), PrestigeDRVoIP.Com Inc. ("Prestige"), Vacancy Rewards, LLC "Vacancy Rewards"), Club Caribe Villa Del Palmar, S.A. de C.V. ("Club Caribe"), Oficinas Parrot Caribbean S.A. de C.V. ("Parrot Caribbean"), ResortCom International, LLC ("ResortCom"), Cancun Ink., Vallarta Gardens, and John Does (collectively, "Defendants"). (*Id.*)

In the Amended Complaint, Plaintiff alleges fifteen Counts[3] against Defendants. (ECF No. 22 at 37-58 ¶¶ 131-250.) Over the intervening years, there has been much litigation between Plaintiffs and the Defendants who made an appearance in the case, and many of the Defendants have resolved the case with Plaintiff, in some way. Defendants Rapid Eagle, Vacancy Rewards, Whisl, and ResortCom each settled with Plaintiff and were dismissed from the action. (ECF Nos. 81, 117, 147, 216.) On February 2, 2023, Magistrate Judge John F. Anderson entered a report and recommendation awarding summary judgment for Plaintiff and against Dynasty (ECF No. 218), which was adopted by District Judge Anothony J. Trenga on February 24, 2023 (ECF No. 219). As of the filing of the instant Motion, these Defendants remain in the case: Prestige, Parrot Caribbean, Club Caribe, Cancun Ink, and Vallarta Gardens.

---

[3] The fifteen Counts are as follows: (1) Trademark Counterfeiting; (2) Trademark Infringement; (3) Contributory Infringement; (4) False Designation of Origin; (5) Trademark Dilution; (6) Unfair Competition; (7) False Advertising; (8) Violations of the Prohibition against Deceptive Telemarketing Acts or Practices, Telemarketing Consumer Fraud and Abuse Prevention Act, and Telemarketing Sales Rule; (9) Violating Consumer Fraud and Abuse Prevention Act; (10) Assisting and Facilitating Abusive and Deceptive Acts or Practices; (11) Virginia Unfair Competition; (12) Virginia False Advertising; (13) Virgnia Common Law Tortious Interference; (14) Virginia Common Law Conspiracy; and (15) Virginia Common Law Conspiracy Claim. (ECF No. 22 at 37-58 ¶¶ 131-250.)

Plaintiff filed this Motion seeking a default judgment against only the Foreign Defendants (Cancun Ink and Vallarta Gardens) on Count I (Trademark Counterfeiting), Count II (Trademark Infringement), and Count III (Contributory Infringement). (ECF No. 229 at 1.) Plaintiff requests a dismissal without prejudice as to the remaining counts against all remaining defendants, should the Court grant this Motion. (ECF No. 239 n. 1.)

Accomplishing service on the Foreign Defendants appears to have been challenging and, after several attempts, on November 4, 2022, Plaintiff moved to bifurcate Foreign Defendants to complete service under the Hague Convention and to extend the schedule as to the Foreign Defendants. (ECF No. 154.) Judge Trenga granted the Motion to Bifurcate on November 11, 2022 (ECF NO. 183), and on January 5, 2024, Plaintiff filed a Motion for Service by Publication and Email (ECF No. 222), which was granted on February 26, 2024 (ECF No. 229).

Service was accomplished on the Foreign Defendants on February 7 and March 11, 2024, using the emails identified in the Court's order. (ECF No. 231.) Plaintiff also served the Foreign Defendants through online and print publications on March 15, 22, 28, and 29, 2024, and on April 1 and 8, 2024. (ECF No. 231.)

The Foreign Defendants needed to file an answer or otherwise respond to the Amended Complaint by April 29, 2024. (ECF Nos. 229, 231.) When none of the Foreign Defendants responded by the deadline, Plaintiff requested an entry of default as to the Foreign Defendants on May 20, 2024 (ECF No. 234), which was entered on May 22, 2024 (ECF No. 236).

On July 15, 2024, the Court entered an order *sua sponte* directing Plaintiff to file a Motion for Default Judgment (ECF No. 237), which Plaintiff filed on July 31, 2024 ("Motion"; ECF No. 238). On August 23, 2024, Plaintiff appeared before the undersign for a hearing on the Motion for Default Judgment; no one appeared on behalf of either of the Foreign Defendants.

## II.     Factual Background

The Amended Complaint (ECF No. 22) and Memorandum in Support of Default

Judgment (ECF No. 239) establish the facts below.

Plaintiff is the largest hotel company in the world, owning 30 brands with more than

7,900 hotel and residential properties in 139 countries and territories. (ECF No. 239 at 2.)

Plaintiff has several word and design marks ("MARRIOTT Marks[4]") that it uses to promote its

lodging, residential, and hospitality services, as well as its products and services. (*Id.* at 2-3.) The

MARRIOTT Marks are famous and distinctive throughout the world, entitling the MARRIOTT

Marks to common law trademark rights. (*Id.* at 3.) The MARRIOTT Marks are also registered

with the Principal Trademark Register of the U.S. Patent and Trademark Office. (*Id.*; ECF No.

22 at Exs. A-B.) Because the MARRIOTT Marks have been in continuous use for five straight

years, the MARRIOTT Marks also have obtained incontestable status under 15 U.S.C. § 1065.

(ECF No. 239 at 3.) Plaintiff asserts these facts as conclusive evidence of the validity,

ownership, and exclusivity of the MARRIOTT Marks. (ECF No. 22 at 16 ¶ 41.)

In the Amended Complaint, Plaintiff asserts that Defendants infringed on its trademarks

in a robocall scam that used the MARRIOTT Marks without Plaintiff's authorization. (*Id.* ¶¶ 59-

70.) Plaintiff states that all Defendants engaged in robocall schemes to secure sales of vacation

packages by falsely claiming to be associated with Plaintiff. (*Id.* ¶¶ 59-60.) Plaintiff further

alleges that, because of these robocalls, its goodwill and reputation have suffered irreparable

harm. (*Id.* ¶ 68.)

---

[4] The Marks identified in the Amended Complaint include Marriott, Marriott Bonvoy, Marriott
Vacation Club, Marriott Resorts, JW Marriott, Marriott Golf Academy, Marriott Village, and
Marriott Grand Residence Club. (ECF No. 22 at 12-16.)

In its Amended Complaint, Plaintiff separates Defendants into two groups based on the two robocall schemes.[5] (ECF No. 155 at 1-2.) The Group 1 Defendants include Vallarta Gardens, Tafer Resorts, ResortCom, Cancun Ink. Corp, Parrot Caribbean, Vacancy Rewards, Whisl, and Prestige. (ECF No. 22 ¶ 71.) Together, the Group 1 Defendants comprise resorts (Vallarta Gardens and Tafer Resorts (*Id.* ¶ 74)), service providers, telemarketers (Cancun Ink, and Parrot Caribbean (*Id.* ¶ 71)), a timeshare vacation exchange website, and voice over internet protocol ("VoIP") service providers (Whisl and Prestige (*Id.* ¶¶ 71, 80)). (*Id.*) Plaintiff claims that the Group 1 Defendants orchestrated a highly profitable and deceptive robocall scheme that utilized MARRIOTT Marks to induce consumers to buy vacation packages. (*Id.* ¶ 72.) At a high level, the resort defendants hire the telemarketer defendants to generate robocalls to consumers using the MARRIOTT Marks; the telemarketer defendants hire the VoIP defendants to create the "lead in" to connect consumers directly to the telemarketer defendants. (*Id.* ¶ 3.) For example, once a robocall connected to an unsuspecting customer, a recorded message would inform the customer that they had qualified for a promotion based on the customer's membership in Marriott Bonvoy, Marriott's loyalty program. (ECF No. 239 at 4.) The customer would be prompted by the VoIP to "press 1" to be connected to a telemarketer, who sold the vacation package. (ECF No. 22 at 5-6 ¶ 3.) Plaintiff alleges that this scam caused a victim to buy a $5,600 vacation package from Vallarta Gardens. (*Id.* at 5.)

As is relevant to this Motion, Vallarta Gardens used Cancun Ink for marketing and to initiate the robocalls. (*Id.* ¶¶ 71-74.) Cancun Ink executed a master services agreement with

---

[5] The Group 2 Defendants, who are not involved in this Motion, include DVC and Rapid Eagle, which coordinated a unique variation of the robocall scam by marketing timeshare vacation packages with a holiday theme. (ECF No. 22 at 32 ¶ 109.)

Prestige for its VoIP services. (*Id.* ¶¶ 83, 86.) Together, between October 12, 2018, and May 2022, the Group 1 Defendants made 66 million robocalls. (ECF No. 239 at 3.)

### III.    Proposed Findings and Recommendations

Rule 55 of the Federal Rules of Civil Procedure allows entry of a default judgment when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Because the Foreign Defendants have failed to respond or otherwise defend the action, the Clerk entered default against them. (ECF No. 236.)

Once in default, the facts alleged in a complaint are considered admitted against the defendants, and the appropriate inquiry is whether the facts alleged state a claim. *See* FED. R. CIV. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."); *see also Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) and *GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003). Even so, the court does not automatically consider as admitted the amount of damages. *See* FED. R. CIV. P. 8(b)(6). Instead, Federal Rule of Civil Procedure 55(b)(2) allows the court to conduct a hearing to determine the amount of damages, to establish the truth of any allegation by evidence, or to investigate any other matter when necessary to enter or carry out judgment.

### A.    Jurisdiction and Venue

A court must establish both subject matter jurisdiction over a claim and personal jurisdiction over a party-in-default before a default judgment may be entered.

As for subject matter jurisdiction, district courts are vested with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, as well as "original jurisdiction over any civil action arising under any Act of Congress

relating to patents, plant variety protection, copyrights and *trademarks*." 28 U.S.C. § 1338(a) (emphasis added). Here, Count I (trademark counterfeiting) and Count II (trademark infringement) allege violations of the Lanham Act 15 U.S.C. § 1114, the federal trademark regulation. Thus, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338. Count III (contributory infringement) arises from the same facts and is based on the same case or controversy as Counts I and II. Courts may exercise jurisdiction over "all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Therefore, the Court may exercise supplemental jurisdiction over Count III pursuant to 28 U.S.C. § 1367(a).

This Court also has personal jurisdiction over the Foreign Defendants because the events giving rise to this action occurred within this district. (ECF No. 239 at 10.) To exercise personal jurisdiction over a matter, both the Virginia long-arm statute and federal due process standards must be satisfied. *See Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301 (4th Cir. 2012). Virginia's long arm statute, Code of Virginia § 8.01-328.1, extends the limits of a courts' jurisdiction to the extent permitted by the Due Process Clause, meaning essentially the same standard is required for both. *See ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 176 (4th Cir. 2002). Federal due process standards are met if the defendant maintains certain minimum contacts with the forum state, such that the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

The Foreign Defendants were allegedly using the MARRIOTT Marks without authorization in the direct or indirect marketing, solicitation, and sale of vacation packages and promotions using fraudulent robocalls to consumers located in this District. (ECF No. 239 at 10.)

7

This conduct establishes the Foreign Defendants' minimum contacts with the state of Virginia, as they were conducting business aimed at the forum. *See Park Hotels & Resorts, Inc. v. Spinnaker Resorts, Inc.*, No. 1:16-cv-1217-LO-MSN, 2017 WL 831155, at *2 (E.D. Va. Feb. 3, 2017), report and recommendation adopted, No. 1:16-cv-1217, 2017 WL 831149 (E.D. Va. Mar. 2, 2017) (finding personal jurisdiction over defendant telemarketing infringed vacation packages to Virginia residents). Venue is also proper as a substantial part of events giving rise to this action occurred in this District. (ECF No. 22 at 10 ¶ 25.)

**B.**   **Service**

Plaintiff has made diligent efforts to serve the Foreign Defendants, who are in Mexico. (ECF No. 223 at 4-5.)  Rule 4(f) of the Federal Rules of Civil Procedure sets out the methods for serving a party located in a foreign country:

> (1)   By any international agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hauge Convention on the Service Abroad of Judicial and Extrajudicial Documents;
>
> (2)   If there is no internationally agreed means or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice . . . or
>
> (3)   By other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f)(1)-(3) (subsections omitted). And unlike domestic parties, the Foreign Defendants need not be served within 90 days from the date the complaint was filed. *See* Fed. R. Civ. P. 4(m).

On November 4, 2022, Plaintiff filed a Motion to Bifurcate Group 1 Defendants to Complete Service Under the Hague Convention.[6] ("Motion to Bifurcate"; ECF No. 154.) In its

---

[6] Both the United States and Mexico are signatories to the Hague Convention. *See* HCCH Members, https://www.hcch.net/en/states/hcch-members (last visited Aug. 6, 2024).

Motion to Bifurcate, Plaintiff expressed that it had been "diligent in attempting to serve the foreign defendants." (ECF No. 155 at 9.) On November 17, 2022, the Court granted the Motion to Bifurcate as it related to the Group 1 Defendants that had not been served. (ECF No. 183.)

Plaintiff tried to serve the Foreign Defendants both in the United States and through the Hague Convention. (*Id.* at 2-3.) The Hague Convention "establishes a uniform framework designed to facilitate and streamline the channels of transmission for judicial or extrajudicial documents to be served abroad." CONVENTION OF 15 NOVEMBER 1965 ON THE SERVICE ABROAD OF JUDICIAL AND EXTRAJUDICIAL DOCUMENTS IN CIVIL OR COMMERCIAL MATTERS, https://assets.hcch.net/docs/f4ccc07b-55ed-4ea7-8fb9-8a2b28549e1d.pdf (last visited Aug. 6, 2024). In accordance with the Hague Convention, the Mexican government has designated a Central Authority with the responsibility of receiving requests for service from any signatory to the Hague Convention. *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, art. 2, Nov. 15, 1965, 20 U.S.T. 361 and MEXICO - CENTRAL AUTHORITY & PRACTICAL INFORMATION, https://www.hcch.net/en/states/authorities/details3/?aid=267 (last updated on June 3, 2024).

As required by the Mexican Central Authority, on June 24, 2022, Plaintiff submitted translated copies of the Amended Complaint and summonses to the Ministry of Foreign Affairs. (ECF No. 223, Ex. 1 ¶¶ 4-10.) On July 20, 2022, the Ministry of Foreign Affairs delivered the translated documents to the local district courts that had jurisdiction over the Foreign Defendants. (*Id.* ¶ 12.) Plaintiff also hired Mexican counsel to assist with service of process, who made diligent efforts in researching and vetting corporate records and service addresses. (*Id.* ¶¶ 13-16.) Through this process, Plaintiff learned that the individual present at the address for Cancun Ink could not be served on behalf of Cancun Ink. (*Id.* ¶ 17.) Plaintiff also tried to serve

Mr. Carlos Rivera Miramontes, Director of Vallarta Gardens,[7] fourteen times at his residence in

Texas. (*Id.* ¶ 20.) At one point, his son answered the door and told the process server that Mr.

Miramontes was traveling and would return on May 21, 2022. (*Id.*) When the process server

returned on that date and several times afterward, including a three-hour stake-out, the gate to the

house was locked. (*Id.* ¶¶ 20-21.) Plaintiff also tried without success to serve Vallarta Gardens at

three other addresses. (*Id.* ¶ 22.) Unable to complete traditional methods of service, Plaintiff sent

the translated and untranslated copies of the Complaint to the Foreign Defendants by DHL and

USPS. (*Id.* ¶ 23.) DHL delivered the documents to Cancun Ink, but Vallarta Gardens refused

DHL delivery each time. (*Id.* ¶¶ 24-26.) USPS was unable to deliver the documents to either of

the Foreign Defendants. (*Id.*)

Having no success in effecting service under the Hague Convention, on January 5, 2024,

Plaintiff filed a Motion for Service by Publication and Email. ("Motion for Service"; ECF No.

222.) On February 26, 2024, the Court granted the Motion for Service and directed Plaintiffs to

file a declaration no later than forty-five days after the entry of the Order, describing the steps

taken in compliance with the Order. (ECF No. 229.) On April 11, 2024, Plaintiff filed a

declaration in compliance with the order. ("Brooks Declaration"; ECF No. 231.) The Brooks

Declaration stated that Plaintiff served the Foreign Defendants by Publication, as directed in the

Court's February 26, 2024, Order.[8] (*Id.* ¶¶ 4-5.) Exhibits of the publications are attached to the

Brooks Declaration. (*Id.* Exs. A-F.) Plaintiff also testified that the Notice of Motion for Service

by Publication and Email, translated service documents, and the translated February 26, 2024,

Order were emailed to the Foreign Defendants. (*Id.* ¶¶ 7-9.)

---

[7] The Exhibit references "Deep Blue," a Vallarta Gardens alias. (*See* ECF No. 239 at 1.)
[8] The publications include print and online versions of the translated documents in *El Universal*, *El Occidental*, and *La Verdad*. (ECF No. 239 at 8.)

For these reasons, Defendants were properly served with the summons and Complaint.

### C.      <u>Grounds for Entry of Default</u>

Under Federal Rule of Civil Procedure 12(a), Defendants had to file responsive pleadings within 21 days after they were served with the summons and complaint. Under Code of Virginia § 8.01-296, if service is affected by posting a copy of the summons and complaint on the place of abode, the party causing service must also send a copy of the summons and complaint by certified mail "not less than 10 days before judgment by default may be entered[.]" VA. CODE § 8.01-296(2)(b). Here, publication was completed through the Mexican newspapers on April 8, 2024, so the Foreign Defendants needed to file a response by April 29, 2024, which they failed to do. (*Id.* ¶¶ 5, 10.) Because the Foreign Defendants failed to file responsive pleadings, on May 20, 2024, Plaintiff asked the Clerk of Court to enter a default against them, which the Clerk entered on May 22, 2024. (ECF Nos. 234, 236.)

Accordingly, the Clerk properly entered default against Foreign Defendants.

### D.      <u>Liability</u>

Under Federal Rule of Civil Procedure 54(c), a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Because Foreign Defendants are in default, the Complaint's factual allegations are admitted as to them. *See* FED. R. CIV. P. 8(b)(6). Of the fifteen counts Plaintiff originally pleaded, Plaintiff requests a default judgment against Foreign Defendants as to only three: trademark counterfeiting (Count I), trademark infringement (Count II), and contributory trademark infringement (Count III). (ECF No. 239 at 1.) Plaintiff seeks injunctive relief, statutory damages, pre- and post-judgment interest, and a dismissal of all remaining claims without prejudice. (ECF No. 239 at 27.)

Counts I and II are brought under the Lanham Act, 15 U.S.C. § 1114(1). Count III arises from a "judicially created doctrine that derives from the common law of torts" and imposes liability upon those who "facilitate or encourage infringement." *See Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 163 (4th Cir. 2012). Because Plaintiff must show trademark infringement to prevail on contributory trademark infringement,[9] the Court will address the Counts in the following order: first, Count II (trademark infringement); second Count I (trademark counterfeiting); and third Count III (contributory trademark infringement).

### 1.    Trademark Infringement

The Lanham Act imposes liability upon those who, without the consent of the registrant, use a colorable imitation of a registered mark in connection with the distribution of goods and services where such use is likely to cause confusion or to deceive. 15 U.S.C. § 1114(1). To prevail on a claim of trademark infringement under the Lanham Act, a plaintiff must show: (1) ownership of a valid mark; (2) defendant used the mark in commerce and without authorization; (3) defendant used the mark, or an imitation of the mark, in connection with the sale, offering for sale, distribution, or advertising of goods and services; and (4) defendant's use of a colorable imitation of the mark is more likely to cause confusion among consumers. *Rosetta Stone Ltd.*, 676 F.3d at 152.

Plaintiff owns the MARRIOTT Marks, as shown by the trademark registrations with the USPTO attached to the Amended Complaint[10] (ECF No. 22-1, Exs. A, B), which is *prima facie* evidence of the validity of the marks. *See Ontel Prod. Corp. v. Unincorporated Associations*

---

[9] *See Rosetta Stone Ltd.*, 676 F.3d 144, 163 ("for there to be liability for contributory trademark infringement, the plaintiff must establish underlying direct infringement").

[10] This Court has already recognized Plaintiff's ownership of the MARRIOTT Marks throughout the procedural history of this case. (*See* ECF Nos. 109, 218, and 220.)

*Identified in Schedule A*, No. 1:21-cv-1452 (MSN/JFA), 2022 WL 9874815, at *8 (E.D. Va. Aug. 12, 2022), *report and recommendation adopted*, No. 121-cv-01452MSNJFA, 2022 WL 4368157 (E.D. Va. Sept. 21, 2022) (citing *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529 (4th Cir. 1984)).

Plaintiff also has shown that the Foreign Defendants used the MARRIOTT Marks in commerce and without authorization through the millions of robocalls made to consumers. As additional evidence, Plaintiff provided a spreadsheet from TripAdvisor's investigation into the robocalls (Exhibit I) and the Industry Traceback Group's[11] report (Exhibit K). (ECF No. 239-1, Exs. I, K.) The TripAdvisor investigation showed calls and emails—either from the Foreign Defendants or parties associated with Foreign Defendants—attempting to sell vacation packages using the MARRIOTT Marks. (ECF No. 239-1 at 14.) The traceback report showed that the Foreign Defendants originated the robocalls. (ECF No. 239-1 at 152-57.) These reports also satisfy the third element of the claim: that the Foreign Defendants' robocalls used MARRIOTT Marks in connection with the sale, offering for sale, distribution, or advertising of vacation packages to Vallarta Gardens. *See also Brocone Organic Priv. Ltd. v. Epoch Consultant Co. LLC*, No. 1:21-cv-1296 (PTG/JFA), 2022 WL 16942259, at *5 (E.D. Va. Aug. 12, 2022), *report and recommendation adopted*, No. 121CV1296PTGJFA, 2022 WL 16924101 (E.D. Va. Nov. 10, 2022) (finding defendant use of registered tradename in solicitations without Plaintiffs authorization to satisfy both the second and third elements of trademark infringement).

---

[11] The Industry Traceback Group is the FCC's registered Traceback Consortium. (ECF No. 22 at 26 ¶ 86.) A traceback is mechanism of collecting data to determine the source of a robocall. *See* TRACEBACK REQUESTS GUIDELINES FOR U.S. LAW ENFORCEMENT TRACEBACK REQUESTS (Aug. 12, 2021), Traceback Requests – Industry Traceback Group (tracebacks.org).

The Fourth Circuit has identified these nine factors to evaluate the fourth and final element, likelihood of confusion:

(1) strength or distinctiveness of the plaintiff's mark as used in the marketplace;

(2) the similarity of the two marks to consumers;

(3) the similarity of the goods or services that the marks identify;

(4) the similarity of the facilities used by the markholders;

(5) the similarity of advertising used by the markholders;

(6) the defendant's intent;

(7) actual confusion;

(8) the quality of the defendant's product; and

(9) the sophistication of the consuming public.

*George & Co. v. Imagination Entm't Ltd*, 575 F.3d 383, 393 (4th Cir. 2009). While the Fourth Circuit has identified nine factors, not all are of equal importance. *See id.* Moreover, when the alleged infringing marks are identical to the protected mark, courts may presume a likelihood of confusion. *See Juul Labs, Inc. v. Zeigler*, No. 118-cv-1382CMHTCB, 2019 WL 2707517, at *3 (E.D. Va. June 11, 2019), *report and recommendation adopted*, No. 1:18-cv-1382, 2019 WL 2656187 (E.D. Va. June 27, 2019) (quoting *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987)).

The Foreign Defendants used marks identical to the MARRIOTT Marks. The TripAdvisor spreadsheet shows a transcription of the recorded call under the "Announcement" column. (ECF No. 239-1, Exs. I, J.) For instance, row 2, column F begins with, "Thank you for choosing Marriott Hotels." (ECF No. 239-1, Ex. I at row 2 column F.) There are over fifty-five entries on the spreadsheet that show identical or similar language. (*Id.*) The traceback report also

14

describes the tracebacks as "[r]ecorded voice offering hospitality incentive through high-volume calling campaign, including wireless numbers. Use of brand names, including Marriott, fraudulently without permission." (ECF No. 239-1, Ex. K.)  Based on these records, the Court may presume trademark infringement based on the use of identical marks.[12] *See, e.g.*, *Hilton Franchise Holding, LLC v. HC Southfield LLC*, No. 1:19-cv-610 (LO/TCB), 2021 WL 5194109 (E.D. Va. Mar. 24, 2021), *report and recommendation adopted*, No. 1:19-cv-00610, 2021 WL 5192362 (E.D. Va. Apr. 12, 2021) (finding trademark infringement based on defendant's identical use of a hotel's registered trademarks when offering hotel services).

Even with the presumption of infringement, Plaintiffs also provided evidence of actual confusion. (ECF No. 239 at 15.) Exhibits A-D of the Memorandum in support of Default Judgment contain "a sampling of the many complaints MARRIOTT received via the Better Business Bureau, Facebook, Reddit, and Twitter, in response to robocalls from 2018 to 2022[.]" (ECF No. 239-1, Declaration of Attison L. Barnes, III ("Barnes Decl."), ¶ 5.) The Barnes Decl. also states that Plaintiff has documented over 7,700 complaints during this period (*id.*), which are recognized as evidence of actual confusion. *See Rosetta Stone, Ltd.*, 676 F.3d at 156 ("Both types [anecdotal and survey evidence] are relevant, and neither category is necessarily required to prove actual confusion.") and *Nat'l Van Lines, Inc. v. Nat'l Van Lines Inc.*, No. CA 4:12-926-TLW, 2013 WL 2180739, at *5 (D.S.C. May 20, 2013) (finding three complaints to support actual confusion for trademark infringement).

---

[12] This Court has also already found the same robocalls used by Dynasty to be identical to the MARRIOTT Marks. (ECF No. 218.)

Taken together, Plaintiff has made an adequate showing of actual confusion based on the Foreign Defendants' use of identical marks. The Foreign Defendants are thus liable for trademark infringement under the Lanham Act.

### 2.   <u>Trademark Counterfeiting</u>

Trademark counterfeiting falls under the same statutory provision as trademark infringement, but courts have applied a different test to evaluate trademark counterfeiting claims. *See Animaccord Ltd. v. Individuals, Partnerships & Unincorporated Associations Identified on Schedule "A"*, No. 1:22-cv-868 (LMB/WEF), 2023 WL 6206452, at *12 (E.D. Va. Feb. 28, 2023), *report and recommendation adopted*, No. 122-cv-868LMBWEF, 2023 WL 3940548 (E.D. Va. June 9, 2023). The test for trademark counterfeiting requires that the plaintiff show: (1) the defendant intentionally used a counterfeit mark in commerce; (2) the defendant knew that the mark was counterfeit; (3) the use occurred in connection with the sale, offering of sale, or distribution of goods; and (4) the use of the counterfeit mark was likely to confuse consumers. *Id.* A counterfeit mark is defined as "a spurious mark which is identical with, or substantially indistinguishable from, [the plaintiff's] mark." *Associated Gen. Contractors of Am. v. Stokes*, No. 1:11-cv-795 GBL/TRJ, 2013 WL 1155512, at *3 (E.D. Va. Mar. 19, 2013) (quoting 15 U.S.C. § 1114 (2012)). Courts need not "indulge in a prolonged and minute comparison of the conflicting marks" but should view the marks considering how the parties use their marks in the marketplace. *CareFirst of Maryland, Inc. v. First Care, P.C*, 434 F.3d 263, 267 (4th Cir.2006) (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:58 (4th ed. 2005)).

Plaintiff has already established the first, third, and fourth elements of trademark counterfeiting. *See infra* section III.D.1. The Foreign Defendants intentionally used identical

marks to the MARRIOTT Marks when making the robocalls in connection with the sale of the vacation packages, which led to customer's actual confusion. *Id. See also Animaccord Ltd.*, WL 6206452, at * 12 ("Many of the allegations noted with regard to the claim of trademark infringement also apply to the claim of trademark counterfeiting, including that the Default Defendants acted with knowledge"); *Juul Labs, Inc.*, 2019 WL 2707517, at *4 (citing the same reasons for trademark counterfeiting as trademark infringement); *Gmbh v. Ilnitskiy*, No. 1:17-cv-415, 2018 WL 1882823, at *5-6  (E.D. Va. Jan. 25, 2018), *report and recommendation adopted sub nom. Montblanc-Simplo GmbH v. Ilnitsky*, No. 1:17-cv-415(LMB/TCB), 2018 WL 844401 (E.D. Va. Feb. 13, 2018) (referencing actual confusion established in trademark infringement analysis for trademark counterfeiting).

        As to the remaining second element, Plaintiff also has sufficiently alleged that the Foreign Defendants knew the marks were counterfeit when they used them. Not only did the Foreign Defendants use the MARRIOTT Marks repeatedly in millions of robocalls, these robocalls resulted in excessive chargebacks (ECF No. 239 at 18-19), which occurs when a charge is returned to a payment card after a customer successfully disputes an item on their statement or transactions report.[13] (ECF No. 22 at 28 n.17.) Chargebacks have been recognized as evidence of a party knowingly making material misrepresentations. *See FTC v. MacGregor*, 360 F. App'x. 891, 894–95 (9th Cir. 2009) (excessive chargeback rates in addition to consumer complaints supported defendant knowingly making material misrepresentations); *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 472 (S.D.N.Y. 2014) (chargeback and return rates showed defendant knowingly engaged in deceptive telemarketing); *Fed. Trade Comm'n v. Click4Support, LLC*, No. CV 15-

---

[13] *See also* Troy Segal, *What is a Chargeback? Definition, How to Dispute, and Example*, INVESTOPEDIA (Dec. 15, 2023), https://www.investopedia.com/terms/c/chargeback.asp#:~:text=.

5777, 2015 WL 7067760, at * 5 (E.D. Pa. Nov. 10, 2015) ("Both C. Patel and N. Patel [defendants] were aware of the extremely high rate of chargebacks, which is a red flag that something is amiss").

Plaintiffs alleged that, because of high chargeback records, ResortCom[14] had to have entered into an escrow agreement with Vallarta Gardens. (ECF No. 239 at 17-18.) Dennis Hershey, the CFO of ResortCom, testified to this fact in a deposition. (ECF No. 239-1, Ex. G). Hershey testified that the industry standard chargeback rate is one percent, and Vallarta Gardens' chargeback rate was over twenty-five percent. (*Id.* at 154, lines 1-15.) Eventually, ResortCom terminated its relationship with Vallarta Gardens in 2019, because of the excessive chargeback rates. (*Id.*) Dennis Hershey also emailed Carlos Rivera of Vallarta Gardens about Cancun Ink's infringing robocalls. (ECF No. 239-1, Ex. F.) Vallarta Gardens relayed Hershey's concerns to Cancun Ink, who responded by stating that they "scrubbed, deleted and blocked" the numbers from their phone database.[15] (*Id.*) But Cancun Ink merely scrubbed the information about a single individual from its database and otherwise continued to make the robocalls. (ECF No. 239 at 17-18.) The Foreign Defendants knew that robocalls were being made with infringing information, and yet they continued to make robocalls using the infringing marks to Plaintiff's detriment.

For these reasons, the undersigned finds that Plaintiff has satisfied all four elements of trademark counterfeiting under the Lanham Act, and the Foreign Defendants are liable for damages resulting from the trademark counterfeiting.

---

[14] ResortCom provides timeshare-related services, including helping resorts manage timeshare membership accounts with billing, processing, reservation, and related services. (ECF No. 22 at 27-28 ¶ 90.)
[15] Exhibit F has an email from "marketingdirector@resgo.net." ResGo is another alias of Cancun Ink. (ECF No. 239 at 4.; ECF No. 239-1. Ex. E at row 26.)

### 3.   __Contributory Trademark Infringement__

Unlike trademark infringement and trademark counterfeiting, contributory infringement is not associated with the Lanham Act. Contributory infringement is a judicially created doctrine that derives from the common law of torts, which imposes liability upon those who facilitate or encourage infringement. *Rosetta Stone Ltd.*, 676 F.3d 144 at 163. First, the plaintiff must establish that an underlying direct trademark infringement occurred. *Id.* Once that has been established, to demonstrate contributory trademark infringement, a plaintiff must show: (1) the defendant intentionally induced another to infringe a trademark, or (2) the defendant continued to supply a product to a third party with actual or constructive knowledge of the infringement. *See Epic Tech, LLC v. Raleigh Startup Sols. LLC*, No. 5:23-CV-136-D, 2023 WL 9051298 (E.D.N.C. Dec. 29, 2023) (quoting *Size, Inc. v. Network Sols., Inc*., 255 F. Supp. 2d 568, 572 (E.D. Va. 2003) and citing *Inwood Lab'ys, Inc.* v. *Ives Laby's, Inc.*, 456 U.S. 844, 854 (1982)). In a case in which the defendants are infringing by selling or advertising products through electronic communications, the plaintiff must show that the defendants had actual knowledge of the infringement and failed to take remedial measures to address it—meaning the defendants were "willfully blind" to the infringement. *See Rosetta Stone Ltd.*, 676 F.3d at 163-64 (willful blindness after adequate notice of infringement on defendant's website may satisfy the standards for contributory trademark infringement).

The Foreign Defendants did not play the same role in the robocall scheme. Plaintiff claims that Vallarta Gardens hired Cancun Ink to create consumer leads, connect with those consumers, and then pitch vacation packages on behalf of Vallarta Gardens. (ECF Nos. 22 at ¶¶ 3, 71-74; 239 at 16-17.) Vallarta Gardens' connection to Cancun Ink is established through the ResortCom email and deposition referenced in the previous section. *Supra* section III.D.2. The

email demonstrates the relationship between Vallarta Gardens and Cancun Ink: Vallarta Gardens emails a representative from Cancun Ink, who confirms the robocalls were made by them. (ECF No. 239-1, Ex. F.) The Hershey deposition also identifies Cancun Ink as the marketer for Vallarta Gardens: "Well, Mr. Rivera was using that company [Cancun Ink] for marketing purposes, and apparently that company was making calls." (ECF No. 239-1, Ex. G, at 236-237, Rows 22, 1.) The TripAdvisor spreadsheet also includes entries where Cancun Ink was identified as Vallarta Gardens' marketing representative. (ECF No. 239-1, Ex. I at Row 16.) *See Universal Furniture Int'l, Inc. v. Frankel*, 835 F. Supp. 2d 35, 48-49 (M.D.N.C. 2011), *aff'd*, 538 F. App'x 267 (4th Cir. 2013) (finding corporate officer who knew distributed product was marketed with trademark infringement was liable for contributory trademark infringement); *Coach, Inc. v. Farmers Mkt. & Auction*, 881 F. Supp. 2d 695, 700-01 (D. Md. 2012) (reiterating that contributory trademark infringement is not limited to manufacturers or distributors); *Hard Rock Café Licensing Corp. v. Concession Serv., Inc.*, 955 F.2d 1143, 1149 (7th Cir.1992) (finding a flea market owner is liable for contributory trademark infringement where it knew its vendor were infringing trademarks).

Most importantly for the contributory trademark infringement claim, continuing to make robocalls after receiving the email from ResortCom shows that Vallarta Gardens continued to induce Cancun Ink to infringe on the MARRIOTT Marks. The email from Cancun Ink to Vallarta Gardens addressing the infringing robocalls was sent on October 31, 2019. (ECF No. 239-1, Ex. F.) This means that Vallarta Gardens was aware of the infringing robocalls as early as October 31, 2019. Yet the robocalls continued long after that date, and the TripAdvisor investigator report shows that calls were placed in 2020 and that many consumer complaints continued into 2022. (ECF No. 239-1, Ex. I, Rows 12-55; ECF No. 239-1, Ex. A.) *See Coach,*

*Inc.*, 881 F. Supp. 2d at 701 (finding notifications of violations and investigators implied awareness of infringement and failure to take remedial measures constitutes willful blindness and contributory trademark infringement).

In sum, the underlying infringement is established by the traceback report, the connection between Cancun Ink and Vallarta Gardens is established by the emails and Hershey deposition, and the continued infringement by Cancun Ink directed by Vallarta Gardens is evidenced by the TripAdvisor report and consumer complaints. Taken together, Vallarta Gardens had to have been aware of the trademark infringement and either induced Cancun Ink to continue the infringement or was willfully blind to it.

For these reasons, Vallarta Gardens is liable for contributory trademark infringement of the MARRIOTT Marks resulting from Cancun Ink's robocalls.

### E.   Damages

As damages, Plaintiff requests statutory damages, pre- and post-judgment interest, and injunctive relief under the Lanham Act. (ECF No. 239 at 27.) *See also* 15 U.S.C. §§ 1116, 1117. These damages are addressed below.

#### 1.   Statutory Damages

The Lanham Act permits plaintiffs to elect statutory damages instead of actual damages when the defendant has used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services. 15 U.S.C. § 1117(c). If a plaintiff elects statutory damages and the Court finds that the counterfeit mark was used willfully, a plaintiff may be awarded not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed. *Id.* § (c)(2). In weighing the appropriate statutory damages, a court "must take into account the need to deter others engaged in selling counterfeit goods[.]" *Diane Von Furstenberg Studio v. Snyder*, No. 1:06-cv-1356 (JCC), 2007 WL 3143690, at *6 (E.D. Va. Oct. 23, 2007).

Other district courts within the Fourth Circuit have found that statutory damages meant to deter wrongful conduct may be "particularly appropriate in cases of default judgment because of non-disclosure by the infringer." *Ontel Prod. Corp*, 2022 WL 9874815, at *11 (E.D. Va. Aug. 12, 2022) (quoting *Cabinet Discounters, Inc. v. Serkisian*, 2017 WL 2930461, at *1 (D. Md. July 10, 2017)).

Plaintiff seeks $8,000,000 in statutory damages—the maximum amount allowed under the Lanham Act—from the Foreign Defendants for their infringement of the MARRIOTT Marks. (ECF No. 239 at 19-20.) Plaintiff requests $6,000,000 from Cancun Ink for counterfeiting the Marriott, Marriott Bonvoy, and Marriott Vacation Rewards marks and $2,000,000 from Vallarta Gardens for counterfeiting the Marriott mark. (*Id.* at 21-22.)

Previously, this Court awarded Plaintiff statutory damages against Defendant Dynasty in the amount of $500,000. (ECF No. 218 at 11-12.) In making this award, the Court identified several mitigating factors for decreasing the amount sought by Plaintiff, including these facts: Dynasty had been responsible for less than six percent of the total robocalls; Dynasty only used the robocalls from January to July 2021; Dynasty alleged that it did not know it was "a big deal" to use the MARRIOTT Marks in the messages; and Dynasty stopped using the infringing marks once it was aware of the infringement. (*Id.*) None of these mitigating factors exist for the Foreign Defendants. Instead, the Foreign Defendants counterfeit use of the MARRIOTT Marks was "sufficiently broad, blatant, extensive, and willful." *See Juul Labs, Inc.*, 2019 WL 2707517, at *6 (awarding $4,000,000, the maximum amount of statutory damages in default judgment against defendant for trademark infringement).

As to the Foreign Defendants, the undersigned recommends the maximum statutory damages award for these reasons. For up to four years—between 2018 and 2022—the Foreign

Defendants made over 66 million robocalls willfully using the registered MARRIOTT Marks to sell vacation packages that had nothing to do with Plaintiff. (ECF No. 239 at 19-20.) The Foreign Defendants' willfulness is shown by the sheer volume of calls and the fact that they used counterfeit marks identical to the MARRIOTT Marks, all to generate profits for themselves on the back of Plaintiff's well-earned reputation. (*Id.* at 3, 22-24.)  *See Gmbh*, 2018 WL 1882823, at *6-7 (awarding $32,000,000 in statutory damages based on the identical marks and excessive use of the counterfeit marks). There also can be no doubt that the Foreign Defendants knew that the robocalls used counterfeit marks; in fact, that was the purpose of the scheme. (*Id.* at 17-18.)  It is also worth noting that Foreign Defendants have evaded by deactivating their emails and allowing ResortCom to withhold information on their behalf. (*Id.* at 23-24.) *Ontel Prod. Corp.*, 2022 WL 9874815, at *4, 12 (awarding statutory damages for trademark infringement where defendants were concealing their identities and evading law enforcement efforts). Plaintiff asserts that it has incurred significant damages because of the Foreign Defendants' conduct, but it cannot determine actual damages because the Foreign Defendant have elected not to participate here. (ECF N. 239 at 24-25.)

Accordingly, the undersigned recommends a statutory award of $6,000,000 against Cancun Ink and a $2,000,000 award against Vallarta Gardens for their use of the four MARRIOTT Marks. An award of this size serves the goals of repairing the harm done to Plaintiff and dissuading the Foreign Defendants and others from using robocalls and the telephonic network to counterfeit and infringe on others intellectual property rights.

### 2. <u>Interest</u>

Plaintiff also requests both pre- and post-judgment interest. (ECF No. 22 at 61 ¶ 13; ECF No. 239 at 22.) The Lanham Act permits prejudgment interest on treble damages for the use of counterfeit marks but does not explicitly permit an award of pre- or post-judgment interest on

statutory damages for the use of counterfeit marks. *See Georgia-Pac. Consumer Prod. LP v. von Drehle Corp.*, 781 F.3d 710 (4th Cir. 2015), *as amended* (Apr. 15, 2015) (noting that only § 1117(b) authorizes prejudgment interest). *Compare* 15 U.S.C. § 1117(b) ("in such a case [the award of treble damages], the court may award prejudgment interest") *with* 15 U.S.C. § 1117(c) (omitting any mention of prejudgment interest). Plaintiff requests statutory damages, not treble damages, meaning that the award of pre- or post-judgment interest is within the discretion of the Court. *See Gmbh*, 2018 WL 1882823, at * 8 (quoting *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 194 (1995)). When determining whether to award interest, the primary factor is whether such an award is "necessary to compensate the plaintiff for its injuries." *Concordia Pharms., Inc. v. Method Pharms., LLC*, 240 F. Supp. 3d 449, 458 (W.D. Va. 2017) (quoting *Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207, 210 (4th Cir. 2000)). The Court finds the award of statutory damages sufficient and declines to award prejudgment interest.

Accordingly, the Court declines to award prejudgment interest, as requested by Plaintiff, but does recommend an award of post-judgment interest at the rate provided by 28 U.S.C. § 1961.

### 3.   <u>Injunctive Relief</u>

Plaintiff also requests a permanent injunction against the Foreign Defendants pursuant to 15 U.S.C. § 1116, which allows a court to award an injunction "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office[.]" 15 U.S.C. § 1116(a). In the Fourth Circuit, a permanent injunction may be awarded upon a plaintiff showing: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of

24

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Juul Labs, Inc.*, 2019 WL 2707517, at \*6-7 (citing *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007)).

The undersigned finds that Plaintiff has met the standard for a permanent injunction and recommends an award of a permanent injunction against the Foreign Defendants. In reaching this decision, the undersigned notes that this Court has already awarded an injunction against Dynasty, who was responsible for less egregious acts than the Foreign Defendants. (*See* ECF No. 218.) Courts within the Fourth Circuit have routinely found that irreparable injury follows trademark infringement. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 938-39 (4th Cir. 1995); *Brocone Organic*, 2022 WL 16942259, at \*6; *Ontel Products Corp.*, 2022 WL 9874815, at \*11. Indeed, Plaintiff is suffering irreparable harm based on the thousands of complaints they have received over the years. (ECF No. 239-1, Exs. A-D.) Second, Plaintiff has alleged that money damages are inadequate because the absence of the Foreign Defendants' involvement makes it impossible to determine accurate damages and makes it unlikely that they will cooperate in the award of future damages. (ECF No. 239 at 24, 26.) *See Volkswagen*, 2018 WL 10426097, at \* 6 (finding the second element for injunctive relief to be met based on defendants' lack of response). Third, the only hardship that would result from the permanent injunction would be for Defendants to follow well-established federal trademark law, tipping the balancing of hardships in favor of Plaintiff. *Id.* Finally, there is public interest in a permanent injunction because it would prevent the public from being confused by the counterfeit marks, which has clearly already occurred based on the consumer complaints. *See supra* section III.D.1. Therefore, Plaintiff's requested injunctive relief should be granted, which permanently

enjoins Foreign Defendants, as well as its principals and others acting on its behalf, from further use or facilitation of use the MARRIOTT Marks as detailed below.

## IV.    <u>Recommendation</u>

For the reasons outlined above, the undersigned recommends entry of default judgment for Plaintiff and against the Foreign Defendants. The undersigned finds that the pleadings and affidavits establish Plaintiff's right to a default judgment, as well as to a total statutory damages award of $8,000,000. The undersigned also recommends that Plaintiff receive the injunctive relief requested, including that Foreign Defendants, its principals, and those acting in concert or participation with the Foreign Defendants, be permanently enjoined from infringing Plaintiff's trademark rights, as outlined in Plaintiff's proposed order (ECF No. 238-1). The undersigned recommends that the remaining claims against all remaining defendants be dismissed without prejudice.

## V.    <u>Notice</u>

Through the Court's electronic filing system and by email and mail as described below, Vallarta Gardens and Cancun Ink are notified that objections to these proposed findings of fact and recommendations must be filed within 14 days of service of this proposed findings of fact and recommendations, and a failure to file timely objections waives appellate review of the substance of the proposed findings of fact and recommendations and waives appellate review of any judgment or decision based on this proposed findings of fact and recommendations.

Plaintiff is directed to email a copy of this proposed findings of fact and recommendations to Vallarta Gardens and Cancun Ink at the email addresses identified below and to file a certificate of service with the Court within 3 days.

**Vallarta Gardens**: carlosrivera@vallartagardens.com,

reservations@vallartagardens.com, memberservices@boutiqueprc.com,

memberservices1@boutiqueprc.com, info@boutiqueprc.com,

carlosrivera@kovaygardens.com, reservations@kovaygardens.com,

info@kovaygardens.com, memberservices1@kovaygardens.com, and

memberservices@kovaygardens.com

**Cancun Ink**: marketingdirector@resgo.net, reservations@resgo.net, and

customerservice@resgo.net.

The Clerk's office is directed to mail a physical copy of this proposed findings of fact and

recommendations to Vallarta Gardens and Cancun Ink at the physical addresses identified below.

**Vallarta Gardens:**

- Deep Blue Desarrollos S. de R.L. de C.V. d/b/a Vallarta Gardens Private

  Beach Club & Spa Private Residence Club

  Paseo Diaz Ordaz No. 530, Centro, Puerto Vallarta, Mexico;

- Carlos Rivera Miramontes

  703 Shook Ave San Antonio, TX 78212; and

- Kovay Gardens

  Km 1.2 Carr. Punta de Mita - La Cruz de Huanacaxtle

  Bahía de Banderas, Nayarit, México. C.P. 63734

**Cancun Ink:**

- Cancun Ink Corp. S.A. de C.V.

  ROSAS NO. 22 MZA. 24 SM. 22, Cancun Centro 77500 Benito Juarez,

  Quintana Roo, Mexico.

Entered this 28th day of August 2024.

_____
William B. Porter
Alexandria, Virginia                    United States Magistrate Judge